# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### DANVILLE DIVISION

GWENDOLYN SMALLS, as Administratrix
of the Estate of LINWOOD RAYMOND
LAMBERT, JR., deceased,

        Plaintiff,

                                        Civil Action No. 4:15CV00017

v.

CHIEF OF POLICE, JAMES W. BINNER,
COLONEL,
Individually and in his official capacity, et als.,

        Defendants.

## BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

James A. L. Daniel (VSB #03881)
Martha White Medley (VSB #21171)
Michael A. Nicholas (VSB #80749)
Counsel for Defendants
DANIEL, MEDLEY & KIRBY, P.C.
110 North Union Street
P. O. Box 720
Danville, VA 24543-0720
(434) 792-3911 Phone
(434) 793-5724 Facsimile
jdaniel@dmklawfirm.com
mmedley@dmklawfirm.com
mnicholas@dmklawfirm.com

# TABLE OF CONTENTS

I.     PROCEDURAL BACKGROUND..........................................................2

II.    FACTS..................................................................................................2

       a.  The SBPD Investigation of a Disturbance at the Super 8 Motel....................3
       b.  The Transportation of Mr. Lambert to the Halifax Regional Hospital............5
       c.  The Conduct of Mr. Lambert at the Halifax Regional Hospital....................6
       d.  The Findings of the Medical Examiner Upon Autopsy Examination of Mr.
           Lambert..........................................................................................9

III.   SUMMARY JUDGMENT STANDARD.....................................................11

       a.  Summary Judgment Generally...............................................................11
       b.  Qualified Immunity............................................................................12

IV.    ARGUMENT........................................................................................14

       a.  No Force was Used Against Linwood Lambert, Jr. Before Arrival at the
           Hospital..........................................................................................15
       b.  The Officers had the Authority to Arrest Linwood Lambert, Jr. after he
           Destroyed the Rear Passenger Window of the Police Vehicle.......................16
       c.  The Force Used Against Linwood Lambert, Jr. was Objectively Reasonable...17
       d.  The Officers did not Deny Linwood Lambert, Jr. Necessary Medical Care....28
       e.  No Actions of the Officers were the Proximate Cause of Linwood Lambert,
           Jr.'s Death.......................................................................................33
       f.  The Remaining Pendent State Law Claims Likewise Fail..........................34
       g.  Since the Officers did not Violate Linwood Lambert, Jr.'s Rights, no Vicarious
           Liability can be Attached to the Town of South Boston or any other
           Defendant........................................................................................35

V.     CONCLUSION.....................................................................................36

COME NOW Defendants, by counsel, and file this their Brief in Support of their Motion for Summary Judgment.

## I.     Procedural Background

Plaintiff filed her original Complaint on April 29, 2015 against Defendants alleging various civil rights violations under 42 U.S.C. §1983 and related state law claims.  ECF #1-0. By Order dated August 6, 2015, this Court limited discovery, allowing it to proceed but only as it concerns the individual officers named as defendants who interacted with Linwood Lambert, Jr. on May 4, 2013, and only on the question of whether or not they are entitled to qualified immunity.  Discovery related to any other Defendant or any other claim was stayed.  ECF #42.

By order dated August 10, 2015, this Court dismissed Plaintiff's Eighth Amendment claims against all Defendants as well as Plaintiff's conspiracy claims against all Defendants. Further, this Court dismissed the South Boston Police Department ("SBPD") as a party defendant.  The Court granted Plaintiff leave to amend her conspiracy claim.  ECF#45.

Plaintiff filed her Amended Complaint on August 10, 2015.  ECF#46.  By Order dated December 8, 2015, this Court dismissed Count IX (the conspiracy count) of the Amended Complaint and denied Plaintiff leave to amend.  ECF# 120.  By oral Order issued on December 7, 2015, this Court set December 16, 2015 as the deadline to file a motion for summary judgment on the issue of qualified immunity.  Defendants file said motion and brief herewith.

## II.     Facts

The pertinent and material facts of this case are straightforward and are memorialized on video and/or audio tapes recorded by the SBPD officers involved and/or the Halifax Regional Hospital's surveillance camera video and are easily divided into four phases: The SBPD investigation of a disturbance at the Super 8 Motel, the transportation of Mr. Lambert from the

2

Super 8 Motel to the Halifax Regional Hospital, the conduct of Mr. Lambert at the Halifax Regional Hospital, and the findings of the medical examiner upon autopsy examination of Mr. Lambert.

### a. The SBPD Investigation of a Disturbance at the Super 8 Motel

On May 4, 2013, at approximately 2:40am the South Boston Police Department dispatcher received a 9-1-1 call from a male caller who claimed to have an emergency at the Super 8 Motel in South Boston. See 9-1-1 dispatch tape, Exhibit 1; see also Exhibit 1A (SBPD Call for Service Record). The caller was very vague and did not give any identifying information. He told the dispatch operator that he was in room 223 of the Super 8 Motel. See incident report of Officer T.D. Clay dated 5-9-13, Exhibit 2 ("Clay Report").

Officers Travis Clay, Clifton Mann and Tiffany Bratton ("the Officers") were dispatched to the Super 8 Motel to investigate. Officer Clay arrived first at approximately 2:53am and spoke to Diane Posey, the manager on duty at the Super 8 Motel. Officers Bratton and Mann arrived shortly thereafter and all three officers went to room 223. Id. See also report of Officer T.N. Bratton dated May 4, 2013, Exhibit 3 ("Bratton Report"); report of Officer C. Mann dated May 6, 2013, Exhibit 4 ("Mann Report"). Officer Bratton knocked on the door to room 223. The occupant of the room, a white male, answered the door and informed the officers that he did not dial 9-1-1. Id. The Officers confirmed that the cell phone number of the occupant of Room 223 did not match the number from which 9-1-1 had been called, after which the officers left room 223. Id.

South Boston Police dispatch received another 9-1-1 call from the original, unknown male caller (later identified as Linwood Lambert, Jr.) at approximately 3:17am. The dispatcher advised the officers that it was the same voice from the first call and this time he gave his

3

location as room 123 of the Super 8 Motel. Id. All three officers returned to the Super 8 Motel and Officer Bratton knocked on room 123. The occupants of room 123, an elderly couple, informed the officers that they had not called the police. The Officers conducted a search of the surrounding area, including the parking lot, for any suspicious persons or vehicles, but their search turned up empty, and they left the Super 8 Motel at approximately 3:29am. Id.

At approximately 4:28am the same male caller dialed 9-1-1 again and informed the dispatcher that he would meet an officer in the hallway of the Super 8 Motel. The Officers returned to the Super 8 Motel and met with the night manager, who informed them that she believed the caller was residing in room 109 because she heard sounds from that room leading her to believe that the occupant was causing damage to the room. Id. Officers Clay and Mann arrived at room 109, and Officer Clay could hear the sound of metal banging coming from the room. Officer Mann knocked on the door and a black male answered. Id. This man identified himself as "Linwood". Officer Clay noticed glass on the floor and blood on the mattress. Id. The officers further noticed extensive damage to the room. See photographs of room 109 of the Super 8 Motel, attached hereto as Exhibit 5.

Officer Mann began to ask Lambert if he was in need of assistance. Lambert responded that "Someone was after him and that was not his blood in the room." Id. He further told the officers that "they had lights on him." When asked what type of lights he responded "those red lights." Officer Mann asked Lambert if he was bleeding and Lambert showed the officers his left hand that had smeared blood in between his ring and little finger. Id.

Officer Bratton then arrived on scene and Mr. Lambert was asked to stand in the hallway. He admitted that he had been drinking that evening. Id. While he was standing in the hallway, Officer Clay noticed that "he kept staring at the lights and kept saying that they were after him."

4

Id. Mr. Lambert's eyes "were constantly jumping as if they were constantly scanning for something." Id. At one point an unrelated individual exited a room from across the hall and Mr. Lambert told Officer Clay that "he didn't like that guy and that he was after him." Id.

After conducting a search of his room, Officer Clay informed Mr. Lambert that they were going to get him help. Mr. Lambert was placed in handcuffs for the purpose of transporting him for a psychological evaluation pursuant to an emergency custody order. As Mr. Lambert was escorted to Officer Clay's patrol vehicle he continued to comment on "the lights" and would stop walking if he thought a light was on him. Id. Lambert was placed into the rear of Officer Clay's patrol vehicle and Officer Clay began driving to the hospital where an on call representative of Southside Community Services (not an employee of Halifax Regional Hospital), Sharron Garrett , asked that Lambert be taken. Often the evaluation takes place at her office but given the time of night, the local hospital was an appropriate meeting place for Garrett to do her evaluation.

### b. The Transportation of Mr. Lambert to the Halifax Regional Hospital

While on the way to the hospital, for the psychological evaluation, Officer Clay informed Lambert that "we are not locking you up." Video of Officer T. Clay's Patrol Car, Exhibit 6, at 00:22. Officer Clay further informed Mr. Lambert that "what we're doing here is, we're going to take you to the emergency room to get you looked at to make sure you are good to go." Id. at 00:22 – 00:35. While in route to the psychological evaluation, Mr. Lambert continued to look around and move in the back seat. Clay Report at 4; Clay Video at 00:35 – 3:50. Nearly six minutes into the transport to the hospital, Mr. Lambert told Officer Clay that he noticed a car following them. Clay report at 5. Officer Clay told Mr. Lambert that "that's a cop behind us. That's my corporal behind us I promise you. Clay Video at 5:40 – 5:46.

5

### c. The Conduct of Mr. Lambert at the Halifax Regional Hospital

Approximately six and a half minutes after beginning the transport to the hospital, Officer Clay informed Mr. Lambert that they had arrived at the emergency room. Clay Video at 6:29. Officer Clay repeated that they were at the emergency room, and indicated to Mr. Lambert the emergency room sign. Id. at 6:34 – 6:37. Without any provocation or instigation, Linwood Lambert, Jr. leaned back on his back and raised his legs, with his feet pointing toward the rear passenger door window. Id. at 6:37. Officer Clay immediately responded by telling Mr. Lambert "Don't kick the window!" Id. at 6:41. Officer Clay repeated the command not to kick the window a second time. Id. at 6:42. He repeated the command a third time Id. at 6:43 and a fourth time. Id. at 6:44. Mr. Lambert did not heed these commands, and continued to kick at the rear passenger window in Officer Clay's patrol vehicle. Officer Clay commanded Mr. Lambert to "quit kicking the window." Id. at 6:45 – 6:47. Mr. Lambert not only failed to comply with the command, but he completely kicked out the rear passenger window of Officer Clay's patrol vehicle, shattering glass throughout the parking lot. See photographs of damaged police vehicle, attached as Exhibit 7; See also Halifax Regional Hospital Surveillance Video ("Hospital Video"), attached as Exhibit 8 at 7:55.

Officer Clay exited his patrol vehicle and opened the driver's side rear back door. He told Mr. Lambert to "calm down." Clay Video at 6:58. He repeated his command in a clear and loud voice. Id. at 7:03. Mr. Lambert told Officer Clay that he would calm down. Id. at 7:06. Officer Clay again informed Mr. Lambert that they were at the emergency room and that Mr. Lambert needed to calm down. Id. at 7:14. While Officer Clay was commanding Mr. Lambert to calm down, Officer Mann arrived at Officer Clay's cruiser to assist and opened the passenger side rear

6

door. Suddenly, Linwood Lambert escaped the police vehicle through the passenger side rear door (opened by Officer Mann). Id. at 7:28.

Rather than comply with Officer Clay's commands, Mr. Lambert lept from the back of the police cruiser and, despite still being handcuffed, ran towards the entrance doors to the hospital. Hospital video at 8:37 – 8:40; see also Video of Officer Clay's patrol car (forward facing) ("Clay Video 2"), attached as Exhibit 9 at 7:28 – 7:34. He struck the hospital entrance doors with such force and violence that the doors were dislodged from their tracks, and hospital personnel had to later reattach the doors in order for them to function properly. Id. at 15:12 – 21:20.

Only after Mr. Lambert refused to comply with multiple commands to calm down, to cease his aggressive and destructive behavior, as well as Mr. Lambert's decision to flee the officers and ram his entire body into the doors of the Halifax Regional Hospital did any officer on scene elect to deploy their Tasers.[1] Clay Video 2 at 7:35. After the initial Taser discharge, Mr. Lambert fell to the ground. Id. at 7:35. Despite repeated commands to "stay down" and to "stop," Mr. Lambert continued to defy the Officers' commands and refused to comply. Id. at 7:35 – 7:55. Mr. Lambert was specifically commanded to roll over on his stomach multiple times. Id. at 7:59 – 9:04. Despite these repeated commands, Mr. Lambert refused to roll onto his stomach. During this time period, both verbal commands, as well as the use of Tasers, were ineffective in controlling Mr. Lambert. Id.

In fact, when the officers attempted to secure Mr. Lambert in leg restraints, he immediately began resisting and kicking towards the officers. Id. at 9:05 – 9:59. Despite the use

---

[1] While the Taser usage logs of each officer (attached at Exhibits 10, 11, and 12, respectively) indicate when each unit was discharged and the duration of the discharge, it is clear that not all of the discharges impacted Mr. Lambert, or were effective or even felt by Mr. Lambert. See Deposition of T. Bratton at p.127-134, Exhibit 13; Report of John G. Peters ("Peters Report") attached as Exhibit 14 at p.11.

of both the Tasers and an ankle lock maneuver,[2] Mr. Lambert still refused to comply. Id.; see also Clay Report at p. 6. Both the use of Tasers and manual pain compliance techniques were ineffective in getting Mr. Lambert under control and getting him to comply with the officers' directions.

Once his legs were shackled, Mr. Lambert informed the officers that he had just "done cocaine." Id. at 9:59. The officers informed Mr. Lambert that he was under arrest. Id. Approximately 1:53 minutes elapsed from the time Mr. Lambert was informed he was under arrest until the officers brought Mr. Lambert to his feet. During that time, Mr. Lambert was conscious, coherent, expressive, and communicating with the officers. Id. at 10:00 – 11:53. Mr. Lambert was not tased during this time period. Once the officers got Mr. Lambert to his feet, they attempted to escort him to the back of Officer Clay's cruiser. Mr. Lambert attempted to drag his feet and delay the officers in that attempt. Id. at 11:53 – 12:00.

When Mr. Lambert was finally placed back into the same police cruiser with the window he had just destroyed, he continued to move around the back seat despite being in handcuffs and leg restraints. Id. at 12:49 – 17:39. In order to secure him with a seatbelt for transport, the officers told Mr. Lambert to put his feet down on the ground.[3] Id. at 17:41. The request to "put your feet down" was repeated several times. Id. at 17:41 – 18:00. Despite the repeated directions, Linwood Lambert, Jr. refused to comply. Id. Mr. Lambert refused to comply with the request to "sit up" even when a Taser was placed against his shoulder (but not yet deployed). Id. at 18:00 – 18:07. Mr. Lambert was then told, repeatedly, to sit up in the back seat of the car. He was even warned that if he did not sit up he would be tased again. Mr. Lambert still refused

---

[2] An "ankle lock" is a pain compliance technique "when you push up on the Achilles tendon and push down on the toes, to get away from the pain, the subject will flip on their belly. They actually flip themselves over tying to get away from the pain." Clay Deposition, Exhibit 15, at p.191.

[3] At this time, Mr. Lambert was sticking his feet outside of the shattered window of Officer Clay's cruiser, and the Officers' commands to put his feet "down on the ground" was in response to this action.

to comply. Id. at 18:07 – 18:53. It was not until Officer Mann entered the vehicle that he was able to place Mr. Lambert in a seatbelt, but even that maneuver met with resistance from Linwood Lambert, Jr. Id. at 19:19 – 20:00. While Officer Mann was attempting to secure Mr. Lambert in the seatbelt, Mr. Lambert attempted to bite Officer Clay. Id. at 20:00 – 20:08.

Once Mr. Lambert was secure in the back seat of the police cruiser, Mr. Lambert was transported to the Blue Ridge Regional Jail. Once at the jail, Officers Mann and Clay recognized that Mr. Lambert had become unresponsive. Id. at 28:50. Mr. Lambert was transported back to the Halifax Regional Hospital by the local rescue squa where he was pronounced dead.

That same day, Colonel James Binner, Chief of Police of the South Boston Police Department, requested that the Virginia State Police investigate the circumstances surrounding the death of Linwood Lambert, Jr. Deposition of Dennis Barker, Exhibit 16, at p.51. The Virginia State Police took over the investigation on May 4, 2013, and evidence regarding the events of that morning was turned over to the State Police. Id.

### d. The Findings of the Medical Examiner Upon Autopsy Examination of Mr. Lambert.

On May 6, 2013 Dr. Jennifer Bowers with the Virginia Office of the Chief Medical Examiner conducted an autopsy on Linwood Lambert, Jr. In her report, Dr. Bowers concluded that the cause of death of Linwood Lambert, Jr. was "acute cocaine intoxication." Report of Dr. Jennifer Bowers, attached as Exhibit 17 at p.1. The manner of death was ruled an "accident" by Dr. Bowers. Id. Further, Dr. Bowers noted that:

> "Postmortem toxicology analysis revealed cocaine, benzoylecgonine (a cocaine metabolite), and ethanol, which reflect the history reported by police and the medical record. The presence of cocaine and benzoylecgonine metabolite indicate the decedent recently ingested cocaine and the active metabolite was indeed active at the time of his arrest. No upper or lower lethal limit has been established for cocaine due to individual tolerance and lack of clinical correlation with levels in the blood. The decedent's symptoms (psychosis) and combativeness before suddenly becoming unresponsive reflect cocaine induced

9

psychosis or cocaine excited delirium as a result of acute cocaine intoxication as the cause of sudden death in this case. The hallmark of this diagnosis was the extremely low concentration of cocaine in the admission blood samples, psychotic symptoms, and violent behavior followed by sudden and unexpected cardiorespiratory collapse."

Id. Dr. Bowers' report included an analysis of the evidence of Taser use by police. Id. at p. 2. (noting that "external examination revealed three punctures, suggestive of Taser barb sites, on the right and left flanks"). Dr. Bowers ultimately found, however, that Mr. Lambert's "epidermis and dermis did not display hyalinzed collagen or a 'swiss cheese' appearance consistent with electrical or thermal injury." Id. Dr. Bowers ultimately concluded that "the only remaining factor that can cause sudden death was cocaine (in its active form), which ultimately was responsible for [Linwood Lambert, Jr.'s] death." Id.

On December 14, 2015, the Medical Examiner, Dr. Bowers, was examined in a deposition by the plaintiff's attorney in this matter. Since DR. Bowers offered her initial report, she has determined that some clarification as to the cause of death may be necessary.

However, during the course of her deposition, Dr. Bowers ultimately testified as follows:

Mr. Daniel, as counsel for Defendants, asked Dr. Bowers if the components of tasing, arrest and the restraining of Lambert in the backseat of the police cruiser were eliminated but Mr. Lambert had ingested cocaine, would Dr. Bowers be of the opinion that Mr. Lambert would have died on May 4, 2013? Dr. Bowers' answer was "yes".

Further, Mr. Daniel asked Dr. Bowers if one were to take out the cocaine variable but leave in the tasing of Lambert, his arrest and his restraint in the backseat of the police cruiser, would he have died on the date in question? Dr. Bowers responded that we may never know; however, she does not think based on those factors alone Lambert would have died.

Thus, a fair reading of her report, coupled with her deposition, clearly proves that the Officers' actions did not directly cause Linwood Lambert, Jr.'s death in the opinion of the Medical Examiner.

### III.     Summary Judgment Standard

Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure is governed by general principles as well as the doctrine of qualified immunity.

#### a.  Summary Judgment Generally

Summary judgment is appropriate when a court, viewing the record as a whole in the light most favorable to the nonmoving party, determines that there exists no genuine issue of material fact and that the moving party is entitled to summary judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986); see also F. R. Civ. P. 56. If the moving party produces evidence suggesting that there is not a genuine and material dispute, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts", as the existence of a scintilla of evidence is insufficient to defeat a motion for summary judgment. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., et al., 475 U.S. 574, 586 (1986); Catawba Indian Tribe of S.C. v. South Carolina, 978 F.2d 1334, 1339 (4th Cir. 1992). While the nonmoving party is entitled to have the facts viewed in the light most favorable to their cause, a motion for summary judgment "requires the nonmoving party to go beyond the pleadings…and designate specific facts showing that there is a genuine issue for trial." Celotex Corp., 477 U.S. at 324 (internal quotation marks omitted). The nonmoving party must demonstrate specific facts, as opposed to general allegations, that present an issue worthy of trial. See Lujan Defenders of Wildlife, 504 U.S. 555, 566-67 & note 3 (1992).

In so designating specific facts and issues to be determined at trial, the nonmoving party

Case 4:15-cv-00017-JLK-RSB   Document 129   Filed 12/16/15   Page 12 of 39   Pageid#: 1467

must indicate facts which are material and issues which are genuine. <u>See</u> <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986); <u>Guinness PLC v. Ward</u>, 955 F.2d 875, 882 (4th Cir. 1992). Disputed facts are "material" only if they are necessary to resolving the case, and issues are "genuine" only if based on more than speculation or inference. <u>Thompson Everett, Inc. v. National Cable Advertising, L.P.</u>, 57 F.3d 1317, 1323 (4th Cir. 1995); <u>See</u> <u>Hux v. City of Newport News, Va.</u>, 451 F.3d 311, 315 (4th Cir. 2006) ("[T]he genuineness and materiality requirements express the sound proposition that litigation for its own sake is not a judicious use of resources.").

Where the record indicates that no rational trier of fact could find for the nonmoving party, summary judgment is appropriate. <u>Matsushita</u>, 475 U.S. at 587.

### b. Qualified Immunity

"Qualified Immunity is 'an entitlement not to stand trial or face the other burdens of litigation.'" <u>Brown v. Gilmore</u>, 278 F.3d 362, 366-67 (4th Cir. 2002) <u>citing</u> <u>Mitchell v. Forsyth</u>, 472 U.S. 511 (1985).

In a suit against an officer for an alleged violation of a constitutional right, the requisites of a qualified immunity defense must be considered in proper sequence. Where the defendant seeks qualified immunity, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive. Qualified immunity is 'an entitlement not to stand trial or face the burdens of litigation.' <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). The privilege is 'an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.' <u>Id</u>. As a result, "we repeatedly have stressed the importance of

12

resolving immunity questions at the earliest possible state in litigation." Hunter v. Bryant, 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (*per curiam*); Saucier v. Katz, 533 U.S. 194, 200-01 (2001) (emphasis in original). [4] Saucier established a two-prong test to determine whether or not police officers enjoy qualified immunity. First, a court must determine "whether a constitutional right would have been violated on the facts alleged." Brown v. Gilmore, 278 F.3d 362, 367 (4th Cir. 2002) (internal citations omitted). Second, the court must determine "whether the right was clearly established at the time such that it would be clear to an objectively reasonable officer that his conduct violated that right." Id. at 367 (internal citations omitted); Harlow v. Fitzgerald, 457 U.S. 800 (1982). "If no constitutional right would have been violated, even when the facts are viewed in the best light for the injured plaintiff, the analysis ends; the plaintiff cannot prevail." Jones v. Buchanan, 325 F.3d 520, 526 (4th Cir: 2003).

The gravamen of Plaintiff's allegations revolve around two central themes: that Officers Bratton, Clay and Mann were excessive in their use of force against Linwood Lambert, Jr. on May 4, 2013 (and as such deprived him of his Fourth Amendment right against unreasonable seizure) and that the officers denied him necessary medical care.

Defendants contend that even in the light most favorable to Plaintiff, the evidence when taken as a whole does not warrant abrogation of qualified immunity.

---

[4] Saucier has been subsequently overruled in part by Pearson v. Callahan, 555 U.S. 223, 172 L. Ed. 2d 565 (2009). In Pearson, the Court held that "while the sequence set forth there is appropriate, it should no longer be regarded as mandatory. The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand. Id. at 576. The Court went on to further state that "Although we now hold that the Saucier protocol should not be regarded as mandatory in all cases, we continue to recognize that it is often beneficial. For one thing, there are cases in which there would be little if any conservation of judicial resources to be had by beginning and ending with a discussion of the 'clearly established' prong." Id.

## IV.    Argument

On May 4, 2013, Officers Bratton, Clay and Mann ("the Officers") encountered a destructive, and violent individual whose actions were unpredictable in the person of Linwood Lambert, Jr.  While taking him to the Halifax Regional Hospital (the location requested by Sharron Garrett) for a mental evaluation pursuant to an Emergency Custody Order, Mr. Lambert, despite having his hands cuffed behind his back, became extremely violent, kicking out and shattering the rear passenger door window of a police vehicle, repeatedly refusing to obey verbal commands to stop, running out of the police vehicle, fleeing the officers, and smashing his body into the doors of the Halifax Regional Hospital with such force that he dislodged the doors from their tracks.

Being confronted with this violent and aggressive behavior, the Officers appropriately deployed non-lethal force in the form of Tasers and "hands-on" compliance techniques.  As is clear in the videos of the incident, even when confronted with Tasers (which were ineffective in many respects) and physical "hands-on" compliance techniques, Mr. Lambert remained non-compliant, out of control and potentially dangerous, both to himself and to the Officers, and to members of the public who may have been in the vicinity of the Hospital's emergency department.

The conduct of Officers Bratton, Mann and Clay in arresting Mr. Lambert, the force used to effectuate that arrest, and their decision to transport him to the Blue Ridge Regional Jail were all well within constitutional norms with respect to use of force and the safe transport of arrestees to the local jail.  Further, the officers were not presented with any obvious signs of medical distress that would be readily apparent to any person with no diagnostic or medical training, thus

Case 4:15-cv-00017-JLK-RSB   Document 129   Filed 12/16/15   Page 15 of 39   Pageid#: 1470

their decision to transport Mr. Lambert to the regional jail, a secure facility, and with a nurse which the Officers believed was on duty, was objectively reasonable.

### a. No Force was Used Against Linwood Lambert, Jr. Before Arrival at the Hospital

In evaluating Plaintiff's excessive force claim, it is critical to evaluate the context of the entire encounter the Officers had with Linwood Lambert, Jr. When the Officers arrived on scene at the Super 8 Motel for the third time, they encountered Mr. Lambert and observed damage to his hotel room. Clay Report; <u>see also</u> Exhibit 5 (the photographs of Super 8 Motel Room 109). When interacting with Mr. Lambert, the Officers found his responses to be strange and inapplicable to the situation they observed. For example, Mr. Lambert stated that someone was after him and that was not his blood in the room." <u>Id.</u> He further told the officers that "they had lights on him." When asked what type of lights he responded "those red lights." Officer Mann asked Lambert if he was bleeding and Lambert showed the officers his left hand that had smeared blood in between his ring and little finger. <u>Id.</u>

Even though the damage to the room and Mr. Lambert's sole presence in that room would have constituted probable cause for seeking an arrest warrant for violation of Virginia Code §18.2-137(B),[5] the Officers elected instead to transport Mr. Lambert for a mental evaluation. The mental health professional on call requested they bring him to the hospital (rather than her office) and Mr. Lambert went voluntarily with the officers for this evaluation. <u>See</u> Second Amended Complaint at para. 72. Thus, even though the Officers had sufficient probable cause to request an arrest warrant for Mr. Lambert, they not only refrained from using

---

[5] Va. Code §18.2-137 provides that any person who intentionally destroys property not his own is guilty of a criminal offense. The grade of offense depends on the value of the property damaged. A violation of this section is a Class 1 misdemeanor if the value of the damaged property is less than $1,000, or a Class 6 felony if the value of the damaged property exceeds $1,000.

any real force against him, but rather requested, and received consent, to transport him to the hospital (the location suggested by Sharron Garrett) for a psychological evaluation.

Mr. Lambert's unusual behavior continued during the transport to the hospital. See Section II(b) supra. Still, at this point, the Officers had no reason to use force against Mr. Lambert nor did they employ any force against Mr. Lambert. Thus, no constitutional claim for excessive force is alleged in the Second Amended Complaint, nor lies against any Defendant for their conduct , prior to the arrival at the Halifax Regional Hospital when Lambert went completely out of control.

### b. The Officers had the Authority to Arrest Linwood Lambert, Jr. after he Destroyed the Rear Passenger Window of the Police Vehicle

Plaintiff makes the bold and factually unsupported claim in Count VIII of her Second Amended Complaint that "Defendants, Corporal Tiffany Bratton, Officer Clifton Mann, and Officer Travis Clay arrested Plaintiff's decedent without a warrant and without probable cause." Second Amended Complaint at para. 163. Defendants concede that the Officers did not have a warrant when they placed Linwood Lambert, Jr. under arrest. However, it is black letter law in Virginia that sworn police officers "may arrest without a warrant any person who commits *any crime* in the presence of the officer and any person whom he has reasonable grounds or probable cause to suspect of having committed a felony not in his presence." Va. Code §19.2-81(B).

In the instant case, the officers did not attempt to place Linwood Lambert, Jr. under arrest until *after* he destroyed the rear passenger window of Officer Clay's police cruiser. See Hospital Video at 7:55. This destruction of property clearly meets the definition of Virginia Code §18.2-137(B). Assuming that the value of the window was less than $1,000 (making the crime a misdemeanor), Mr. Lambert clearly committed the action in the presence of Officer Clay, thus

16

permitting Officer Clay to arrest Mr. Lambert under the provisions of Va. Code §19.2-81(B). The question of whether excessive force was used in effectuating that arrest is a separate claim and a separate issue. What cannot be disputed, based on these facts, is the conclusion that the Officers had sufficient probable cause to place Linwood Lambert, Jr. under arrest, having observed him destroy property not belonging to him in their presence. Accordingly, summary judgment in Defendants' favor is appropriate on Count VIII of Plaintiff's Second Amended Complaint.

### c. The Force Used Against Linwood Lambert, Jr. was Objectively Reasonable

Plaintiff claims in Counts I and IV of her Second Amended Complaint that the Officers violated Linwood Lambert, Jr.'s civil rights, namely his Fourth Amendment right against unreasonable seizure, when they allegedly used excessive force in dealing with him.

Excessive force claims under 42 U.S.C. §1983 are analyzed under a constitutional framework. "§1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred. In addressing an excessive force claim brought under §1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." Graham v. Connor, 490 U.S. 386, *393-*394 (1989) (internal quotation marks and citations omitted). "In most instances, that will be either the Fourth Amendment's prohibition against unreasonable seizures of the person, or the Eighth Amendment's ban on cruel and unusual punishments…". Id. at *394.

The test of the reasonableness of the force used is an objective one. Id. at *397 ("the reasonableness inquiry in an excessive force case is an objective one: the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. An officer's evil intentions will not

Case 4:15-cv-00017-JLK-RSB   Document 129   Filed 12/16/15   Page 18 of 39   Pageid#: 1473

make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.").

Fourth Amendment jurisprudence has long recognized that the right to make an arrest necessarily carries with it the right to use some degree of physical coercion or threat of coercion to effect it. <u>See</u> <u>Terry v. Ohio</u>, 392 U.S. 1, 22-27 (1968). The proper question, therefore, is not whether the Officers were entitled to use force – they were – rather, the inquiry rests on whether or not the Officer's particular use of force was objectively reasonable given the circumstances.

"The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." <u>Bell v. Wolfish</u>, 441 U.S. 520, 559 (1979). Rather, the "proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." <u>Graham v. Connor</u>, 490 U.S. at 396; <u>see also</u> <u>Tennessee v. Garner</u>, 471 U.S. 1, 8-9 (1985) (the question is "whether the totality of the circumstances justifie[s] a particular sort of…seizure.").

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight…With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation.

<u>Graham v. Connor</u>, 490 U.S. at 396-97 (internal citations omitted).

In evaluating a use of force involving Tasers, the Fourth Circuit has held that the use of Tasers "in general, is more than a non-serious or trivial use of force," however it is "less than deadly force." <u>Thomas v. Holly</u>, 533 Fed. Appx. 208, 217 (4th Cir: 2013) (internal citations omitted).

18

Even though the qualified immunity inquiry "focuses on the objective facts, the immunity inquiry must be filtered through the lens of the officer's perceptions at the time of the incident in question." Id., quoting Sevigny v. Dicksey, 846 F.2d 953, 957 (4th Cir. 1988). Two purposes are served by viewing the facts through this lens. "First, using the officer's perception of the facts at the time limits secondguessing the reasonableness of actions with the benefit of 20/20 hindsight. Second, using this perspective limits the need for decision-makers to sort through conflicting versions of the "actual" facts, and allows them to focus instead on what the police officer reasonably perceived." Id., citing Gooden v. Howard County, Md., 954 F.2d 960, 965 (4th Cir. 1992) (en banc). "In sum, the officer's subjective state of mind is not relevant to the qualified immunity inquiry but his perceptions of the objective facts of the incident in question are." Id.

The Fourth Circuit provided a detailed use of force analysis involving Tasers in Meyers v. Baltimore County, Md., 713 F.3d 723 (4th Cir: 2013). In Meyers, police were called by the family members of Ryan Meyers to their home to handle a domestic disturbance. When they arrived the police encountered Mr. Meyers acting erratically, holding a baseball bat and advancing toward the officers. In that situation, a police officer deployed three Taser shocks (in probe mode) to Mr. Meyers, causing him to fall to the ground only after the third shock. Id. at 733. The Court concluded that the three applications of the Taser on Mr. Meyers were objectively reasonable and did not violate Meyer's Fourth Amendment rights. Id.

However, the police officer in Meyers did not stop with the initial three Taser applications. The police officer shocked Mr. Meyers an additional seven times.[6] Of the ten applications of a Taser on Mr. Meyers, the first four were in probe mode and the last six were in

---

[6] This is another distinct difference between Meyers and the instant case. According to the Medical Examiner in her deposition, based on her review of the video evidence, Mr. Lambert received, at most, three complete and effective applications of Taser in probe mode resulting in "temporary paralysis."

drive stun mode. The Court held that "the evidence showed that the justification for Officer Mee's first three uses of his Taser had been eliminated after Ryan relinquished the baseball bat and fell to the floor. At that point, several officers sat on Ryan's back, and Ryan only was able to move his legs." Id. At most, the Court found, Mr. Meyers "stiffened his body, keeping it rigid while he was on the ground." Id. The Court concluded that "after Ryan [Meyers] fell to the floor, he no longer was *actively* resisting arrest, and did not pose a continuing threat to the officers' safety. Id. (emphasis added). Despite these conditions, the officer in Meyers continued "to use his [T]aser until he had rendered Ryan [Meyers] unconscious." Id. The Court held that qualified immunity did not apply to the latter seven applications of the Taser against Mr. Meyers (six of which were in drive stun mode).

Unlike the facts in Meyers, the evidence in the instant case clearly leads to a starkly different conclusion. While, like in Meyers, Linwood Lambert, Jr. was tased, several important and dispositive factors distinguish both the actions of Mr. Lambert from the actions of Mr. Meyers as well as the actions of the Officers from the actions of the officer in Meyers.

First, unlike Ryan Meyers, who merely demonstrated a *potential* threat to the officers and to the surrounding property, Linwood Lambert, Jr. *actually* committed a crime in the Officers' presence by violently shattering the rear passenger door window of Officer Clay's police cruiser. See Hospital Video at 7:55; see also Va. Code §18.2-137(B). By violently and completely destroying the rear passenger window of Officer Clay's police cruiser, and then ramming into the hospital entrance doors, Linwood Lambert, Jr. displayed both the ability and willingness to use violence in destruction of property, and presented an actual threat to the safety of the Officers, any hospital personnel and any citizens that might have been in the vicinity. Despite the fact that he was in handcuffs, "Lambert's behavior indicates that he was not under control at the time he

20

kicked out the patrol car window then shortly thereafter, ran from the officers." Report of John Combs ("Combs' Report), Exhibit 18, at p.8. "At this point, verbal commands had not been successful, nor did it appear from the way the officers' reports described Lambert's behavior, they would be." Id. Mr. Combs' conclusion is supported by the video evidence, where Mr. Lambert refuses every request to "calm down" and to "stop kicking the window." See Section II(c), supra. see also Bratton Deposition at pp. 76-77 ("Mr. Lambert was in control then out of control. The likelihood that he would again go back out of control was high. So there was a propensity for imminent violence, so it was not a controlled setting").

Second, unlike Meyers, "not only had verbal instructions failed to gain control of [Linwood Lambert, Jr.], but even several Taser deployments were ineffective. This certainly indicates that [Linwood Lambert, Jr.] was not under control, making it reasonable to continue to use Taser deployments and other physical control techniques until resistance has ceased." Combs' Report at p.8. It is clear from the video evidence that even after the application of the Tasers, Mr. Lambert was not only failing to comply with the Officers' commands, but was actively resisting any attempt to place Mr. Lambert under arrest or to secure his person. See Section II(c), supra.

More specifically, and in contrast to Meyers, not all of the Taser discharges from the Officers had an impact upon Linwood Lambert, Jr. "If one probe does not make contact with the target in probe mode, the electrical circuit is not completed and therefore produces not [sic] neuromuscular incapacitation (NMI) on the individual." Report of Dr. John Peters ("Peters' Report"), Exhibit 14 at p.11. Officer Bratton herself confirmed that she did not believe her initial Taser application had been effective. Bratton Deposition at pp.127-134 as evidenced by the arcing sound and visible sparks visible on the video. See Clay Video 2 at 8:17. Tasers have

21

long been recognized as being "designed specifically to protect the safety of law enforcement officers performing their official duties in arresting or otherwise taking into custody…unpredictable, resisting, struggling, assaultive, and/or potentially violent criminal suspects or those in need of…hav[ing] their assaultive behaviors thwarted." Peters' Report at p.11. Further, Tasers "are a safe and recommended force intervention tool that will assist law enforcement officers in the capture of individual [sic] who are suspected of being mentally unstable." Id. at p.10. However, if a circuit is not completed, then the Taser application has no force or effect whatsoever on the subject. In the instant case, although there were multiple Taser deployments, not every deployment actually affected Mr. Lambert.

The fact that two Tasers were deployed at the same time does not mean that Mr. Lambert was subjected to double the amount of electricity from the Taser probes. "Electricity is not cumulative, and does not build-up in the body like poison. Mr. Lambert was not subjected to 100,000 volts of electricity as alleged in Plaintiff's Amended Complaint." Peters' Report at p.16.

Unlike in Meyers, Linwood Lambert, Jr. was not tased when he was under the control of the Officers. Even when two of the Officers had their bodies pressed against Mr. Lambert, while Mr. Lambert was on the ground, it is plainly obvious that Mr. Lambert was still actively resisting with both his legs (attempting to kick the officers) and his upper body (continuing to struggle and resist). See Clay Video 2 at 9:06 – 9:48. Even if Mr. Lambert had been tased during that time period, such tasing is easily distinguished from Meyers, where Mr. Meyers merely "stiffened his body." Meyers, 713 F.3d at 733.

Third, unlike in Meyers, where the officer deployed his Taser with such frequency that Mr. Meyers lost consciousness, Linwood Lambert, Jr. never lost consciousness during, or

immediately after, any application of a Taser. The video evidence clearly shows Mr. Lambert remained alert and conscious after being tased in front of the hospital doors. See Clay Video 2 7:30 – 12:00. He even resisted the Officers' attempts to get him into the police vehicle. Id. at 11:52. When Mr. Lambert was finally placed back into the police cruiser, he was able to move around the back seat despite being in handcuffs and leg restraints. Clay Video at 12:49 – 17:39. Mr. Lambert refused to comply with the command to "sit up" even when a Taser was placed against his shoulder (but not yet activated). Id. at 18:00 – 18:07. It was not until Officer Mann entered the vehicle that he was able to place Mr. Lambert in a seatbelt, but even that maneuver met with resistance from Linwood Lambert. Id. at 19:19 – 20:00. While Officer Mann was attempting to secure Mr. Lambert in the seatbelt, Mr. Lambert attempted to bite Officer Clay. Id. at 20:00 – 20:08. All of these actions on the part of Linwood Lambert, Jr. stand in stark contrast to Meyers, where Ryan Meyers was unconscious for several applications of the Taser. In the instant case, Linwood Lambert, Jr. "continued to resist the officers even after he had been taken to the ground and was refusing to obey numerous verbal instructions during the attempt to get him under control. [Mr. Lambert] continued to further physically resist the officers while being moved to and placed into the patrol car, and had to be stunned with the Taser in drive stun modes." Combs' Report at pp.8-9. Given Mr. Lambert's own conduct, the Officers' conduct was not "unnecessary, gratuitous and disproportionate force," nor were the Officers trying to "seize a secured, unarmed citizen." Meyers, 713 F.3d 723, at 734.

Fourth, unlike Meyers, Linwood Lambert, Jr. was never under the control of the officers. Upon arrival at the hospital Mr. Lambert demonstrated that he was a threat to himself, other citizens and the Officers through his violent destruction of the police vehicle window, his refusal to obey commands and his charging into the entrance doors to the hospital. See Peters' Report at

p. 13. Additionally, even when handcuffed and in leg irons in the back of the police vehicle, Linwood Lambert, Jr. was not under control. "Force is used based upon the behavior of the handcuffed individual. If the handcuffed person complies with directions and instructions given by the officers, there may be no further need to use force other than to direct the individual. However, if the individual fights with the officer(s), then using other force options, including a Taser ECW, is consistent with training." Id. at p. 15. In the instant case, the video evidence clearly demonstrates that at no time did Linwood Lambert, Jr. comply with a command *prior* to a use of force application, including the use of a Taser. In fact, multiple uses of the Taser failed to achieve the intended result of bringing Mr. Lambert's under control.

Each officer, under intense questioning and scrutiny during their respective depositions testified as to the difference between restraint and control. See e.g. Deposition of Clayton Mann, Exhibit 19 ("Mann Deposition") at p. 86-87:

> "Q: And if an individual is handcuffed and unarmed, what kind of threat do they pose to the rest of the public that would deprive them the opportunity to receive medical attention?
> A: Well, the size of the person. As you could see on the video, you know, when he ran into the doors, the doors broke. And I mean, the size of the person. He could use his feet, his hands – well, his feet, his mouth, his head, and just the sheer size of the person. He was huge. I mean, he was a big guy.

see also Mann Deposition, Volume 2 at p.8:

> "Q: Okay. And what constitutes full restraint?
> A: Full restraint would be – I mean, you would have handcuffs, leg restraints. The person is being cooperative and complying with what you're saying. He's not out of control. You actually got hands on the subject and you're able to control the subject and restrain his movements. If you control him, to me, that's being restrained.
> Q: So just to make sure I understand you correctly, an individual needs to be handcuffed, compliant, and under the officer's physical control in order to be fully restrained?
> A: Yes, sir."

see also Clay Deposition at pp. 120-121:

> "Q: What's the difference between an individual being restrained and under control?

24

A: Under control the person is – they pose no threat to themselves or the officers or the public. Being restrained, they can be handcuffed, they could be seat belted or they – shackles. That's the difference between restrained and under controlled [sic]. Somebody can be under control but they're not handcuffed either.

Q: Can someone be restrained and not under control?

A: Yes"

see also Clay Deposition at pp. 121-122 (responding to an accusation that the deployment of Tasers in the instant case violated specific SBPD policy):

"Q: Okay. So if someone's handcuffed, the're restrained?

A: That's correct.

Q: So please go to page 5 of the policy [ADM.112. attached as Exhibit 20]. The policy states that 'the use of Air Taser is no longer justified, once the subject has been restrained or is under control.' Did I read that correctly?

A: That's exactly, yes, sir.

Q: Oka. So sir, based upon this policy, even the first use of the Taser was not justified, because Mr. Lambert was handcuffed and by your own admission restrained; correct?

A: He – he was restrained.

Q: So pursuant to this policy, even the first use of the Air Taser violated policy; correct?

A: He was not under control.

Q: But it says, 'The use of an Air Taser is no longer justified, once the subject has been restrained or is under control'; correct? It does not say 'and.'

A: Yes, sir.

Q: Okay.. So was the use of the Taser the first time on Mr. Lambert, did that violate the policy, the way it is worded here on ADM.112?

A: No.

Q: Okay, and why is that?

A: Like I said, at this particular time the suspect, when he got away from the other officers and ran into the emergency room, he was not under control. He posed a threat to himself, he posed a threat to the public, he posed a threat to the other officers."

see also Bratton Deposition at pp.83-84:

"Q: Okay. So your – is your testimony that he was resisting up until the minute that you left for the jail?

A: My testimony is he was resisting up until the point where Officer Mann and Officer Clay actually got him a seatbelt, he sat up, and we were able to leave the parking lot.

Q: Okay. So at the point where they had secured him in the seatbelt and he's sitting up, is he restrained and under control at that point in time?

A: Yes."

The common denominator that runs throughout the entire encounter with the Officers and Linwood Lambert, Jr. is that Mr. Lambert was never under the control of the officers until he

25

was secured (seatbelted) and restrained (handcuffed and leg shackles) in the back of Officer Clay's patrol car *and* was compliant with the Officers' commands. **No force was used against Mr. Lambert once he was secured, restrained, *and* compliant.**

These facts not only distinguish the instant case from <u>Meyers</u>, but also serve as the basis for qualified immunity in their own right. Courts must consider "the salient events in full context, with an eye toward the proportionality of the force in light of all the circumstances." <u>Id.</u> (internal citations omitted). When so considering the salient events in full context, "Subjective factors involving the officer's motives, intent, or propensities are not relevant. The objective nature of the inquiry is specifically intended to limit examination into an officer's subjective state of mind, and thereby enhance the chances of a speedy disposition of the case. <u>Rowland v. Perry</u>, 41 F.3d 167, 173 (4th Cir: 1994), <u>citing</u> <u>Hunter v. Bryant</u>, 502 U.S. 224, 112 S. Ct. 534, 536-37, 116 L. Ed. 2d 589 (1991).

Even though the inquiry "focuses on the objective facts, the immunity inquiry must be filtered through the lens of the officer's perceptions at the time of the incident in question." <u>Id.</u>, quoting <u>Sevigny v. Dicksey</u>, 846 F.2d 953, 957 (4th Cir. 1988).

The crimes at issue, in full context, include destruction of property (at both the Super 8 Motel and the police vehicle) as well as disorderly conduct, in violation of Virginia Code §18.2-415. While, in the light most favorable to Plaintiff, all the crimes at issue are misdemeanors, they involve the destruction of property and the propensity toward violence, leading directly into another factor: the safety of the Officers and the public. It is clear from the factors enumerated above that Mr. Lambert's conduct constituted a continuing threat to the officers until he was under their control. At no time did the officers use force against Mr. Lambert when he was restrained and under their control. As Officer Bratton testified, "Mr. Lambert was in control and

26

then out of control and then in control and then out of control. The likelihood that he would again go back out of control was high. So there was a propensity for imminent violence, so it was not a controlled setting". Bratton Deposition at pp. 76-77.

Further, it is clear from the video evidence that Mr. Lambert continually resisted being placed under arrest by the officers through physical non-compliance. Finally, to the extent that Plaintiff's death is a consideration (as it should be), there is no evidence whatsoever in the record that the direct proximate cause of Plaintiff's death was the conduct of these Officers.[7] As the Medical Examiner made clear in her report, and then clarified and reaffirmed in her deposition, in her opinion, Linwood Lambert Jr. would have died from his cocaine ingestion whether or not the Officers took the actions they did on May 4, 2013.

Even when looking at the extent of Mr. Lambert's injuries in the light most favorable to Plaintiff, at best they reveal a superficial cut on Mr. Lambert's head. See Exhibit 21. The Medical Examiner's report reflects the fact that there were no injuries to Mr. Lambert's brain and there were no internal injuries.

The Medical Examiner did find some abrasions and cuts on other parts of Mr. Lambert's body. However, counsel represents that she testified in her deposition that all the injuries were relatively minor and would not have required immediate medical attention.

There is no evidence in the record that suggests that this injury required immediate medical attention or caused his death. Thus the "extent of injury" to Linwood Lambert, Jr., was, as far as can be proved on this record, superficial. It is clearly established that *de minimus* injuries do not give rise to 42 U.S.C. §1983 liability. See Martin v. Gentile, 849 F.2d 863, 869 (4th Cir: 1988) (holding that a full context analysis of any given use of force will deem officers liable for only objectively unreasonable applications of force.); see also Tennessee v. Garner,

---

[7] For a more complete discussion of this point, see Section IV(d), infra.

471 U.S. 1, 8-9 (1985) (explaining that the proper analysis is whether the totality of circumstances justifies the particular seizure at issue).

Given all of the factors articulated in Meyers, Graham and their progeny, and applying those considerations to the facts of the instant case, it is clear that the force employed by Officers Bratton, Clay and Mann on May 4, 2013 against Linwood Lambert, Jr. was objectively reasonable. Even if the Court finds that the Officers violated certain constitutional rights, they are nonetheless entitled to qualified immunity if a reasonable person in the officers' position "could have failed to appreciate that his conduct would violate those rights." Torchinsky v. Siwinski, 942 F.2d 257, 261 (4th Cir: 1991). On this record, it is clear that the conduct of the Officers did not violate the clearly established rights of Linwood Lambert, Jr. Accordingly, the Officers are cloaked in qualified immunity, and summary judgment should be granted in their favor as to Counts I and IV of Plaintiff's Second Amended Complaint.

### d. The Officers did not Deny Linwood Lambert, Jr. Necessary Medical Care

In Count VII of her Second Amended Complaint, Plaintiff alleges that the Officers denied Linwood Lambert, Jr. necessary medical care. The gravamen of this count alleges that by transporting Linwood Lambert, Jr. to the regional jail, as opposed to taking him into the hospital, the Officers, *inter alia*, intentionally and recklessly disregarded Linwood Lambert, Jr.'s need for immediate medical attention. Second Amended Complaint at para. 156. Plaintiff alleges that this supposed failure to provide medical attention was the proximate cause of Linwood Lambert, Jr.'s death. Id. at para. 161. Contrary to Plaintiff's assertions, there is simply no evidence in the record that supports the conclusion that any action by any of the defendant Officers was the proximate cause of Linwood Lambert, Jr.'s death.

28

"The Due Process Clause of the Fourteenth Amendment requires public officials to provide medical care to pretrial detainees who are injured in the course of arrest." Perry, 41 F.3d at 174. "The right to medical care for pretrial detainees under the Due Process Clause derives from the notion that the state's restriction of a person's ability to seek care on his own creates an affirmative obligation on the part of the state to provide such care." Id. citing DeShaney v. Winnebago County, 489 U.S. 189, 200 (1989).

In considering Plaintiff's claim in the instant action, it is critical to note that the purpose of bringing Mr. Lambert to the hospital in the first place was at the suggestion of the case worker on call instead of seeing him in her office and it was for a *mental* evaluation. Mr. Lambert did not display any signs of imminent physical distress or emergency physical distress while at the Super 8 Motel or on the ride from the motel to the hospital. Further, even if a medical professional could have diagnosed a situation of imminent physical distress,[8] "police officers are not trained to make a medical or mental illness diagnosis of individuals with whom they come into contact because they are not medically and/or psychologically qualified to make such diagnoses." Peters' Report at p.7. See also Combs' Report at p.9 ("Police officers as a general rule are not mental health professionals, are not trained or expected to diagnose or provide treatment for specific mental illnesses, nor are they trained or expected to apply reasonable force any differently based upon a person's mental health status.").

A careful review of the undisputed video evidence available clearly indicates that for the entire encounter at the Halifax Regional Hospital Mr. Lambert was alert, conscious, and capable of speech and movement. Mr. Lambert never lost consciousness during his encounter with the

---

[8] This point is not conceded by Defendants. In fact, there is no professional medical evidence in the record to indicate that Mr. Lambert was ever in imminent physical distress or crisis, whether at the Super 8 Motel, during the ride to the hospital, or at the hospital itself. In fact the only signs of a *physical* medical emergency were at the Blue Ridge Regional Jail.

Officers at the Halifax Regional Hospital, nor did he exhibit any obvious need for immediate, emergency medical care.

Further, given the totality of the circumstances of this case, the decision to take Mr. Lambert to the regional jail was objectively reasonable. "The Halifax jail had a nurse who could medically evaluate Mr. Lambert in a safe and confined area. Security is a key variable at this point in time given the violent behavior of Mr. Lambert. The officers were wise in not trying to struggle with Mr. Lambert to get him inside the hospital emergency department because he could have caused more physical damage to the building, and/or caused physical harm to anyone who was in the waiting room, including medical staff." Peters' Report at p. 15.

See also Combs' Report at p.9:

> )"The officers in this situation appropriately transported Mr. Lambert to a nearby jail where appropriate medical attention could be provided in a secure environment. Based upon Mr. Lambert's actions in the back seat of the patrol car upon arrival at the hospital, fleeing from the officers and subsequent physical struggle with them at the E.R. doors following his kicking out the patrol car window, and his continued resistance once he was placed back inside the patrol car, in my opinion he should not have been taken into the hospital nor would it have been prudent for the officers to try and have medical personnel come to the vehicle.").

When asked directly why alternative options were not explored (such as having medical providers come to Linwood Lambert, Jr. in the parking lot), Officer Bratton (the ranking officer on scene), summarized the decision to take Mr. Lambert to the jail succinctly:

> "Q: At any point, did you go into the hospital and request that the hospital provide you a bed to place Mr. Lambert on so that he could be restrained to the bed?
> A: No.
> Q: Why not?
> A: Because again, Mr. Lambert was in control then out of control. The likelihood that he would again go back out of control was high. So there was a propensity for imminent violence, so it was not a controlled setting. There were – I have to take into account Mr. Lambert's health, but I also have to take into account everybody that's inside the ER, including medical staff and citizens who are there. So, no, because I could not say for certain that I could completely restrain Mr. Lambert and have him completely restrained in a controlled environment inside the Halifax ER."

In this case, Linwood Lambert, Jr.'s "ability to seek care on his own" under Perry was restricted once he was placed under arrest. At that moment he became a pretrial detainee. "The Supreme Court has held that a pretrial detainee has a right to be free from any form of punishment under the Due Process Clause of the Fourteenth Amendment." Belcher v. Oliver, 898 F.2d 32, 33 (4th Cir: 1990) (internal citations omitted). "The Fourteenth Amendment right of pretrial detainees, like the Eighth Amendment right of convicted prisoners, requires that government officials not be deliberately indifferent to any serious medical needs of the detainee. Id., citing Martin v. Gentile, 849 F.2d 863, 871 (4th Cir. 1988).

Therefore, the contours of the Officers' duty to Linwood Lambert, Jr. when he was placed under arrest is clear. They could not be *deliberately indifferent* to any *serious* medical need of Linwood Lambert, Jr. The premise underlying this duty is that the Officers had to be *aware* that Mr. Lambert had a serious medical need, for one cannot be deliberately indifferent to a medical condition one does not know about. In the instant case, the Officers were not made aware of any serious or emergency medical condition of Linwood Lambert, Jr. Following use of the Tasers to bring Mr. Lambert under control, he was conscious, alert and capable of movement. There was no indicia of a medical emergency whatsoever. The Officers reasonably believed that a nurse was on duty at the Blue Ridge Regional Jail and the jail nurse did, in fact, assist in providing emergency care to Mr. Lambert at the jail. Therefore, the actions of the Officers, specifically the decision to transport Mr. Lambert to the regional jail, were objectively reasonable.

Yet even if it could be argued that the actions of the Officers were not objectively reasonable with respect to the lack of medical care, there must be some evidence in the record

31

that this deliberate indifference was the proximate cause of Linwood Lambert, Jr.'s death. Correlation is not causation. To assert that Mr. Lambert must have passed away while on the way to the regional jail, and that, because he passed away after the Officers' use of force, the proximate cause of his death must have been either a) the result of the actions of the Officers, or b) their deliberate indifference, is an exercise in the logical fallacy of *post hoc ergo propter hoc.*

However, the Court cannot make such an assumption, even at Plaintiff's invitation, because there *does* exist evidence in the record, that the cause of death of Linwood Lambert, Jr. was "acute cocaine intoxication". See Autopsy Report at p.1. Even the cocaine induced delirium described in the autopsy report is not a condition that is recognized by the leading diagnostic publications. See Peters' Report at p.7 ("Excited delirium is not a medical or psychological diagnosis that can be found in the International Classification of Diseases, Tenth Revision (ICD-10), or the Diagnostic Statistical Manual, Fifth Revision (DSM-5)." In fact, excited delirium "is a recognized *post-mortem* diagnosis made by Medical Examiners, and can be a pre-mortem delirium subset diagnosis made by medical doctors following a differential diagnosis." Id. (emphasis added).

None of the Officers involved in the instant case are medical doctors, professionals, or medical examiners trained in how to diagnose specific medical conditions. Assuming *arguendo* that excited delirium was a medical condition that *could* have been recognized by a professional, the actions of the Officers, specifically their deployment of their Tasers, was not the direct proximate cause of death of Linwood Lambert, Jr. Therefore, their use of their Tasers was not deliberately indifferent to a known, serious medical condition. Therefore, summary judgment is appropriate as to Count VII of Plaintiff's Second Amended Complaint.

32

### e. No Actions of the Officers were the Proximate Cause of Linwood Lambert, Jr.'s Death

Plaintiff claims in Counts II and III of her Amended Complaint that Defendants are liable for the wrongful death of Linwood Lambert, Jr. pursuant to Virginia Code §8.01-25. It is well settled that in Virginia "to impose liability upon one person for damages incurred by another, it must be shown that the negligent [or, as alleged in the instant case, the intentional] conduct was a necessary physical antecedent to the damages." Beale v. Jones, 210 Va. 519, 522 (1970) citing Wells v. Whitaker, 207 Va. 616, 622 (1966).

"The proximate cause of an event is that act or omission which, in natural and continuous sequence, unbroken by an efficient intervening cause, produces the event, and without which that event would not have occurred." Id. (internal citations omitted). Further, "one of the elements that a plaintiff must prove is a causal connection between the breach of duty and any claimed injury or damage. Fruiterman v. Granata, 276 Va. 629, 637 (2008) (internal citations omitted).[9]

Dr. Bowers' Autopsy report clearly indicates that the cause of death was "acute cocaine intoxication." See Autopsy Report at p.1. See also Section IV(d), supra.

Without any medical evidence that Linwood Lambert, Jr.'s death was directly caused by the actions or inactions by these Defendants, and there being evidence to the contrary, summary judgment is appropriate as to Counts II and III of Plaintiff's Second Amended Complaint. Even if it could be said that the actions or inactions of any of these Defendants was the proximate cause of Linwood Lambert, Jr.'s death, if the Officers acted reasonably, then the pendent state claims (of which Counts II and III both are), cannot be sustained. See Milstead v. Kibler, 91 F.

---

[9] Fruiterman and the cases it relies on all deal with medical malpractice, and the facts of those cases are not directly applicable here. However, they do stand for the general proposition that a Plaintiff must prove the causal connection between the actions of the defendants (in this case the Officers) and the injury complained of (in this case the death of Linwood Lambert, Jr.).

33

Supp. 2d 895, 901 (W.D. Va.: 2000 ), affirmed 243 F.3d 157 (4th Cir: 2001) ("If the Fourth and Fourteenth Amendment claims are decided in favor of defendants on their motion for summary judgment, the state law claims should also be dismissed.").

The Fourth Circuit specifically addressed a wrongful death statute in the §1983 context in Sigman v. Town of Chapel Hill, 161 F.3d 782, 789 (4th Cir: 1998) ("However, because we have concluded that [defendant officer's] actions were, as a matter of law, reasonable in the circumstances of this case, they cannot be negligent or wrongful, as required by [North Carolina's Wrongful Death Statute].").   The same logic holds in this case.  If the actions of the Officers were reasonable, then as a matter of law their actions could not have been negligent or wrongful, as required to maintain a wrongful death or survivor's action in Virginia.

Accordingly, given the evidence in the record demonstrating a direct cause of death other than the actions or inactions of the Officers, the lack of any evidence providing a sufficient nexus as to lead this Court to conclude, even in the light most favorable to Plaintiff, that the actions or inactions of the Officers was the proximate cause of Linwood Lambert, Jr.'s death, summary judgment should be granted to Defendants as to the wrongful death claim and survival action claim, Counts II and III of Plaintiff's Second Amended Complaint.

f. **The Remaining Pendent State Law Claims Likewise Fail**

If this Court finds that the Officers' actions were objectively reasonable and grants summary judgment as to the excessive force and denial of medical care allegations, then the remaining pendent state law claims, namely Assault and Battery (Count V), Intentional Infliction of Emotional Distress (Count X), and Violation of the Virginia Constitution (Count XI) should likewise be dismissed.  Milstead, 91 F. Supp. 2d, supra.; see also Waller v. City of Danville, 2005 U.S. Dist. LEXIS 34584, *20 (W.D. Va: 2005) (holding that if the defendant officers'

34

actions are reasonable as a matter of law, then the state court claims cannot be sustained); see also Sigman, 161 F.3d. supra.

**g.   Since the Officers did not Violate Linwood Lambert, Jr.'s Rights, No Vicarious Liability can be Attached to the Town of South Boston or any other Defendant**

Count VI of Plaintiff's Second Amended Complaint alleges that the Town of South Boston's policies and procedures were unconstitutional and/or that the Officers were not properly trained. It is well settled that a civil rights violation by a municipal officer is a condition precedent to holding the municipality liable for damages.

> ["In] an action for damages, neither Monell v. New York City Dept. of Social Services, 436 U.S. 658 (1978) nor any other of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm. If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point."

City of Los Angeles v. Heller, 475 U.S. 796, 810-811 (emphasis in original). Plaintiff's Second Amended Complaint repeatedly alleges that Defendants were acting within the scope of their employment as police officers, following the policies and procedures of the South Boston Police Department during their interaction with Linwood Lambert, Jr. Second Amended Complaint at para. 36-37. However, the existence of the policies of the SBPD, and whether or not they were followed, authorized conduct beyond the Officers' actions in this case, or proscribed any of the said conduct is irrelevant if the conduct of the Officers was objectively reasonable. Therefore, for the reasons expressed in Section IV, the Officers' conduct was reasonable, and accordingly, the necessary condition precedent for municipal liability is lacking. Summary Judgment should be granted as to Count VI of Plaintiff's Second Amended Complaint.

## V.    Conclusion

The actions of Officers Travis Clay, Clifton Mann and Tiffany Bratton during their interaction with Linwood Lambert, Jr. on May 4, 2013 were objectively reasonable. The Officers used a reasonable amount of force given the totality of the circumstances and are entitled to qualified immunity.  Linwood Lambert, Jr. died as a direct result of acute cocaine intoxication, not due to the actions or inactions of these Defendants.  Accordingly, they cannot be held liable for any constitutional violaion under 42 U.S.C. §1983.  Since there is no §1983 violation, there can be no vicarious municipal liability, nor can there be any liability as to any pendent state claims.

WHEREFORE, your Defendants pray that this Court grant their motion for summary judgment, dismiss Plaintiff's Second Amended Complaint with prejudice, award them their attorney's fees and costs, and provide them with whatever other relief is appropriate and just.


**CHIEF OF POLICE, JAMES W. BINNER,
COLONEL, ET ALS.**

By Counsel

COUNSEL:

s/ Michael A. Nicholas
James A. L. Daniel (VSB #03881)
Martha White Medley (VSB #21171)
Michael A. Nicholas (VSB #80749)
Counsel for Defendants
DANIEL, MEDLEY & KIRBY, P.C.
110 North Union Street
P. O. Box 720
Danville, VA 24543-0720
(434) 792-3911 Phone
(434) 793-5724 Facsimile
jdaniel@dmklawfirm.com
mmedley@dmklawfirm.com
mnicholas@dmklawfirm.com


## CERTIFICATE OF MAILING

I hereby certify that on the ____16th____ day of December, 2015 I electronically filed the

foregoing with the Clerk of Court using the CM/ECF system which will send notification of such

filing to the following:

> David M. Kopstein, Esquire
> Philip P. Kuljurgis, Esquire
> Kopstein & Associates, LLC
> 9831 Greenbelt Road, Suite 205
> Seabrook, MD 20706
> *Co-Counsel for Plaintiff's attorneys*

> Joseph L. Messa, Esquire
> Ramon A. Arreola, Esquire
> Thomas N. Sweeney, Esquire
> Messa & Associates
> 123 S. 22nd Street
> Philadelphia, PA 19103
> *Co-Counsel for Plaintiff's attorneys*

s/ Michael A. Nicholas