# DANIEL, MEDLEY & KIRBY, P.C.

ATTORNEYS AT LAW
110 NORTH UNION STREET
DANVILLE, VIRGINIA  24541

JAMES A. L. DANIEL
MARTHA WHITE MEDLEY
WILLIAM L. KIRBY, III
JANINE M. JACOB
MICHAEL A. NICHOLAS
MAGGY L. GREGORY
T. BRENT GAMMON

MAILING ADDRESS:
POST OFFICE BOX 720
DANVILLE, VIRGINIA 24543-0720

TELEPHONE:  (434) 792-3911
FACSIMILE:  (434) 793-5724
INTERNET:  dmklawfirm.com

MARTINSVILLE OFFICE
P. O. BOX 1192
MARTINSVILLE, VA 24114
TELEPHONE:  (276) 666-1585
FACSIMILE:  (276) 666-4046

November 10, 2015

**Via Email**

Ramon A. Arreola, Esq.
Messa & Associates
123 S. 22nd Street
Philadelphia, PA 19103

> RE:   Gwendolyn Smalls as Administratrix of the
> Estate of LINWOOD RAYMOND LAMBERT, JR., deceased
> v.
> Chief of Police, James W. Binner, Colonel, et als.
> Civil Action No.:  4:15cv00017

Dear Ray:

Pursuant to Rule 26(A)(2)(b), we designate the following persons who will provide expert testimony in the above-captioned matter:

> John E. Combs
> John G. Peters

Pursuant to Rule 26, a copy of their respective reports is enclosed with this correspondence. I remain

Very truly yours,

Michael A. Nicholas

MAN:rbg

Enclosure -   Report of John E. Combs
Report of John G. Peters

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF VIRGINIA

DANVILLE DIVISION

Civil Action No.: 4:15-CV-00017

GWENDOLYN SMALLS AS )
ADMINISTRATRIX OF THE )
ESTATE OF LINWOOD RAYMOND )
LAMNERT, JR., DECEASED )
                                 )
                                 )        **REPORT OF JOHN E. COMBS**
                                 )
       Plaintiff, )
                                   )
       vs. )
                                   )
                                   )
CHIEF OF POLICE, JAMES W. BINNER, )
COLONEL, et als., )
                                   )
                                   )
       Defendants. )
                                   )

I, John E. Combs, being of legal age and under the penalties of perjury, state as follows:

I am currently employed as the School Director and Chief Instructor for the Subject Control/Arrest Techniques and Physical Fitness Training Programs, assigned to the Specialized Tactical/Traffic Center at the North Carolina Justice Academy.  I am also a sworn Police Officer (reserve) with full arrest powers and duties with the Fayetteville Police Department (assigned to the Training Center), and as a Deputy Sheriff with the Sampson County Sheriff's Office, and have been employed in law enforcement for over 28 years.

Attached hereto is a true and accurate copy of my expert report in this litigation.

The report summarizes my analysis and findings and includes a statement of my opinions.  The report also includes data and other information considered by me in forming my opinions and sets out my qualifications, including my Curriculum Vitae, which describes in more detail my educational and work background.  Also included in my CV is a list of training courses, publications and presentations I have been involved with; professional organizations to which I

1

belong, and cases that I have been involved in as an expert witness, to include this case and other ongoing cases. I charge $150 per hour for review and testimony (reports, deposition, and court) as an expert witness, and $75 per hour for travel.

Opinions stated herein are based upon the materials that I have been presented and reviewed to date, and are offered to a reasonable degree of professional certainty.

I affirm under the penalties of perjury that the foregoing statements are true and correct.

_____ John E. Combs _____

John E. Combs

_____ 11/09/15 _____

Date

2

## REPORT OF JOHN E. COMBS

The items reviewed to date include:

1.  Complaint;
2.  Answers of Defendants;
3.  Records of Corporal Bratton;
4.  Records of Officer Clay;
5.  Records of Officer Mann;
6.  Surveillance Video at Halifax Regional Hospital;
7.  Deposition of James W. Binner;
8.  Deposition of William E. Fallen, Jr.;
9.  SBPD General Orders Manual;
10. TASER Usage Recordings;
11. Dispatch Records;
12. Photos taken by Inv. Redd;
13. Photos of Lambert;
14. Photos of damaged police vehicle and vehicle at Super 8;
15. Video – Bratton's patrol car at Super 8;
16. Video – Bratton's patrol car at Halifax Regional;
17. Video – Mann's patrol car;
18. Video – Clay's patrol car/back seat;
19. Deposition of Officer Clay;
20. Deposition of Officer Mann (Parts 1 and 2)

## METHODOLOGY FOR MATERIALS ANALYSIS AND BASIS FOR OPINIONS

I was retained by defense counsel in this matter to review the materials sent to me and to render an opinion as to the reasonableness of the officers' actions when they used force in subduing plaintiff at the Halifax Emergency Room entrance after taking him into custody on an ECO (Emergency Custody Order) for a mental health evaluation.

Because I was not on the scene to observe this incident, I must rely on the various materials presented to me for analysis. In addition, because I do not know either the plaintiff or the defendants, I cannot make a credibility assessment for either. However, it is my understanding of the civil trial process that the trier-of-fact will make this credibility judgment after all testimony has been heard. In this understanding, and for purpose of analysis and opinion, I am assuming the facts as the officers have described them in their reports to be true. Therefore, my approach to the analysis as to the reasonableness of the officers' actions is to answer the question, *if the trier-of-fact believes the officers' version of this incident to be the most credible, did they or did they not act reasonably?*

3

OPINIONS

Based on the documents I have reviewed, and my education, training, knowledge and experience in law enforcement, and especially the use of force in law enforcement, I can opine with a reasonable degree of professional certainty:

The amount and methods of force used by Corporal Bratton and Officers Mann and Clay on May 4, 2013 were reasonable under the circumstances and were not excessive or otherwise in violation of established training standards.

Furthermore, the decision by the officers to transport Mr. Lambert to a nearby jail was reasonable under the circumstances.

FACTUAL BASIS AND SUPPORT FOR OPINIONS

I have reviewed the policies and procedures of the South Boston Police Department and believe them to be reasonable, appropriate, and standard for law enforcement agencies. There is no single technique, book, video, training program, force option model or department policy that will even begin to address every possible scenario and level/type of resistance that officers may face. To advocate that only specific force techniques are the only ones that officers may use in a given situation would be irresponsible and dangerous on the part of an instructor, school, or law enforcement agency. To do so would "pigeon-hole" officers into having to choose from a limited number of force options to address an infinite number of possible situations. Officers must be able to choose appropriate force options based upon the totality of the circumstances. Officers Mann, Clay, and Bratton appear to have been properly trained and applied that training in a reasonable manner and one that is consistent with standard law enforcement procedure, in their dealings with Mr. Lambert.

According to Lt. Barker's summary of the incident, a male subject called 911 and stated that he had an emergency at the Super 8 Motel but did not give his name and eventually hung up on the dispatcher. Cpl. Bratton was dispatched to the call. Officer Clay, along with Officer Mann and Cpl. Bratton arrived on the scene. Subject was not located and Cpl. Bratton cleared all from the scene. The male called back and officers returned to try and locate the caller and the incident. While the officers were checking the scene, the subject called back twice. The officers could not locate either and again, cleared the scene. The subject called back again and the manager called at around the same time stating that it sounded like there was a disturbance in room 109. All 3 officers arrive back on the scene and are able to speak with Lambert, who was taken into custody on an ECO (Emergency Custody Order) for a mental health evaluation and is being transported to the hospital by Officer Clay.

According to Cpl. Bratton's written statement, after 2 unsuccessful attempts to locate a 911 caller, same called back and stated he was at the Super 8, with the dispatcher advising she

4

could hear him tearing up the room (room 109). Officers Clay and Mann arrived first. The male that the officers spoke to claimed to have stabbed 2 people in the room after a fight and that the bodies were in the ceiling tiles – Mann advised that the male had a small cut on his hand – same was identified as Linwood Lambert, Jr., and was not wanted. Bratton decided that they needed to take Lambert into custody for a mental health evaluation. He was handcuffed and initially compliant when placed into Officer Clay's car for transport to the hospital.

As Bratton was speaking to the mental health case worked via dispatch, she noticed glass on the ground near Clay's patrol car, with Mann running toward the vehicle (she stated that it appeared Lambert had broken the rear window of the patrol car). When she got to the car, Lambert was kicking the door. All 3 officers attempted to remove him from the car. Lambert then ran toward the emergency room and struck the double doors with his shoulder. Bratton deployed her TASER striking Lambert, who fell to ground and got back up. Officer Clay also deployed his TASER – Lambert fell but got back up again. Bratton deployed another TASER stun but Lambert regained his strength quickly. Lambert rolled on the ground while not following Bratton's instructions to roll onto his stomach. She tried to deploy the TASER again but was not successful. She then attempted to physically stop him from rolling, while Mann went to his patrol car to retrieve a set of leg irons.

All 3 officers struggled with Lambert to get the leg irons on him. Bratton heard Lambert say he was on cocaine and doing weed. He was told at that time that he was under arrest for damage to property at the Super 8, the patrol car window, and disorderly conduct. The officers had to drag him back to Clay's patrol car as he refused to walk, and they were able to get him back in the car. Lambert laid down in the back and refused to sit up to have the seat belt put on – Bratton had to use a drive stun with the TASER to gain compliance. During this process, Lambert tried to bite Officer Clay on the hand.

As the officers arrived at the jail, Bratton noticed that Lambert appeared to be having a medical emergency (grey skin color and appeared not to be breathing). Bratton was unable to obtain a pulse and Clay called for rescue. The 3 officers removed Lambert from the car and Mann began CPR, with Clay relieving him and Bratton operating the defibrillator. Rescue arrived and transported Lambert to the Halifax E.R.

According to Officer Clay's written statement, at approximately 0437 the manager of the Super 8 met the officers and led them to room 109 at the 3rd attempt to find the anonymous 911 caller. Clay stated that there was a metal banging coming from inside the room. A B/M sweating heavily and with what Clay noticed was a white substance coming from his nose, came to the door. The room was in disarray and the man had the bed frame in his hand. Lambert tried to put his hands in his pockets as Cpl. Bratton grabbed his wrists. Clay secured Lambert's right wrist and assisted Bratton in handcuffing him. He was searched and placed in Clay's patrol car.

5

On the way to the hospital, Lambert kept making comments that they were after him, and as they got to the hospital, he got to his back and kicked the window of the patrol car twice before it broke. Two officers made their way to the rear passenger side of Clay's patrol car and, after the door was opened, Lambert took off running toward the entrance to the emergency room. Clay heard a TASER but Lambert kept running and was pushing at the E.R. doors. Clay deployed his TASER and Lambert fell and hit his head on the wall next to the doors. Lambert Tried to get up and Bratton deployed her TASER again, warning him to stop and to get on his stomach.

At this point, Clay used a drive stun with his TASER that was not effective. He then tried to apply an ankle lock which also apparently had no effect. Man and Bratton attempted physical control along with Clay and the 3 were able to put leg irons on Lambert. As they sat him up, Lambert stated to the officers that he had some cocaine. The officers got him back to Clay's patrol car but Lambert refused to get in by falling to the ground and refusing to stand. Clay tried a bent wrist technique that didn't work, and finally had to just lift him up and into the car. Lambert began to bang his head against the glass between him and the front area of the car and also against the door. He then made as if to kick the windows again. Bratton and Mann both used a TASER drive stun and Mann forced him to sit back up to the point that he had to get in the back seat with Lambert. Clay used a pressure point under Lambert's jaw to sit him up as he continued to struggle with Mann. Lambert was also biting at Clay at this time.

Shortly after arriving at the jail, Mann yelled to Bratton that he didn't think Lambert was breathing. The officers removed Lambert from the car, took off the handcuffs, and began CPR.

According to Officer Mann's written statement, he and Officer Clay arrived at the Super 8 on their 3rd attempt to locate a 911 caller. Upon arrival, they responded to room 109 and heard the sounds of things being broken inside the room. They were finally able to get a male subject to the door who was holding a metal rod in his hand that had been taken off the bed. Mann asked him to put down the metal rod and he did so. The subject, later identified as Linwood Lambert, Jr., stated that they were after him and pointed toward a corner of the room when Mann asked further about this. Mann believed that Lambert was having hallucinations, and indicated that he wanted to handcuff him. Lambert became more agitated and Mann decided that if he would be compliant that he would not handcuff him. Mann noticed that the room was badly damaged and Cpl. Bratton told Lambert to put his hands behind his back. Mann and Bratton were able to get him handcuffed and told him that they were taking him to the E.R. to get help.

Upon arrival at the E.R., Mann heard a loud noise and saw glass explode into the parking lot. He realized that Clay's patrol car's rear window had been knocked out. Mann saw Lambert moving around and yelling for help and that they were after him. When Mann opened the door, Lambert ran toward and into the E.R. doors causing them to break. Bratton and Clay used their TASERS and Lambert fell. He tried to get up and the TASER was applied again. Mann got the

6

leg restraints and tried to apply them – Lambert was kicking and trying to get into the E.R. Lambert was told to get onto his stomach so the leg restraints could be applied but he did not comply, and the TASER was used again. As Mann and Clay physically had to take control of Lambert to roll him over for leg restraint application, Mann wrote that "the subject fought us the whole time." In addition, Lambert stated that he had done cocaine. Mann indicated in his statement that Lambert was told he was under arrest at this time.

As the officers were trying to get Lambert back to the patrol car, he began dragging his feet and refused to walk, then refused to get into the patrol car. Lambert had to be physically placed into the car and then began striking his head against the side window of the patrol car. He then stuck his feet outside of the broken window and refused again to sit up. Mann used the drive stun of the TASER to his left shoulder which had no effect. With Lambert still refusing to comply, Mann used the drive stun again in the same area with no effect. Bratton used the drive stun to Lambert's leg, which also had no effect. Mann and Clay were able to physically sit Lambert up and put on the seat belt. Mann also saw Lambert attempt to bite Clay.

Lambert was transported to the jail by Clay. When Mann arrived at the jail, he noticed that Lambert was not moving and called his name. When he didn't answer, Mann checked his pulse and couldn't find one. Bratton also checked and was unable to locate a pulse. Lambert was removed from the car and Clay started CPR, with Mann taking over shortly after. Rescue was called and Lambert was transported to the hospital.

The video from the hospital shows the officers' patrol vehicles pulling into the parking area of the emergency room, and at approximately 07:56 of the video, the rear passenger window of Officer Clay's patrol car appears to shatter outward toward the parking lot. The three officers appear to open the doors on both sides of the vehicle, and very shortly after, Lambert runs quickly out of the patrol car from the passenger side away from the officers and toward the doors of the E.R. It appears that he is hit with TASER probes at some point from two of the three officers and looks to fall to the ground. While on the ground, Lambert looks to be rolling back and forth and continually sitting up. At some point, the officers move in to attempt physical control. Man had the leg restraints and also appeared to try to control Lambert's foot and ankle. The officers had to struggle with Lambert continually, with Lambert appearing to kick and roll while the officers attempted to place the leg restraints on him. Mann was able to apply the leg restraints, and the officers all donned protective gloves. The three then helped him to his feet and began to lead him toward the patrol car. Lambert appeared to continue to struggle and then began to stop moving his feet at all. At this point the officers appeared to have to carry him the rest of the way toward the vehicle, and physically place him inside. There appears to be further difficulty in getting Lambert under control once inside the vehicle. This goes on for some time until the officers were able to close the door and begin to take pictures and collect the TASER wires before leaving the parking area.

7

The video from Officer Clay's backseat shows Lambert kicking the back window of the patrol car several times (at approximately 6:45 of the video) while Clay is telling him to stop numerous times. Officers can be heard giving numerous loud verbal commands to "roll over" and "get on your stomach" along with what sounds like the TASER being applied. At shortly before the 13:00 mark, commands to "stand up" can be heard over and over.

Shortly after the 18:00 mark, the officers were telling Lambert numerous times to put his feet down – he appeared to have his feet up near the rear window area of the patrol car. 2 officers can be seen placing a TASER on Lambert – one at the right shoulder area and the other at his lower leg. Both were in drive stun mode and a TASER can be heard being applied, but it is unclear from the video which one it was. A drive stun can be heard being applied again near the 19:00 mark – it appeared from the video to be applied to the lower leg area. Lambert ultimately had to be physically forced into a seated position by two of the officers. At one point, shortly after the 20:00 mark, an officer can be heard stating that Lambert tried to bite him. Shortly after arriving at the jail, officers can be seen checking his pulse and calling for rescue.

The TASER used in drive-stun mode is used as a pain compliance technique, much as an officer would use pressure point control. In my opinion, and under the circumstances described by the officers along with what the video shows, this is a reasonable use of the TASER.

Lambert's behavior indicates that he was not under control at the time he kicked out the patrol car window then shortly thereafter, ran from the officers. At this point, verbal commands had not been successful nor did it appear from the way the officers' reports described Lambert's behavior, they would be. Not only had verbal instructions failed to gain control of plaintiff, but even several TASER deployments were ineffective. This certainly indicates that plaintiff was not under control, making it reasonable to continue to use TASER deployments and other physical control techniques until resistance had ceased. Therefore, the continued application of the above-mentioned force options was reasonable.

In my opinion, at this point the officers were forced to respond as police officers to try and prevent the situation from becoming more dangerous. They no longer had the option at this point of trying to establish a dialog with Lambert. The officers now had to respond to a rapidly escalating and potentially physically threatening situation that could have been made much worse had they allowed Lambert to continue.

What is relevant is that the plaintiff continued to resist the officers even after he had been taken to the ground and was refusing to obey numerous verbal instructions during the attempt to get him under control. Plaintiff continued to further physically resist the officers while being moved to and placed into the patrol car, and had to be stunned with the TASER in drive stun

8

modes. In my opinion, the number of TASER deployments is irrelevant. Repeated use of the above referenced force options is not prohibited when attempting to control a resistive subject.

Reasonableness is not determined by any particular force option(s) but rather all of the surrounding circumstances that caused the officer to make the decision on the use of a particular force option(s). In other words, it's not the "tool" (in this case, TASER usage) but how it is applied in a given set of circumstances that determines reasonableness.

It is not required or expected for an officer to be physically assaulted before taking proactive measures to gain control of a person. Further, standard law enforcement procedure and training does not automatically prohibit the use of any control technique based upon any one factor (i.e., age, gender, drug usage, mental or physical condition, etc.).

Police officers as a general rule are not mental health professionals, are not trained or expected to diagnose or provide treatment for specific mental illnesses, nor are they trained or expected to apply reasonable force any differently based upon a person's mental health status. Further, standard law enforcement procedure and training does not distinguish the appropriate use of force response by reference to an individual's age, mental or medical state, but rather, by the individual's actions. Further, as a general rule, officers do not have medical training beyond being familiar with basic first aid and CPR.

Law enforcement confrontations are quick, sometimes violent, and may take place in very confined areas. These confrontations are also very different than the static environment of a spacious mat room during a training session, and the variables are too numerous to describe. To control a resistive person, an officer must completely overwhelm that person's resistance as quickly as possible. That may mean having to use multiple force options until the resistance has stopped, and the person has been controlled. For this very reason, multiple officers simultaneously attempting to control a resistive person is recommended, reasonable, and appropriate. Further, these situations do not occur in a manner that can be accurately predicted and responded to with a pre-planned, choreographed, and neatly sequenced response, nor do they fall exactly into pre-designed categorized "continuums" or "levels" of officer/subject action/response.

The officers in this situation appropriately transported Mr. Lambert to a nearby jail where appropriate medical attention could be provided in a secure environment. Based upon Mr. Lambert's actions in the back seat of the patrol car upon arrival at the hospital, fleeing from the officers and subsequent physical struggle with them at the E.R. doors following his kicking out the patrol car window, and his continued resistance once he was placed back inside the patrol car, in my opinion he should not have been taken into the hospital nor would it have been prudent for the officers to try and have medical personnel come to the vehicle.

9

Based upon the foregoing, it is my opinion that the officers acted reasonably and in a manner consistent with common experience in law enforcement when they handled this issue in the manner described in their reports and statements. These are my opinions to a reasonable degree of professional certainty based upon the materials reviewed to date. It is possible that these opinions could change based upon the review of any material not reviewed to date.

**John Eric Combs**
5840 Conservation Court Fayetteville, NC 28314
910-487-9318 (home)
910-303-0087 (cell)
910-525-4151, ext. 264 (work)
Email: jcombs@ncdoj.gov

## PROFESSIONAL CAREER OBJECTIVES

To instruct and manage the academic and training environment consisting of the design, development, and implementation of academic and training curricula, focusing on criminal justice, government, and health/wellness academic programs. Supervise the development of new programs and the expansion of existing programs to include both traditional and distance learning environments.

## TEACHING PHILOSOPHY

In my experience, students seem to be more responsive to direct interaction with their instructor and classmates, rather than passively receiving information during a lecture. For this reason, I find that a dialectic style of education tends to be highly effective. Once the students become accustomed to this method, they respond to the challenge and often initiate interaction themselves. An effective educator must be willing to continually adjust to the needs of the students to reach the primary goal of encouraging learning, and providing the skills and tools necessary to reach that goal. My lengthy experience and education not only makes me more effective in the classroom, it helps me to network my students into desirable positions in their respective chosen career fields. As an educator, I have found it to be highly effective to combine the philosophical, theoretical, and research orientation with the practical, applied, and professional orientation of the subject matter being presented.

## EDUCATION

**Master of Arts**                                                      August 2008
**Health Education & Promotion**
East Carolina University
College of Health and Human Performance
Department of Health Education and Promotion
Advisor: Dr. Hans Johnson, (252) 328-1818; johnsonh@ecu.edu

**Master of Public Administration**                                    August 1999
The University of North Carolina at Charlotte
College of Arts and Sciences
Department of Political Science
*Accredited by the National Association of Schools of Public Affairs & Administration (NASPAA)*
Advisor: Dr. Gary Rassel, 704-687-3013, grassel@uncc.edu
Thesis: "Physical Fitness Standards in Law Enforcement."

1

> *18 graduate semester hours in **Criminal Justice,*** *UNC-Charlotte/East Carolina*
> *21 **doctorate-level** semester hours in Adult Education/Training & Development, NC State*

**Graduate Certificate**                                                         January 2013
**Community Preparedness & Disaster Management**
The University of North Carolina at Chapel Hill
Gillings School of Global Public Health
Department of Health Policy & Management
Advisor: Bill Gentry, (919) 966-4228; wgentry@email.unc.edu
> *12 graduate semester hours in **Community Preparedness & Disaster Management***
*All-hazards and cross-discipline graduate program on the current issues facing disaster*
*management, the analytical methods used to evaluate risk, as well as the roles and*
*responsibilities of federal, state and local governmental agencies.*

**Professional Certificate**                                                     May 2000
**Nonprofit Management**
Duke University
Office of Continuing Education & Summer Session
Durham, NC
> Courses taken (in order) include: *Leadership Through Facilitation; Program Evaluation;*
> *Meetings That Work; Human Resources Solutions; Developing Strong Volunteer-Staff*
> *Partnerships; Strategic Planning; Leadership Through Influence; Influencing Public*
> *Policy; Building a Budget.*

**Bachelor of Arts, Sociology**                                                  May 1995
Pfeiffer University
School of Sociology and Criminal Justice
Misenheimer, NC (Cum Laude)
*2 courses from dual degree in Criminal Justice*

**Associate in Applied Science**                                                 August 1991
Criminal Justice – Protective Technology
Rowan-Cabarrus Community College
Salisbury, NC (Honors)

## INSTRUCTIONAL/TRAINING EXPERIENCE

<u>**North Carolina Justice Academy**</u>                                        2001-Present
***School Director & Chief Instructor***
***Physical Fitness and Subject Control & Arrest Techniques Training Programs***
***Tactical & Traffic Center***
- Chief instructor and primary liaison to the NC Criminal Justice Education and Training Standards Commission for the above programs.
- Direct and control the overall administration, planning, implementation, and daily operation of the Physical Fitness and Subject Control/Arrest Techniques Training Programs, to include the evaluation of staff, lesson plans, and facilities.

2

- Supervise and coordinate the Management Development Program Wellness Curriculum. Responsible for designing the overall program development and course curriculum, scheduling fitness assessments & sessions, researching available resources, and evaluating educational materials along with students and staff. Conduct periodic meetings throughout the MDP course as needed for evaluation and revision efforts.
- Research, design, develop, revise, and implement course materials (to include distance education), plan and evaluate training curriculum, methods, materials, and student progress based on constant task analyses, interviews, requests, and committee meetings with stakeholders throughout the state.
- Develop and recommend new and revised programs, policies, procedures, and standards to respond to changes in health program needs, objectives, and priorities.
- Serve on the NC Department of Justice Wellness Advisory Committee, the purpose of which is to promote positive physical and mental health practices and to provide information and education regarding health and safety issues to state D.O.J. employees.
- Instrumental in the development of the NCJA Wellness Program, which touches every section of the Academy, provides a wealth of information for health fitness, and promotes healthier lifestyle choices for Academy employees.
- Provide direction, technical assistance, and guidance to school directors and section staff within the realm of fitness and health programs in such areas as decision making, determination of program needs, and program or budget planning.
- Lead subject matter curriculum revision committees responsible for making needed changes in course curriculum based on findings and reports from the field, and for making presentations on needed changes and/or additions to the programs.
- Maintain direct supervision, direction, control, and evaluation over the performance of all persons to whom any portion of the planning, development, presentation, or administration of the courses has been delegated.
- Responsible for the training of all Specialized Physical Fitness and Subject Control Instructors in North Carolina.
- Ensure that course curricula are job-related and applicable, reflect current information and practices, employ appropriate performance-based training methods, and accurately measure student performance in both cognitive and motor skill aspects, based on training evaluation methods that reflect current job environments and agency requirements.
- Develop and supervise skills testing with performance-based dynamic confrontational drills and other approved and appropriate evaluation methods, containing specific sub-skills/components necessary for officer survival, reflecting current needs in the law enforcement field.
- Train law enforcement and detention officers in numerous locations throughout the state in fitness techniques, injury prevention, exercise leadership, motivational techniques, exercise programs, fitness screenings, prescription and testing, officer survival tactics, contact/cover skills, pressure point control, stunning/striking/distraction techniques, impact weapons, take downs and ground defense leading to control, principles of movement and reactionary distances, tactical handcuffing/speed cuffing techniques, weapon retention/takeaway techniques, searching techniques, the use-of-force continuum and legal issues.

3

- Through periodic assessments, daily physical training workouts, and proper weight management/nutritional planning incorporating concepts of strength and conditioning, cardiovascular training, and plyometric/combat fitness techniques for speed and power development, assist trainees in developing their physical skills, fitness levels, and overall health while emphasizing the improvement of all aspects of physical wellness to a level needed to function effectively as law enforcement officers/instructors.

### North Carolina Justice Academy                                          1999-2001
***School Director & Chief Instructor***
***North Carolina Police Corps Training Academy***

- Chief instructor and primary liaison to the NC Criminal Justice Education and Training Standards Commission, and the NC Police Corps for the Police Corps Basic Law Enforcement Training Program.
- Responsible for the overall administration, planning, implementation, and daily operation of the 24-week NC Police Corps Training Program.
- Assure compliance with all Training Standards requirements through Title 12 of the NC Administrative Code governing Commission-approved training courses.
- Designed the Police Corps Academy budget instrument, managed the Police Corps Academy budget, and continued to monitor and track program purchases, existing inventory, and staff training and equipment expenses.
- Supervised, monitored, and evaluated the presentations and schedules of over two dozen Justice Academy and adjunct instructors in 33 individual blocks of instruction that comprise the BLET curriculum.
- Responsible for recruiting, selecting, and recommending for hire the most experienced and highest quality instructors to serve as trainers and subject matter experts in the Police Corps Academy.
- Maintained direct supervision, direction, and control over the performance of all persons to whom any portion of the planning, development, presentation, or administration of the courses had been delegated.
- Wrote and distributed *Trainee Guides* on student conduct and Academy policy.  Ensured that written documentation was maintained on all aspects of the Police Corps Academy including assessments, injury documentation and action taken, daily logs of activities, and individual counseling sessions.

### Specialized Instructor                                                  1994-1999
**Basic Law Enforcement Training & Detention Officer Certification Courses**

Served as a training instructor and student evaluator in basic and specialized instructor certification programs in the physical fitness and defensive tactics areas at the NC Justice Academy (Salemburg, NC), Rowan-Cabarrus Community College (Salisbury, NC), Davidson County Community College (Lexington, NC), and Mitchell Community College (Statesville, NC).  Trained and evaluated basic recruits and in-service personnel in physical fitness, arrest and control, and officer survival.  Blocks of instruction taught include; Defensive Tactics, Mechanics of Arrest, Subject Control & Arrest Techniques, Physical Fitness, Patrol Techniques, and Ethics.

4

# UNIVERSITY TEACHING EXPERIENCE

## Campbell University                                                    2001-Present
*Adjunct Faculty for Criminal Justice/Homeland Security, Ft. Bragg Campus*
*Department of History, Criminal Justice & Political Science*

- Provide instruction in introductory and upper-level baccalaureate courses in the Criminal Justice curriculum, leading to the Bachelor of Science degree.
- Develop course objectives, outline, and curriculum, select and evaluate course materials, texts, and training aids.
- Design and administer exams, develop and grade written and oral course projects.
- Supervise and evaluate student progress and experience gained in real world justice work environments during working internships and thesis projects.
- Maintain liaisons with numerous local and state agencies for the purpose of networking students into choice career fields.
- Review and revise course curriculum to meet mandated changes or industry needs.

*Currently instruct the following courses:*

- Introduction to Criminal Justice
- Introduction to Law Enforcement
- Introduction to Criminology
- Theories of Justice
- Correctional Philosophies and Issues
- Senior Seminar in Criminal Justice
- Internship Program in Criminal Justice
- Criminal Law
- Criminal Justice Organization
- Criminal Justice Policy
- Ethics in Government & Criminal Justice
- Courts and Procedures
- Youth at Risk
- Juvenile Justice
- Stress Management & Emotional Survival
- Terrorism
- The National Government
- Victimology
- Crime Scene Investigation
- Organized Crime
- Emergency Preparedness
- Emergency Management
- Currently developing a course for the new Homeland Security degree program titled *"Emergency Management – Analytical Methods, Planning & Implementation."*

Having served as the lead faculty for the Criminal Justice program at the Pope AFB campus, I held the following responsibilities;

- Assist the Campus Director in the supervision and management of faculty assigned to their department.

5

- Conduct coordination as required with the main campus Department Chair regarding curriculum changes, course changes, exchanging syllabi, and providing the Department Chair with information as requested.
- Assist the Academic Coordinator by providing recommendations regarding the scheduling of departmental courses and assignment of instructors.
- Serve as a member of the Extended Campus Faculty Advisory Council for their respective site.

## Methodist University                                    2003-Present
### *Adjunct Faculty, School of Public Affairs*
### *Department of Justice Studies*
- Hold all of the above listed duties and responsibilities

*Currently instruct the following courses:*
- Terrorism and the Homeland Security Response
- Police in an Urban Society (seated and online – Blackboard software)
- Security Management
- Correctional Process (developed as an online course/Blackboard)
- Victimology (developed as an online course/Blackboard)
- Criminology
- Introduction to Law Enforcement
- Ethical Foundations
- Stress Management & Emotional Survival

## Mount Olive College                                    March 2010-Present
### *Adjunct Faculty, School of Professional Studies*
### *Department of Criminal Justice*
- Hold all of the above listed duties and responsibilities

*Currently instruct the following courses:*
- Family Violence (online – Moodle software)
- Criminal Justice Ethics

## Stanly Community College                                    2003-2005
### *Adjunct Faculty, Criminal Justice*
- Held all of the above listed duties and responsibilities

*Have instructed in the following course:*
- Organization and Administration (online – WebCt software)

## RESEARCH INTERESTS

My primary research interests are associated with the learning theories and practical applications of motor skill development as they relate to training transfer effectiveness, physical fitness levels, and officer survival issues. This includes theories and philosophies on the design, development and implementation of optimal training environments that maximize skill development while maintaining realism and safety. In addition, I have research interests in the development, implementation, and evaluation of the effectiveness of scenario-based learning

environments and training program development. My current work also focuses on holistic wellness, physiological and psychological responses to stress, survival stress research, and their effects on officer skill and reactive ability. Further, I am interested in what type of training environments are best suited for the overall cognitive, ethical, and motor skill development of a justice professional, to include personality development, speaking and writing skills, emotional and political survival, organizational compatibility, and safety. In the future, I would like to combine laboratory and field work to examine these behavioral issues.

## TRAINING CURRICULA DEVELOPED, EDITED, & REVISED

In the course of my employment at the North Carolina Justice Academy, I have developed and/or revised/edited the following training curricula (all are under constant and ongoing revision):

- *Specialized Subject Control & Arrest Techniques Instructor Training Curriculum* – Revise and Edit the following blocks of instruction:
  - Course Orientation
  - BLET Subject Control Lesson Plan
  - Practical Skills Enhancement
  - Injury Prevention
  - Combat Conditioning
  - Safety Guidelines
- Developed the *Basic and Advanced Ground Defense Instructor Training Courses*
- Developed *Understanding Force Option Selection*
- Developed *Spontaneous Attack Defense for Detention Officers*
- Developed *Basic Subject Control & Arrest Techniques*
- Developed *Basic Ground Defense Training*
- *Specialized Physical Fitness Instructor Training Curriculum* – Continually revise and edit the following blocks of instruction:
  - Course Orientation
  - CVD Risk Factors
  - Fitness Assessments
  - Fitness Programs
  - Nutrition Awareness
  - Wellness Programs & Fitness Standards Validation
  - Care & Prevention of Common Injuries
  - BLET Fitness Lesson Plan
- Developed *Stress Management for Law Enforcement* – Traditional & Online courses
- Developed *Functional Conditioning for Motor Skills Development*
- Developed *Wellness & Stress Awareness for Law Enforcement, Train-the-Trainer* (a part of mandatory state-wide In-Service Training for 2006)
- Developed *Impact Weapons & Handcuffing* for 2007 In-Service Training
- Revised *Physical Fitness & Functional Conditioning for SWAT* (Instructor Course)
- Developed *Nutrition for Management Development Program* (Wellness block)
- Developed *Fitness for Combat Readiness*
- Developed *Weapon Retention and Disarming Techniques* for 2008 In-Service Law Enforcement Training

7

- Developed *Close Quarter Combat* for 2008 In-Service Detention Officer Training
- Developed *Combat Readiness for SWAT Operator II*
- Developed *In-Service Wellness and Validating Fitness Standards* for the Specialized Physical Fitness Instructor Training Course
- Developed *OC Spray Training* for NC Justice Academy Staff Training, 2008
- Developed *Workplace Safety & Ergonomics* for NC Justice Academy Staff Training, 2009
- Developed *Combat Conditioning* for the Specialized Subject Control & Arrest Techniques Instructor Training Course, 2009
- Developed *Health & Fitness for Telecommunicators,* NCJA 2009 State Conference
- Developed *Health & Fitness for Detention Officers* for 2010 In-Service Detention Officer Training
- Developed *Ground Control, Defense, and Escape* for 2010 In-Service Law Enforcement Training
- Developed *Subject Control for Detention Officers* for 2011 In-Service Detention Officer Training
- Developed *Healthy Living for Telecommunicators,* 2011 In-Service Training
- Developed *Basic Nutrition* for NC Justice Academy Staff Training, January 2012
- Developed *Validating and Implementing Physical Fitness Standards,* September 2012
- Developed *Officer Safety: The First Five Minutes,* 2014 In-Service

## PUBLISHED ARTICLES

Combs, John E. (2014).  Fitness standards and testing validation for public safety. *Tactical Strength & Conditioning Report,* National Strength & Conditioning Association, October 2014 issue.

Combs, John E. (2010).  Developing voluntary in-service wellness programs & validating mandatory fitness standards (part II). *IADLEST Newsletter, 21(3),* July 2010, 9-14.

Combs, John E. (2010).  Developing voluntary in-service wellness programs & validating mandatory fitness standards (part I). *IADLEST Newsletter, 21(2),* April 2010, 12-15.

Combs, John E. (2007). Functional conditioning (part II). *The Firearms Instructor.*  Issue 43.

Combs, John E. (2006). Functional conditioning (part I). *The Firearms Instructor.*  Issue 41.

Combs, John E. (2005).  Transfer training effectiveness. *Law and Order.*  Under review for publication in an upcoming "Training" issue.

Chapman, Valerie-Lee, Sork, Thomas J. and associates. (2003). Talking intelligibly about planning/theories, not. *Proceedings of the 33rd SCUTREA Annual Research Conference.* Bangor, Wales: U. Of Bangor.

Combs, John E.  (2003).  Motor skill learning theory (part II). *Use of Force Journal, 3(2).*

Combs, John E. (2003). Motor skill learning theory (part I). *Use of Force Journal, 3*(1).

Combs, John E. (2002). Scenario-based training. *Use of Force Journal,* 2(6).

Combs, John E. (2002). Distance education. *FBI National Academy Associate, 4*(4), 13-14; 18-20.

## PROFESSIONAL OPINIONS

In the course of my employment at the North Carolina Justice Academy, I have been retained in both federal and state court systems (NC, VA, GA, & SC), to provide written, deposition, and courtroom testimony in the following use of force, physical fitness, & product liability cases:

56.     Lambert v. Town of South Boston, VA. United States District Court for the Western District of Virginia, Danville Division; Civil Action No.: 4:15-CV-00017. Attorney: Jim Daniel; Daniel, Medley & Kirby, P.C., 434-792-3911. *(TASER use during service of a mental commitment – plaintiff deceased).* *Discovery.*

55.     Greene v. County of Durham Sheriff Department. United States District Court for the Middle District of North Carolina; Civil Action No.: 1:14-CV-00153. Attorney: Marie Inserra, Senior Assistant County Attorney, (919) 560-0655. *(UOF in the detention center during a cell search). Discovery.*

54.     Rodney Wagstaff v. J.B. Throckmorton and Town of South Boston, VA. Halifax County Circuit Court; Case No.: CL15000193-00. Attorney: Martha W. Medley; Daniel, Medley & Kirby, P.C., 276-666-1585.

53.     State of NC v. James Coleman Johnson. General Court of Justice, Superior Court Division; File No.: 14 CRS 004493-94. Attorney: Barrett Temple, Assistant District Attorney, County of New Hanover, 910-772-6900. *(Wilmington PD officer charged with simple assault). Trail set for November 2.*

52.     Vidal v. Brunswick County Sheriff et. al. Attorney: Christopher J. Geis, Womble Carlyle Sandridge & Rice, 336-721-3543. *(TASER use on person with possible mental illness).*

51.     Ledbetter v. City of Durham. General Court of Justice, Superior Court Division; File No.: 12 CVS 005955. Attorney: Kimberly M. Rehberg, Sr. Assistant City Attorney, City of Durham, 919-354-2716. *(Facial injury to plaintiff after a takedown on a drug arrest). Discovery.*

50.     Loy v. City of Salisbury. United States District Court for the Middle District of North Carolina; Civil Action No.: 1:14-CV-259. Attorney: Scott MacLatchie/Womble Carlyle Sandridge & Rice, 704-331-4942. *(Injury to individual after being taken to the ground by officer). Discovery.*

9

49.     Langley v. Town of Leeland.  United States District Court for the Eastern District of North Carolina, Southern Division; Civil Action No.: 7:13-CV-179. Attorney:  Brian Edes/Crossley McIntosh Prior & Collier, Wilmington, NC, (910) 762-9711.

48.     Mills v. Town of Wrightsville Beach.  United States District Court for the Eastern District of North Carolina, Southern Division; Civil Action No.: 7:13-CV-00138. Attorney:  Brian Edes/ Crossley McIntosh Prior & Collier, Wilmington, NC, (910) 762-9711. *(Officer struck arrestee with closed fist during a struggle inside the booking room). Discovery.*

47.     Brian C. Lee v. Town of Seaboard.  United States District Court for the Eastern District of North Carolina; Civil Action No.: 2:13-cv-20-D.  Attorney: Kari Johnson/ Cranfill, Sumner, & Hartzog, 919-863-8722. *(Officer fired his weapon at a vehicle that he believed was attempting to run over him). Discovery.*

46.     Joshua M. Mitchell v. Robert A. Wolfe.  United States District Court for the Eastern District of North Carolina, Western Division; Civil Action No.: 5:13-CV-752. Attorney: Lee Davis, Davis & Hamrick, L.L.P., (336) 725-8385. *(Use of knee-strikes and arm-bar takedown during handcuffing). Discovery.*

45.     The Estate of Ronald H. Armstrong v. The Village of Pinehurst. United States District Court for the Middle District of North Carolina; Civil Action No.: 1:13-cv-407. Attorney: Kari Johnson/ Cranfill, Sumner, & Hartzog, 919-863-8722. *(Plaintiff died after officers attempted to subdue him while serving involuntary commitment papers on him). Discovery.*

44.     Emmerli Wilcoxon v. The City of Raleigh Police Department, et al. United States District Court for the Eastern District of North Carolina; Civil Action No.: 5:13-cv-00732-FL. Attorney: Hunt K. Choi, Deputy City Attorney, Raleigh City Attorney's Office. (919) 996-6560. *(Officer-involved shooting). Discovery.*

43.     Michael Elder v. City of Danville, VA and Officer Thompson.  Civil Division for the Western District Court of Virginia, Danville; Case No. 4:13cv00047. Attorney:  James A.L. Daniel, Daniel, Medley, & Kirby, P.C. 434-792-3911 *(Use of OC spray and strike techniques on individual failing to comply with arrest on FTA warrant). Case dismissed at Bench Trial on 5/22/14.*

42.     Pamela Adams as Administrator of the Estate of Hatchel P. Adams, Deceased v. Ptl. David Whitley, et al. Hampton Virginia Circuit Court; Case No. CL11-2511.  Attorney: James A. Cales III/Furniss, Davis, Rashkind and Saunders, PC. 757-461-7100. *(Emergency Custody Order service, UOF & TASER use). Discovery.*

41.     Raina Conner, Administratrix of the Estate of Adam Wade Carter, v. Wake County, Sheriff Donnie Harrison et al. United states District Court for the Eastern District of North Carolina, Western Division.  Case No. 5:12-CV-701-H.  Attorney: J. Nicholas

Ellis/Poyner & Spruill, LLP, 919-783-2907. *(Subject shot by deputy while advancing with a knife). Discovery.*

40. Robert E. Young v. City of Rockingham et al. United states District Court for the Middle District of North Carolina, Greensboro Division. Case No. 1:12-CV-1003. Attorney: Kari Johnson/ Cranfill, Sumner, & Hartzog, 919-863-8722. *(Plaintiff tackled and TASER deployed after 2 foot pursuits following a traffic stop). Discovery.*

39. Beatriz Torres Dennis as Personal Representative of the Estate of Andrew Orval Torres, Deceased v. City of Greenville (SC), et al. United States District Court for the District of SC, Greenville Division. C.A. 6:12-1767-JMC. Attorney: Luanne Runge/Gallivan, White & Boyd, P.A. 864-271-5359. *(Officers serving an Order of Detention, TASER & UOF). Discovery.*

38. Sarah Strickland, et al. v. City of Clinton P.D., et al. United States District Court for the Eastern District of NC, Southern Division. Court File No.: 7:12-CV-207. Attorney: Kari Johnson/ Cranfill, Sumner, & Hartzog, 919-863-8722 *(TASER use by resource officer on student fighting at a high school). Discovery.*

37. Carlise Lumpkin and Linda Akins v. Sheriff Larry Rollins, et al. United States District Court for the Eastern District of NC, Western Division. Civil Action No. 5:12-CV-00297-BO. Attorney: Natalia K. Isenberg/Teague, Campbell, Dennis & Gorham, LLP. (919) 873-0166. *(UOF during narcotics search warrant service by Harnett CO. S.O.). Case Settled.*

36. Tracey Bernard Gilyard and Tiffany Adams v. Randy Benson, E. Shaw, and Richland County Sheriff's Department. United States District Court, District of South Carolina, Columbia Division. Civil Action Number: 3:12-CV-01336-CMC. Attorney: Robert D. Garfield, Davidson & Lindemann, PA; 803-806-8222. *(TASER use on plaintiff during traffic stop). Dismissed in Summary Judgment. .*

35. Roylin J. Beale v. Deputy J.P. Madigan, et al. Attorney: Scott Hart/Sumrell, Sugg, Carmichael, Hicks & Hart, P.A.,: File No. 60231.16. (252) 633-3131; (800) 272-8369. *(Inmate tased at Pitt County Jail during booking process). Dismissed - Summary Judgment 8/26/14.*

34. Everett Fifield v. Dare County Sheriff, et al. Attorney: Sonny S. Haynes, Womble Carlyle Sandridge & Rice, LLP, (336) 721-3632. *(Deputy bitten when attempting to stop plaintiff from swallowing drugs on a traffic stop. TASER, pressure points, and strikes used). Discovery.*

33. Lois Hardy v. City of Vanceboro, et al. United States District Court for the Eastern District of NC. Civil Action No. 4:10-CV-189-D; Attorney: Scott Hart, Sumrell, Sugg, Carmichael, Hicks & Hart, P.A.,: (252) 633-3131; (800) 272-8369. *(Wife of arrestee charged w/RDO & assault; OC spray & physical force used). Discovery.*

11

32.  Eugene Dunston v. Wake County Sheriff's Office. United States District Court for the Eastern District of North Carolina, Western Division; Civil Action No.: 5:11-CV-747-F; Attorney: Nick Ellis, Poyner/Spruill, 252-452-2127. *(Detention deputy is assaulted by inmate inside cell block).* **Trial set for March 9.**

31.  Eugene N. Dunston v. The City of Raleigh and Officer D.P. Egan of the Raleigh Police Department, in his individual capacity. United States District Court for the Eastern District of North Carolina, Western Division; Civil Action No.: 5:11-CV-677; Attorney: Dorothy K. Leapley, Deputy City Attorney, 919-831-6560. *(Use of a leg sweep and arm bar takedown during warrant service after traffic stop).* **Case settled.**

30.  George V. Stokes v. Glen A. Harris, Officer of the Rockingham City Police Department, individually and in his official capacity, City of Rockingham. United States District Court for the Middle District of North Carolina; Civil Action No.: 1:10-cv-935; Attorney: Kari Johnson/ Cranfill, Sumner, & Hartzog, 919-863-8722. *(Use of TASER and physical force during an arrest at a traffic stop).* **Discovery.**

29.  William S. Mills, Ancillary Administrator of the Estate of Aaron Lorenzo Dorsey v Duke University, a Not for Profit Corporation, Larry Carter, and Jeffrey Liberto, Jointly and Severally; Attorney: Dan Hartzog; Cranfill, Sumner, & Hartzog, LLP. (919) 863-8705. *(Shooting of suspect during a struggle for the officer's weapon).* **Defense awarded Summary Judgment.**

28.  Bryant Mitchell v. City of Danville, Virginia, Bonnie Nicole Jones and Jerry Wayne Riggins; United States District court for the Western District of Virginia, Danville Division; Civil Action No. 4:11-cv-00020; Attorney: Martha Medley; Daniel, Medley, & Kirby, P.C. 434-792-3911. *(Use of K9 after a break-in of a pharmacy).* **Case settled.**

27.  Bryan DeBaun v. Daniel J. Kuszaj and City Of Durham, NC; Durham County Superior Court; 11 CVS 3999; Attorney: Joel M. Craig, Kennon/Craver, Attorneys at Law. 919-490-0500. *(Use of TASER).* **Dismissed in Summary Judgment, August 2012.**

26.  Sharlene English, Individually and as the Administrator of the Estate of Derek Jerome Jones, deceased v. City of Martinsville and Ronnie Wray and TASER International, Inc. United States District Court for the Western District of Virginia; 4:11CV00001. Attorney: Martha White Medley, Daniel, Medley, & Kirby, P.C. 276-666-1585 or 434-792-3911. *(Use of TASER while investigating a possible break-n after theft from grocery store).* **Dismissed, December 2011.**

25.  Charles Boswell v. City of Oxford/Oxford Police Department. United States District Court for the Eastern District of NC, Western Division; 5:11-CV-94-F. Attorney: Kari Johnson/ Cranfill, Sumner, & Hartzog, 919-863-8722. *(Use of TASER after foot pursuit).* **Discovery.**

24.  Armeria and Margaret Graham v. City of Whiteville. State of North Carolina, General Court of Justice, Superior Court Division; Civil Action No. 10-CV-000592. Attorney:

Brian Edes/ Crossley McIntosh Prior & Collier, Wilmington, NC, (910) 762-9711. *(Use of OC and "takedown" of 2 females on a traffic stop). Deposed on July 1, 2011. Case settled July 2011.*

23.   Nikki Thompson v. City of Danville, VA & City of Danville Police Department and Sgt. V.T. Brown. United States District Court for the Western District of Virginia, Danville Division; 4:10-CV-00012. Attorney: James A.L. Daniel, Daniel, Medley, & Kirby, P.C. 434-792-3911 *(Use of TASER on handcuffed female suspect after arrest following traffic stop). Dismissed in Summary Judgment, June 2011.*

22.   Tammy Lou Fontenot, as Administratrix of the Estate of Darryl Wayne Turner, deceased v. TASER International, Inc.et al. United States District Court for the Western District of NC, Charlotte Division; 3:10-CV-125. Attorney: John R. Maley, Barnes & Thornburg, LLP, 317-231-7464 *(TASER use by officer during arrest). Trial week July 11-18, 2011.*

21.   Roberts v. City of Kinston, et al. United States District Court, Eastern District of NC, Eastern Division; 4:09-CV-00207-F. Attorney: Scott C. Hart, Sumrell, Sugg, Carmichael, Hicks, & Hart, P.A. 252-633-3131 *(TASER, OC, Strikes, and Takedowns during undercover drug buy). Discovery.*

20.   White v. Van Duncan. U.S. District Court for the Western District of NC, Asheville Division; 1:10CV14-03-MU. Attorney: Curtis W. Euler, Associate County Attorney, Buncombe County, 828-250-4112 *(TASER use and take-down during cell extraction).*

19.   Stephen Williamston, et ux. v. Youngsville Police Department, et al. U.S. District Court for the Eastern District of NC; 5:09-CV-543. Attorney's: Jim Secor & William Hill, Frazier, Hill, & Fury, 336-378-7785 *(UOF, strikes and LVNR on resisting handcuffed arrestee). Settled at mediation, 09/22/10.*

18.   Tevin Boose and Sandra Winters v. Joel Cooper and Plaza Associates, Inc. Wake County, Civil Action No.: 09 CVS 22782. Attorney: Carrie Barbee, Ragsdale Liggett PLLC, 919-881-2221 *(broken arm after quick-take arm bar outside mall, during arrest).*

17.   David Rose v. Wayne County Sheriff's Office and Sheriff Carey A. Winders. United States District Court, Eastern District of NC, Western Division, Civil Action 5:09-CV-00366. Attorney: Dan Hartzog, Jr., Cranfill, Sumner, & Hartzog, 919-863-8736 *(deputy terminated – fitness for duty issue, physical demands)*

16.   Steven Wayne Thomas v. R.V. Holly, et. al. District Court for the Eastern District of NC, Western Division, Civil Action 5:10-CV-52-BO. Attorney: Bradley Wood/Womble, Carlyle, Sandridge & Rice, 336-728-7012. *(TASER, OC, & physical control after officer assaulted). Discovery.*

15.   Jerry Scantling v Onslow County Board of Commissions/Sheriff's Department. I.C. No. 096774. CS&H No. 1103.991679. Attorney: Brian Kromke/ Cranfill, Sumner, &

Hartzog, 910-332-0949. *Discovery.* Deposition, May 7, 2010, Salemburg, NC *(stroke after a departmental physical fitness test).*

14. Whitley v. Scotland Neck. General Court of Justice, Superior Court Division, Halifax County, NC. Civil Action No.: 5:08-CV-427-D. Attorney: Kari Johnson/ Cranfill, Sumner, & Hartzog, 919-863-8722. *Discovery (subject shot by police after he shot at officers at different locations)*

13. Danny Ray Bridges v. Chad Murray, et al. United States District Court, Western District of North Carolina (Asheville Division). Civil Action No.: 1:08-CV-00013-GCM. Attorney: Scott MacLatchie/ Womble Carlyle Sandridge & Rice, 704-331-4942. *Discovery.* Deposition, July 29, 2009, Charlotte, NC *(plaintiff received a broken nose after deputy delivers a closed-fist strike while struggling during an arrest). Settled, 09/30/10.*

12. Smith v. Garcia and the Town of Spring Lake. General Court of Justice, Superior Court Division, Cumberland County, NC. Civil Action No.: 08-CVS-10893. Attorneys: Kari Johnson & Dan Hartzog/ Cranfill, Sumner, & Hartzog, 919-863-8722. *(officer shot suspect wielding a brick). Settlement in process – trial set for August 10-11, 2011.*

11. James David Moss v. Jeffrey N. Mackey, Town of Maggie Valley Police, et al. United States District Court, Western District of North Carolina (Asheville Division). Civil Action No.: 1:07-CV-135. Attorney: Scott MacLatchie/ Womble Carlyle Sandridge & Rice, 704-331-4942. *Case Dismissed in Summary Judgment (officers used pepper spray to control resisting subject).*

10. Richard Edward Breitwieser and Joshua Crihfield v. Danville Police Department, et al. U.S. District Court, Western District of Virginia (Danville Division). Consolidated Case No.: 4:07-CV-00010. Attorney: Jeremy Carroll/Glenn, Feldmann, Darby & Goodlatte, 540-224-8036. *Case Dismissed in Summary Judgment (TASER used during arrest at a convenience store).*

9. Jimmy D. Ridge v. City of Randelman, et al. General Court of Justice, Superior Court Division, Randolph County, NC. Civil Action No.: 07 CVS 793. Attorney: Kari Johnson/Cranfill, Sumner, & Hartzog, 919-863-8722. *Discovery (shooting during traffic stop after plaintiff came after officer with a blade).*

8. State v. Michael Loukos. General Court of Justice, Superior Court Division, Wilkes County, NC. Criminal Action No.: 07-CRS-821. John Sherrill/Assistant District Attorney, 336-667-0109. Served as expert witness/consultant for SBI and Wilkes County District Attorney's Office. *Officer convicted on misdemeanor charge.*

7. Christie Arrington v. Michelle Peele. United States District Court, Eastern District of North Carolina, Western (Raleigh) Division. Civil Action No.: 507 CV 00011BO. Attorneys: Patricia L. Holland, 919-424-8608; Norwood Blanchard, 910-332-0944 *(officer shot suspect who attempted to strike her with stolen motor vehicle).*

14

6.  Anthony Wright v. Oxford Police et al.  United States District Court, Eastern District of North Carolina, Western (Raleigh) Division.  Civil Action No. 5:05 CV-804-FL (2).  Attorney:  Kari Johnson/Cranfill, Sumner, & Hartzog, 919-863-8722.  *(OC spray used on plaintiff during an arrest while attempting to serve a warrant).  Summary Judgment granted, October 2007.*

5.  Manuel Pena v. Town of Clayton, et al.  United States District Court, Eastern District of North Carolina, Western Division.  Civil Action No. 5:04 CV-970-BR(3).  Attorney:  Brian Edes/ Crossley McIntosh Prior & Collier, Wilmington, NC, (910) 762-9711.  Deposition date, February 27, 2006 Raleigh, NC.  Trial testimony, September 17, 2009.  *Jury found for defendants on excessive force claim (shooting while attempting to locate an escaped prisoner).*

4.  Charles Alford v. Cumberland County, et al.  United States District Court, Eastern District of North Carolina.  No. 5:04-CV-108-FL(3).  Attorney:  Doug Canters/Assistant County Attorney, Cumberland County, 910-678-7760.  Deposition date, April 5, 2005 Fayetteville, NC *(shooting during a drug raid after suspect grabbed officer's weapon).*

3.  Bobby Reed and Melissa Reed v. City of Lavonia, et al.  United States District Court, Middle District, Athens Division.  CAFN: 3:03-CV-111(CAR).  Attorney:  Thomas Mitchell, 770-932-3552.  Deposition date, 09/17/04 Buford, GA.  Trial testimony, August 17, 2005 Athens, GA.  *Case settled after trial (ASP baton used during struggle with arrestee on the side of the interstate during traffic stop).*

2.  Lori Gamble Harvey v. Town of Kernersville, NC.  United States District Court, Middle District of North Carolina.  1:03CV00505. Attorney:  Pat H. Flanagan/Cranfill, Sumner, & Hartzog, 704-940-3442.  Deposition date, 04/08/04 Raleigh, NC.  *Case settled (arrestee's leg broken during a sweep take-down during traffic stop).*

1.  Mary Ann Brummell and Louise J. Brummell v. City of Oxford, NC.  United States District Court, Middle District of North Carolina. 5:00-CV-621-F(2). Attorney:  Missy S. Sumerell/Cranfill, Sumner, & Hartzog, 704-940-3442.  *Dismissed in Summary Judgment - on appeal.*

## INVITED PRESENTATIONS

"Developing and Validating Physical Fitness Standards."  International Conference – International Law Enforcement Educators & Trainers Association (ILEETA), Chicago, IL, April 2013

"Developing and Validating Physical Fitness Standards."  *Police Liability in NC – Lorman Educational Services,* Raleigh, North Carolina.  October 2012.

15

"Developing and Validating Physical Fitness Standards." International Conference – International Law Enforcement Educators & Trainers Association (ILEETA), Chicago, IL, April 2012 (selected, but unable to attend/present).

"Developing and Validating Physical Fitness Standards." International Conference – International Law Enforcement Educators & Trainers Association (ILEETA), Chicago, IL, April 2011.

"Multilateral Training & Fitness Standards Validation." State SWAT Symposium – NC Tactical Officer's Association, Raleigh, NC, March 14, 2011.

"The Police Officer Physical Abilities Test (POPAT)." International Conference – American Society of Law Enforcement Trainers, Albuquerque, New Mexico, January 2006.

"Nutrition for Life – Wellness and You." North Carolina Department of Justice, Raleigh, North Carolina, October 2005.

"Functional Conditioning for Motor Skill Development." International Conference – American Society of Law Enforcement Trainers, Jacksonville, Florida, January 2005.

"Stress Management." North Carolina Correctional Association Annual Conference, Durham, NC. November 18, 2004.

"Functional Conditioning for Motor Skill Development." Physical Fitness Instructor's Conference – Coastal Plains Law Enforcement Training/Wilson Technical Community College, Wilson, NC. March 3, 2004

"Functional Conditioning for Motor Skill Development." International Conference – American Society of Law Enforcement Trainers, St. Louis, Missouri, January 2004.

"Stress Management for Law Enforcement Officers." International Conference - American Society of Law Enforcement Trainers, Ontario, California. January 9, 2003.

"Understanding the Use of Force Continuum." Police Liability Seminar – Lorman Educational Services, Raleigh, North Carolina. July 25, 2002.

"Ground Defense for Law Enforcement." NC Department of Correction – Less Than Lethal Defensive Tactics Conference, Raleigh, North Carolina. May 30, 2002.

"Stress Management." NC Telecommunicator's Conference, Raleigh, North Carolina. October 5, 2001.

"Stress Management for Law Enforcement Officers." Southwestern Illinois Law Enforcement Commission, Belleville, Illinois. September 18, 2001.

16

"Stress Management for Law Enforcement Officers." East Central Illinois Police Training Project, Urbana, Illinois. May 29, 2001.

"Stress Management for Law Enforcement Officers." International Conference – American Society of Law Enforcement Trainers, Orlando, Florida. February 16, 2001.

## PROFESSIONAL ORGANIZATIONS/COMMITTEES (past & present)

- Co-Chair, Pfeiffer University Criminal Justice Curriculum Advisory Board
- Chair, NC Justice Academy *Fit to Live* Workplace Wellness Committee
- Faculty Advisory Council, Campbell University/Ft. Bragg & Pope AFB campuses
- NC Department of Justice, Wellness Advisory Board
- USA Track & Field
- USA Weightlifting
- National Strength and Conditioning Association
- National Strength and Conditioning Association, Tactical Strength & Conditioning
- American College of Sports Medicine, Alliance of Health and Fitness Professionals
- NC Tactical Officer's Association
- MPA Alumni Interest Group, UNC-Charlotte
- NC Law Enforcement Training Officer's Association
- American Society of Law Enforcement Trainers – Former NC State Director/Representative
- International Law Enforcement Educators and Trainers Association
- Diver's Alert Network (PADI Divemaster )
- Florida SWAT Association
- NC Department of Juvenile Justice, Subject Control Curriculum Advisory Board
- Chapter President – Southern Piedmont Chapter, NC Police Benevolent Association, 1994 -1998
- Alpha Kappa Delta, Pfeiffer University, 1994

## RELEVANT PROFESSIONAL EXPERIENCE

**Police Officer**                                                               1987-Present
- Served as a full-time sworn law enforcement officer (1987-1999) with the Atlanta, Clayton County (GA), Salisbury and Kannapolis (NC) Police Departments.
- Assignments included: Patrol, Housing Authority, Undercover and Surveillance, Bicycle Patrol, School Resource Officer, Field Training Officer, Background Investigations, In-Service Training, SWAT, continual Criminal Case and Traffic Crash Investigation, and the Accreditation Management Team.
- Served as a sworn Reserve Police Officer with the City of Greensboro (December 1999-2010), in the Special Operations Division. Worked uniform patrol in all districts of the city, handled calls for service, maintained pro-active patrol, and emergency response. This was a sworn, paid position with full arrest powers and duties.
- Served with the Apex P.D. as a sworn, Reserve Police Officer from May-October 2010 in the Training Division.

17

- Currently sworn with the Fayetteville P.D. as a Police Officer (reserve), assigned to the Services Bureau, Training Center. Also sworn with the Sampson County Sheriff's Office as a Deputy Sheriff (reserve).

## SPECIALTY & INSTRUCTOR CERTIFICATION COURSES

### Subject Control/Use of Force

- Certified Criminal Justice School Director (NC Dept. of Justice, Criminal Justice Education & Training Standards Commission)
- Tactical Training Certificate Program (NC Justice Academy)
- Specialized Defensive Tactics Instructor (NC Dept. of Justice)
- Subject Control and Arrest Techniques Instructor (NC Dept. of Justice)
- Offensive Strategic Body Defense – Level 100, 300, 500, & Senior Instructor (Champion MMA)
- 2nd Degree Black Belt (Ni Dan), Keikan Jitsu
- Basic Ground Defense Instructor (NC Dept. of Justice)
- Advanced Ground Defense Instructor (NC Dept. of Justice)
- PPCT Defensive Tactics Instructor (Pressure Point Control Systems, Inc.)
- Use of Force Instructor (National CJ Training Council)
- TASER Instructor (TASER International, Inc.)
- S.P.E.A.R. Instructor (Blauer Tactical Confrontation Management Systems)

### Physical Fitness, Health & Wellness

- Health Promotion Director (Cooper Institute of Aerobics Research)
- Certified Strength & Conditioning Specialist (NSCA)
- Certified Exercise Physiologist (American College of Sports Medicine)
- Specialized Physical Fitness Instructor (NC Dept. of Justice)
- Physical Fitness Specialist (Cooper Institute of Aerobics Research)
- Level 1 Track & Field Coach (USA Track & Field)
- Level 1 Sports Performance Coach (USA Weightlifting)
- Fitness Coordinator and Combat Fitness Instructor (Fit Force)

### Officer Safety, Munitions, Medical

- Explosives and Hazardous Materials Specialized Instructor (NC Dept. of Justice)
- Hazardous Materials Technician (OSHA/FEMA)
- Radiological Emergency Response Operations (FEMA)
- Hazardous Materials Technician for CBRNE Incidents (FEMA)
- Integrated Capstone Event for Hazardous Materials (FEMA)
- FEMA/Emergency Management Institute – *ICS Courses 100, 200, NIMS 700, 800; WMD Radiological/Nuclear Awareness; Radiological Emergency Management; Military Resources in Emergency Management; Exercise Design*

- Officer Safety Instructor (NC Dept. of Justice)
- Tactical Baton Instructor (Armament Systems and Procedures)
- H&K Redman Simulations Instructor
- Simunitions Supervisor/Instructor
- OC Spray Instructor (Armor Holdings)
- Chemical Munitions Instructor (Armor Holdings)
- Specialty Impact Munitions Instructor (Armor Holdings)
- Distraction Devices Instructor (Armor Holdings)
- Ropes Challenge Course Facilitator
- NC EMT-Basic
- Diver Medical Technician/Nat'l Board of Diving and Hyperbaric Medical Technology
- International Trauma Life Support (Advanced)

# John E. Combs

Consulting Services
PO Box 99; Salemburg, NC 28385
910-525-4151
jcombs@ncdoj.gov

Consultations: Preliminary discussions with potential clients are free.

Fees & Rates: A $1500.00 retainer fee is applied to services requested.

| SERVICE* | DESCRIPTION | RATES |
|---|---|---|
| **Case Analysis** | • *Review court filings, reports, depositions, transcripts*<br>• *Review audio, photo, video exhibits*<br>• *Opinion report composition*<br>• *On-Site / Scene visits*<br>• *Event reconstruction (video/still photography)*<br>• *Research* | $150.00 *Hour* |
| **Testimony** Deposition | *Does not include travel expenses* | $150.00 *Hour* |
| **Testimony** Trial | *Does not include travel expenses* | $150.00 *Hour* |
| **Travel** Day | *Roundtrip travel <u>less than</u> 300 miles of Angier, NC.* | $75.00 *Hour***\** |
| **Travel (per diem)** Overnight | *Roundtrip travel <u>greater than</u> 300 miles Angier, NC. Air not included.* | $300.00 *Day+* |

*Updated October, 2015;

** Includes mileage; Does not include lodging, rental car, or meals

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

**GWENDOLYN SMALLS as Administratrix**                    CASE NO.: 4:15CV00017
**of the Estate of LINWOOD RAYMOND**
**LAMBERT, JR., deceased**
**2846 Fairfield Avenue, Apt. #E**
**Richmond, Virginia 23223**

                          Plaintiff,

v.

**CHIEF of POLICE, JAMES W. BINNER,**
**DEPUTY CHIEF OF POLICE BRIAN K.**
**LOVELACE, CORPORAL TIFFANY BRATTON,**
**OFFICER CLIFTON MANN, OFFICER**
**TRAVIS CLAY, Individually and in their**
**official capacity as a member of the South**
**Boston Police Department, and TOWN OF**
**SOUTH BOSTON**

                          Defendants.

**Opinion Expert Report: John G. Peters, Jr., Ph.D., CTC, CLS**
209 South Stephanie Street • Suite B249 • Henderson, Nevada 89012
Telephone: 717.538.5940

    Pursuant to Fed. R. Civ. P. 26(1)(2), I, John G. Peters, Jr., Ph.D., hereby submit my report that contains a complete statement of all opinions to be expressed and the bases and reasons therefore; the data and other information I considered in forming the opinions the exhibits or list of references I used as a summary of or support for the opinions; my qualifications, including a list of all publications authored within the preceding ten years; the compensation to be paid for the study and testimony time; and a listing of any other cases in which I have testified as an expert at trial or by deposition within the preceding four years.

*John G. Peters, Jr., Ph.D.*

John G. Peters, Jr., Ph.D.
November 10, 2015

## SUMMARY OF FACTS

See APPENDIX A.

## CASE SPECIFIC DOCUMENTS REVIEWED/CONSIDERED

See APPENDIX B.

## COMPENSATION

See APPENDIX C.

## FOCUS OF ANALYSIS

Through counsel for Defendants, I was asked to review the documents produced in discovery, certain pleadings, and other publically available documents and then analyze the officers' use of force on Mr. Linwood Raymond Lambert, Jr. (Mr. Lambert), deceased, in addition to related issues and then offer opinions about same. The analyses and preliminary opinions developed are contained within this report.

I have been retained to provide preliminary opinions in the aforementioned areas of law enforcement practices. I am not a party to this litigation, and am over the age of twenty one. A copy of my *Curriculum Vitae* is attached to this report, which identifies my education, professional experience, over 200 publications, and other training and experience. There are areas of my education, training, and experience, which are very relevant to issues identified and opinions developed in this matter.

One area is law enforcement investigations. I have been an investigator, and have conducted primary research on the management of criminal investigations across the United States for a private research firm that had received research funding from the United States federal government.

Another area is training. I have been providing instructor-level, or Train-the-Trainer, training throughout North America and England since 1979. Topics have included, but are not limited to: criminal investigation management; investigating arrest-related deaths; sexual harassment; sexual harassment investigations; use of force; expandable baton; straight baton; side-handle baton; tactical handcuffing; tactical flashlight; electronic restraint devices; handgun retention and disarming; unarmed defensive tactics; handling of emotionally disturbed persons; restraint devices; identification and prevention of in-custody (or arrest-related) death (ARD); etc. I have trained thousands of law enforcement officers in these topics. I also hold a California

*CLEAR Career Technical Education Teaching Credential: Public Service* from the teacher credentialing program at California State University, San Bernardino (CSUSB).

I am also a graduate of TASER ECD Instructor programs and have taken a five-second TASER ECD exposure, the TASER Armorer program, the TASER Evidence Collection and Analysis Training program, the X3™ ECD, the XREP™, the AXON™, and Evidence.com. Additionally, I have co-authored 2 training workbooks, **ECD Forensic Analysis** (Versions 1 & 2), which are used in a law enforcement forensics ECD program I also co-developed. I have taught this program to law enforcement officers across the United States. A customized program was developed for a Wyoming law enforcement agency that focused upon electronic control device basic and evidence collection.

As a former Pennsylvania law enforcement patrol officer and Massachusetts law enforcement administrator, I am familiar with the need for written policy, rules, and procedures, and the need to properly train officers about them. I was also President of a Pennsylvania Civil Service Commission, where I oversaw testing requirements for law enforcement officers and also was involved with disciplinary actions involving law enforcement officers. Supervisory training is also a key ingredient to organizational effectiveness, as is having contemporary policies and procedures. I have written about these issues, conducted organizational diagnoses about management, training, policies and procedures, etc. in law enforcement organizations, and hold graduate degrees in management.

I have been teaching courses that focus upon use-of-force, defensive tactics, tactical handcuffing, restraint methods, excited delirium, sudden, in-custody deaths, arrest-related death, etc. for over four decades across North America. Additionally, I have coordinated and held 9 international conferences on excited delirium, arrest-related deaths, and related subjects in Las Vegas, Nevada beginning in 2006. Most recently I coordinated the first global law enforcement camera-based systems symposium, which was held in Las Vegas, NV in 2015.

I have also written about law enforcement policy and procedures, use-of-force, excited delirium, sudden in-custody (or arrest-related) death, and related topics, I have also authored warnings for several law enforcement products including, but not limited to, handcuffs, pepper spray, restraint devices, including electronic restraint devices.

## RIGHT TO AMEND

It is my understanding that Discovery is continuing. Therefore, I reserve the right to amend and/or supplement these opinions in the event that additional information becomes available, or in response to expert disclosures of the defendants, or in the event that questions are asked of me that do not relate to information contained in this disclosure.

## OPINION STANDARDS

Expressed preliminary opinions are to a reasonable degree of scientific certainty and/or to a reasonable degree of professional certainty.

## OPINION METHODOLOGY

The opinions herein were developed using one or more qualitative and quantitative research methodologies, in addition to my education, training, experience, and literature review. These research methodologies may have included Historiography, Content Analysis, Phenomenology, Ethnography, Discourse Analysis, and Case Study. Although not a research methodology, chronology has also been used: "the setting down of occurrences and events in the order in which they happened" (Leedy & Ormrod, 2001, p. 174).

The documents reviewed are classified in the social sciences as *archival records*. According to Graziano and Raulin (1997), archival records are "records that already exist" (p. 135). Archival records are one type of unobtrusive measure available to researchers and/or experts. The review and analysis of archival records is an accepted research methodology in the social sciences, and applies to law enforcement research. While not as exacting as *experimental research* where there are control and experimental groups, conducting interviews and examining archival records, plus conducting observations are methodologies that are used in the social sciences.

## PRE-INCIDENT OPINIONS

*Pre-Incident Opinions* are those professional opinions that focus on events that took place prior to the instant matter.

1.   **The Town of South Boston and/or its Police Chief had issued a written "Use of Force" policy that is consistent with good leadership, management, generally-accepted police practices.**

General Order Number 112.ADM, "Use of Force" had been issued by Chief Binner on August 1, 2012 (Binner, Use of Force, 2012, p. 1). The General Order amended a previous General Order regarding "Use of Force" dated December 22. 2008 (p. 1). The development and issuance of one or more written directives is usually collected in a manual or binder and referred to as "General Orders" and/or "Policy Manual" is consistent with recommended criminal justice "best practices."

The Commission on Accreditation of Law Enforcement Agencies, Inc., (CALEA) standard 1.3 *Use of Force* directs law enforcement administrators to develop "A written directive [that] states personnel will use only the force necessary to accomplish lawful objectives"

(Commission on Accreditation of Law Enforcement Agencies, Inc., November 2001, p. 1-4). A related CALEA standard, 1.3.4 states: "A written directive governs the use of authorized less-than-lethal weapons by agency personnel" (p. 1-4).

TASER electronic control weapons (ECW) were identified and discussed in the Town of South Boston General Order 112.ADM (see section V.F). This is consistent with TASER training. As stated in TASER lesson plans, it is the responsibility of the agency to develop, implement, and train on its ECD policy. Each law enforcement agency is expert in and responsible for its own use-of-force deployment and post-deployment policies and procedures (Instructor Certification Course, *Lesson Plan* versions 9.0 (2003), 10.0 (2003), 11 (2004), 12 (2005), 13 (2006), V14 (2007), V14.2 (2008), V15 (2009), V16 (2009, December) User Slide 91, V17 (2010, May) User slides 3 and 184. Each law enforcement agency that adopts TASER products has a duty to establish its own policy, procedure, training, etc. regarding the electronic device(s). This is not only reasonable, but is also responsible, as the manufacturer does not have any ministerial authority over the government entity or the law enforcement agency or the user of the product. A reasonable government entity administrator or board member knows that the entity, or employer, has a duty to train its employees in core tasks, and also to regulate employee discretion about a product through the use of written policies, procedures, and/or other guidelines.

For example, **Slide #184: Agency Policy Considerations for Use of Force** "It is the responsibility of each law enforcement agency to create their own use of force policy and determine how the TASER ECDs fit into their policy and training based on legal and community standards. Your use of force policy should address ECD use and be clearly communicated to all officers" (TASER, User Certification Course, TASER X26 ECD, Version 17.0, Slide #184).

> Instructor Notes: "It is the responsibility of each law enforcement agency to create their own use of force policy and determine how the TASER ECDs fit into their policy and training based on legal and community standards. Your use of force policy should address ECD use and be clearly communicated to all officers.
> Remember, the TASER ECD is not intended to be a substitute for deadly force" (TASER training materials Version 17, PowerPoint Slide #3).

Based upon my education, training, and experience, the Town of South Boston, Virginia met and/or exceeded national policy recommendations and/or requirements regarding policies, procedures, and rules governing its sworn employees' use-of-force.

2.   **The Town of South Boston and/or its Police Chief had purposively trained their officers according to Commonwealth of Virginia and/or other generally accepted law enforcement standards.**

According to the **Standards for Law Enforcement Agencies** (November 2001), training is noted as one of the most important responsibilities and duties of a law enforcement agency. According to the Commission on Accreditation for Law Enforcement Agencies (CALEA), "well trained officers are generally better prepared to act decisively and correctly in a broad spectrum of situations" (p. 33-1).

It is well publicized in the criminal justice community and generally accepted that the employer and the employee's administrator must reasonably train **employees in their core tasks** (see *Understanding & Managing Law Enforcement Liability: Critical Areas of Concern*, 1993; City of Canton, Ohio v. Harris, et al, 489 U.S. 378, 109. S.Ct. 1197 [1989].) Contemporary and reasonable law enforcement administrators and other municipal administrators know when they fail to conduct core training, they can be held to be deliberately indifferent under what one court has defined as "just not giving a damn"(Bordanaro v. McLeod, 871 F2d 1151, 1164 [1st Cir. 1989]. These and similar court holdings are discussed in contemporary training courses, which contemporary and reasonable county and agency administrators attend.

Having taught law enforcement officers throughout the Commonwealth of Virginia during the past three decades, I am familiar with the requirements to be a law enforcement officer and in my professional opinion to a reasonable degree of professional certainty, coupled with my education, training, and experience, the Town of South Boston Police Department Corporal Bratton, Officer Clay, Officer C. Mann, and others who had interacted with Mr. Lambert on May 4, 2013 were purposively trained according to Commonwealth of Virginia minimum standards for police officers.

3.   **SBPD Officers Bratton, Clan, and Mann were educated use-of-force users.**

I am familiar with law enforcement training that is conducted within the Commonwealth of Virginia, and the types of training Virginia police officers receive regarding use-of-force, techniques, weapons, tactics, options, incident realities, etc. based upon literature review, interviews, and having taught many law enforcement officers both inside the State of Nevada and outside of it. Virginia police officers receive specialized training in use-of-force, use-of-force equipment, such as handguns, rifles, pepper spray, and use-of-force tactics and techniques, and therefore, in my professional opinion, are sophisticated use-of-force users when it comes to the application of force. Virginia police officers know that any use-of-force has the risk of causing or contributing (in some way to) death or serious bodily injury, such as spraying a person with pepper spray who then walks in front of a passing motor vehicle and is struck and killed or seriously injured. These police officers also know that any use-of-force event is multifactorial, unpredictable, usually rapidly evolving, and often filled with numerous unknown, or unverified, factors and conditions.

4.   **Police officers are trained not to make a medical and/or mental diagnosis of individuals because they are not qualified to make such diagnoses.**

Police officers are not trained to make a medical or mental illness diagnosis of individuals with whom they come into contact because they are not medically and/or psychologically qualified to make such diagnoses. As a trainer who has taught thousands of police officers about excited delirium and agitated chaotic events™, officers learn about what behavioral cues may be demonstrated by an individual, but are not trained to make a medical or psychological diagnosis. Upon seeing one or more behavioral cues, officers must then comply with their training and policy. Excited delirium is not a medical or psychological diagnosis that can be found in the International Classification of Diseases, Tenth Revision (ICD-10), or the Diagnostic Statistical Manual, Fifth Revision (DSM-5). Excited delirium is a recognized post-mortem diagnosis made by Medical Examiners, and can be a pre-mortem delirium subset diagnosis made by medical doctors following a differential diagnosis (American College of Emergency Physicians, 2009, p. 6).

5.   **SBPD officers were reasonably trained in the TASER®[1] Electronic Control Device (ECD or device).**

Chief Binner testified TASER training was conducted annually for SBPD officers (Binner deposition, 51:12). Officer Mann had testified to having received TASER update training in 2012 (Mann deposition, 32:21). Officer Clay's TASER ECD certification records show he was trained in April 2013, and had taken a TASER certification test on April 19, 2013

---

[1] AIR TASER, M26, and X26 are trademarks of TASER International, Inc. TASER® and ADVANCED TASER® are registered trademarks of TASER International, Inc.

(Clay, TASER X26 Electronic Control Device Certification Test, April 19, 2013; Clay, TASER ECD User Certification Form, April 19, 2013). Version 18.0 of the TASER ECD lesson plan was in effect at that time (TASER International, Inc. (TASER), *v. 18.0*). A content analysis of TASER instructional lesson plan Version 13.0 (2006) surfaces that it comports to generally accepted lesson plan format and design. Since 2013 other versions of the TASER training program have been developed and produced.

### 6. TASER ECDs are designed to protect.

TASER's electronic control weapons (ECW) are designed specifically to protect the safety of law enforcement officers performing their official duties in arresting or otherwise taking into custody, capturing, or controlling unpredictable, resisting, struggling, assaultive, and/or potentially violent criminal suspects or those in need of being controlled such as Mr. Lambert. Although many critics argue that the electrical shock from a TASER ECW is dangerous, the electrical shock cannot be removed from the ECW because it would have a serious impact on the utility of the device.

On some occasions people have been injured, and on rare occasions, people have temporally died after struggling with law enforcement officers who deployed an ECW in an effort to assist in capturing them. To date, no death has been scientifically proven to have been caused directly by a TASER ECW.

On October 10, 2007, the U.S. Justice Department announced the results from a two-year Wake Forest study that concluded that the use of TASER ECDs by law enforcement agencies inflict very few serious injuries on their targets. Of the 962 people tracked between July 2005 and June 2007, only three of these people (or 0.3%) sustained moderate or severe nonfatal injuries that required hospitalization. Furthermore, 216 people sustained mild injuries (abrasions, minor cuts, etc.). In total, the study found that 99.7% of the people who had received a TASER ECW deployment either had no injuries or only mild injuries (Tuttle, 2007).

In June 2008 National Institute of Justice Study of Deaths Following Electro Muscular Disruption: Interim Report:

> While exposure to CED [conducted energy device] is not risk-free,
> there is no conclusive medical evidence within the state of current
> research that indicates a high risk of serious injury or death from
> the direct effects of CED exposure. Field experience with CED use
> indicates that exposure is safe in the vast majority of cases.
> Therefore, law enforcement need not refrain from deploying
> CED's, provided the devices are used in accordance with accepted
> national guidelines such as the model policy of the International
> Association of Chiefs of Police.

It was not until 2012 when the findings from a case series review were published that cautioned against the shooting of both probes into a person's chest area near the heart (Zipes, 2012a). Dr. Douglas Zipes, M.D. (Dr. Zipes) had conducted a case series review (not experimental research) and concluded a TASER X26 ECW when probes were shot into a person's chest area near the heart could cause cardiac electrical capture, and if not treated, the person's heart could go into cardiac arrest (Zipes, 2012a, p. 2421). Dr. Zipes was also clear that shooting the probes into other areas of the human body were safe, and only cautioned TASER X26 users not to intentionally shoot the probes into what has been referred to as the transcardiac vector area of the chest (Zipes, 2012b).

TASER X26 drive stuns (touching the skin with only the contact points of a TASER) have not been shown to cause cardiac issues in humans.

TASER instructor training materials Version 16, Version 17, and Version 18 contained PowerPoint slides that clearly showed the preferred target areas for ECD deployment. The May 1, 2010 TASER warnings also contain these warnings. Additionally, "TASER X26 Electronic Control Device (ECD) User Certification Test" specifically addressed preferred target areas of the body in two questions: #3 and #4 (TASER Training Academy, "TASER X26 Electronic Control Device (ECD) User Certification Test,", undated, pp. 1-2).



TASER Training Version 16, X26 ECD Only Instructor PowerPoint®, Slide #135.



TASER Training Version 16, X26 ECD Only Instructor PowerPoint®, Slide #136.



TASER Training Version 17, X26 ECD Only User-level PowerPoint®, Slide #144

7. **A TASER ECD is often used and recommended as an intervention device when confronting a mentally unstable individual.**

During a 72-month period of time, Ho, Dawes, Johnson, Lundin, and Miner (2007) found that there were 10, 608 reports of ECD usage, and of these reported uses, 2,452 (23.1%) uses were on mentally ill subjects (p. 780). In another case study of a Florida law enforcement agency's ECD usage, approximately 33% of the reported ECD usages were on mentally ill subjects (Peters, 2007). "The mentally ill represents a significant portion of subjects upon whom CEWs [ECDs] are used" (Ho, et al., 2007, p. 780).

"Conducted energy weapons [ECDs] are considered to be nonlethal weapons under the definition set forth by the United States Department of Defense" (Ho, et al., 2007, p. 783). The International Law Enforcement Forum published its findings in 2006 that "of note also was the sense from many of the group members that police use of CEOs (ECDs) to gain compliance of subjects who are suffering from mental health problems (e.g., schizophrenia) has found broad support among mental health groups (The Schizophrenic Society of Canada, The Schizophrenic Association in the UK, and the National Institute of Mental Health in the US were all mentioned)" (Hughes, 2006, p. 39).

ECWs are a safe and recommended force intervention tool that will assist law enforcement officers in the capture of individual who are suspected of being mentally unstable.

## INCIDENT OPINIONS

*Incident Opinions* are those opinions that focus on the actions of the parties during the incident under review.

### 8.    TASER devices are intended to provide a viable force option.

TASER's ECWs are designed specifically to protect the safety of law enforcement officers performing their official duties in arresting or otherwise taking into custody, capturing, or controlling unpredictable, resisting, struggling, assaultive, and/or potentially violent criminal suspects or those in need of being captured, controlled, restrained, and/or have their assaultive behaviors thwarted.

### 9.    Corporal Bratton and Officer Clay deployment of their TASERS at Mr. Lambert in a manner consistent with TASER training and instruction.

Officer Clay reported aiming his TASER X26 at Mr. Lambert's "belt buckle" (Clay, Incident #: 13018177: Disorderly Conduct/Assault on Police Officer/Destruction of Property/Resisting Arrest, 5-9-2013, p. 5). Corporal Bratton initially deployed her TASER in probe mode, and later used it in Drive Stun mode in an effort to get Mr. Lambert to sit up for her (Bratton, Incident # 13018177, 5-4-2013, p. 4). The autopsy report confirmed appropriate TASER deployment.

According to Pathologist Dr. Jennifer Bowers, M.D. (Dr. Bowers), upon examination she reported 3 puncture wounds to Mr. Lambert on his "right and left flanks" (Bates Stamp, Lambert 35). Dr. Bowers' findings did not report any puncture wounds over the heart area, and the fact there were only 3 puncture wounds demonstrates only one TASER ECW had completed its electrical circuit in probe mode. If one probe does not make contact with the target in probe mode, the electrical circuit is not completed and therefore produces not neuromuscular incapacitation (NMI) on the individual. The targeted areas and probe-struck areas are consistent with TASER training.



TASER Training Version 16, X26 ECD Only Instructor PowerPoint®, Slide #136.



TASER Training Version 17, X26 ECD Only User-level PowerPoint®, Slide #144

10.     **The force used by SBPD Officers Bratton, Clay, and Mann was consistent with national use-of-force standards, training, agency policy, and the totality of the circumstances.**

Police officers are taught about use of force in the law enforcement academy, and also in-service, as well as other training programs authorized by their agency and the state. Officers are taught that the national standard regarding the use of deadly and non-deadly force that amounts to a 4th Amendment seizure is one of objectively reasonable force, under the United States Constitution's Fourth Amendment, based upon the totality of the circumstances known to the officer at the moment the force was used (**Lethal and Less Lethal Force**, 2006, p. 12-2; **Police Civil Liability and the Defense of Citizen Misconduct Complaints**, 2005, section 62).

Officers are taught, among other things, "reasonableness contemplates careful consideration of the facts and circumstances of the incident including: (1) the severity of the crime at issue, (2) whether the person poses an immediate threat to the safety of officers or others, and (3) whether the person is actively resisting arrest or attempting to evade arrest by flight" SBPD Officers Bratton's, Clay's, and Mann's use of force was consistent with national use-of-force standards, training, agency policy based upon the totality of the circumstances known to them at the time.

Petrowski (2002) wrote "the cornerstone of use-of-force training should be threat assessment" (p. 29). As a use-of-force instructor trainer, law enforcement officers such as SBPD officers are taught force must be used before it can be analyzed. It is clear that the officers' decisions to use force, if they thought they were operating under the training they received regarding the seizure of a free person was based upon three factors, and one element that reasonable law enforcement officers are taught during their use-of-force training: was Mr. Lambert an immediate threat to them and/or others, including himself?; was Mr. Lambert actively resisting seizure and/or arrest or attempting to evade arrest by flight?; what was the

crime Mr. Lambert was in the process of committing?; and were the totality of the circumstances tense, uncertain, and rapidly evolving? (Peters, Flosi, & Marker, 2009, pp. 59, 72-73).

## Factor #1: Was Mr. Lambert an immediate threat to the officers, to others, or to himself?

Yes.

Corporal Bratton reported that Mr. Lambert had told her he drank an entire bottle of vodka (Bratton, Incident # 13018177, 5-4-2013, p. 2). Additionally, Mr. Lambert was acting unusual, which caused the officers enough concern to want to take him to a hospital for an evaluation. After they had placed a handcuffed Mr. Lambert into the rear seat of Officer Clay's patrol car, he used his feet to kick out the right rear passenger window (see photographs; Bratton, Incident # 13018177, 5-4-2013, p. 3; Mann, Incident # 13018175, 5-6-2013, p. 3; Clay, Incident # 13018177, p. 5). Mr. Lambert's behaviors coupled with the kicking the patrol car rear passenger window breaking it, all support that Mr. Lambert was an immediate threat to himself and the officers.

When Mr. Lambert fled the patrol car's rear seat and charged into the moveable doors of the hospital breaking them, he also demonstrated he was a threat to the officers, others, and to himself (see video of Mr. Lambert fleeing the patrol car and running into the hospital doors).

## Factor #2: Did Mr. Lambert actively resist the officers?

Yes.

When Mr. Lambert was asked to "turn around and put his hands behind his back" he hesitated and instead began to place his hands into his pockets (Bratton, Incident # 13018177, 5-4-2013, p. 3). This is one form of active resistance in that he failed to follow officer instructions.

A second time Mr. Lambert actively resisted officers was when he had kicked the right rear passenger window out of Officer Clay's patrol car (see photographs; Bratton, Incident # 13018177, 5-4-2013, p. 3; Mann, Incident # 13018175, 5-6-2013, p. 3; Clay, Incident # 13018177, p. 5).

A third time Mr. Lambert demonstrated active resistance to officers is when he quickly fled the patrol car and would not follow officer commands.

A fourth time Mr. Lambert actively resisted the officers is after the first probe TASER deployment. After falling to the ground he attempted to again stand (Bratton, Incident # 13018177, 5-4-2013, p. 4).

A fifth time Mr. Lambert actively resisted officers was after the second TASER re-energizing by Corporal Bratton. Mr. Lambert refused to stop moving, and rolled around on the ground—side to side (Bratton, Incident # 13018177, 5-4-2013, p. 4).

A sixth time Mr. Lambert demonstrated active resistance toward the officers by kicking his feet when they attempted to place leg irons on his ankles. All the officers reported struggling with Mr. Lambert (Bratton, Incident # 13018177, 5-4-2013, p. 4; Mann, Incident # 13018177, p. 3).

A seventh time Mr. Lambert demonstrated active resistance was he drug his feet as the officers led him back to Officer Clay's patrol car (Mann, Incident # 13018177, p. 4).

A eighth time Mr. Lambert demonstrated active resistance was when he refused to get inside the patrol car (Mann, Incident # 13018177, p. 4).

A ninth time Mr. Lambert demonstrated active resistance was when he laid down on the back seat of the patrol car and stuck his feet out the broken window and refused to sit upright (Mann, Incident # 13018177, p. 4).

A tenth time Mr. Lambert demonstrated active resistance was when he tried to bite Officer Clay's hand (Mann, Incident # 13018177, p. 4).

Mesloh, Henych, and Wolf (2008) found in their study on force used by law enforcement officers that "the injuries of both officers and suspects rose correspondingly with the length of the confrontations" (p. 89). They also found that an officer's use of "decisive force early on in the active suspect officer confrontations appears to be the solution in ending conflict quickly. . ." (p. 89), otherwise there may exist a force deficit where the officer uses ". . .less force than may be justifiable or necessary to subdue the suspect and end the confrontation" (p. 89).

## Factor #3: What was the crime that had been committed by Mr. Lambert?

Initially, none of which the officers were aware. However, after he had damaged the hotel room and had resisted the officers, Corporal Bratton reported telling Mr. Lambert he was under arrest ". . . for property damage to the Super 8 Motel, Officer Clay's window, and for disorderly conduct" (Bratton, Incident # 130181177, p. 4).

## Element: Were the circumstances surrounding the interaction and arrest of Mr. Lambert on May 4, 2013 tense, uncertain, and rapidly evolving?

Yes, for the foregoing reasons.

11. **Deploying a TASER in probe or drive stun modes on a handcuffed person is consistent with TASER and other use-of-force training.**

As the author of the most definitive work on handcuffs coupled with having taught thousands of officers as handcuff instructors and users, handcuffs are only temporary restraint devices that do not stop a person from attacking and/or injuring officers. For example, handcuffs do not stop a prisoner from fleeing. Handcuffs do not stop a person from kicking. Handcuffs do not stop a person from using hands or teeth to hurt officers.

Generally, after a person has been handcuffed the use of force greatly diminishes. However, force is used based upon the behavior of the handcuffed individual. If the handcuffed person complies with directions and instructions given by officers, there may be no further need to use force other than to direct the individual. However, if the individual fights with the officer(s), then using other force options, including a TASER ECW, is consistent with training.

12. **Removing Mr. Lambert from the hospital area and returning him to the jail for medical evaluation was proper, and minimized more damage to persons and property at the hospital.**

Officer Clay testified that officers made a group decision not to ask a nurse to come out to evaluate Mr. Lambert because he was trying to bite officers (Clay deposition, 22:17-24). Fear of injury was also a basis for not contacting emergency medical providers (22:17-24). The officers decided that jail was the better place for Mr. Lambert to be medically evaluated (22:25).

The Halifax jail had a nurse who could medically evaluate Mr. Lambert in a safe and confined area. Security is a key variable at this point in time given the violent behavior of Mr. Lambert. The officers were wise in not trying to struggle with Mr. Lambert to get him inside the hospital emergency department because he could have caused more physical damage to the building, and/or caused physical harm to anyone who was in the waiting room, including medical staff.

Officers' choices must be examined at the time the choice was made, not in 20/20 hindsight. Given the violence and continued active resistance of Mr. Lambert, it was wise not to forcefully struggle with Mr. Lambert to relocate him into the emergency department.

13. **TASER ECD is a safe device for the controlling of Mr. Lambert.**

TASER X26 ECWs have 50,000 (peak open circuit arcing voltage with 1,200 peak loaded voltage) V, 2.1 mA (or .0021 A), with a stored energy per pulse of 0.36 J (nominal or peak capacitor, and 0.07 J delivered into load.

In contrast, external cardiac defibrillators typically generate approximately 400 J, which further illustrates the safety of TASER-brand devices with regard to the human heart (Gibault, 2006, p. 2). To see one's hair stand up, many people have placed a hand on a Van de Graaff generator, which can generate up to 1 million V.

According to Dr. Mark Kroll, Ph.D. (Dr. Kroll), when an individual is exposed to a TASER ECD, (s)he receives a very small amount of energy delivered into the body. A TASER X26 is powered by a battery of two, thee-volt camera cells. The 50,000 volts is the stored peak open-circuit arcing voltage to get electricity through the clothing. The peak voltage delivered into the person from, say, a TASER X26 is 1,200 V. It gives 19 (very short duration) pulses per second. Dr. Kroll notes that the current is ZERO 99.8% of the time. Or, to put it another way, one TASER X26 pulse is "on" for only 1/10,000ths of a second, times 19 PPS equals 19/10,000ths of a second. Given the average current is about .0021 A, the average voltage is about **3/4 of one volt**, less than a AA penlight cell (Kroll, 2006, pp. 5-6).

When a TASER ECD is used in a drive stun (or touch stun) mode (without the barbs), it usually will cause *friction abrasions*, or low grade burns. These are usually harmless, unless the individual picks at any scab that may form, which can cause an infection (Peters, 2006).

Electricity is not cumulative, and does not build-up in the body like poison. Mr. Lambert was not subjected to 100,000 volts of electricity as alleged in Plaintiff's Amended Complaint.

## POST-INCIDENT OPINIONS

The next category of opinions discusses events that took place after Mr. Lambert was pronounced dead at the hospital.

14. **The Town of South Boston and its Police Chief reasonably investigated the incident involving Mr. Lambert, which is within the scope of generally accepted internal investigation police practices and CALEA guidelines.**

Reiter (2006) wrote "agency initiated complaints come in different forms. Most commonly found complaints are those initiated by a supervisor for some breach of rules and regulations. Other times it might be knowledge that comes to the agency without an actual complaint from the aggrieved party. . ." (p. 1.9). Reiter also notes that the "complaint process must be as foolproof as possible" (Chapter 2. p. 2.1). The widely-adopted text (now in its third edition) by Reiter who is former Assistant Chief of Police for the Los Angeles (CA) Police Department, outlined and discussed in very detailed form how the investigation should be conducted, who should be assigned to conduct it, what information should be identified and sought, and how the investigation can be used for disciplinary purposes.

Regarding complaint processing, the CALEA standard manual notes "a written directive requires the agency to investigate all complaints against the agency or employees of the agency" (CALEA, Standard 52.2.1, p. 52-2). The CALEA standards manual notes "the integrity of the agency depends on the personal integrity of the agency and discipline of each employee" (p. 52-1).

The decision to have the Virginia State Police conduct an investigation into the arrest-related death of Mr. Lambert was prudent given the circumstances.


15.   **A TASER ECW data download that records trigger pulls does not mean the ECW probes and/or contact points ever touched the target, delivering a shock.**

TASER ECW discharge <u>does not</u> equate to application. Table 1 shows Officer Clay's ECW discharges.

Table 1  Officer Clay's ECW discharges

| Sequence # | Local Time | Duration of Discharge in Seconds |
|---|---|---|
| 56 | 05:04:2013 | 5s |
| 57 | 05:44:02 | 5s |
| 58 | 05:44:35 | 5s |

Clay, Evidence Sync Device Report, June 6, 2013, p. 2.

The standard "run time" when a TASER ECW trigger is pulled is 5 seconds. Although the timestamp of the ECW discharge is recorded, there is no evidence the ECW had made contact with Mr. Lambert in each of the 3 discharges.

A review of Corporal Bratton's and Officer Mann's ECW data download showed 15 discharges for Corporal Bratton's ECW, and 1 discharge for Officer Mann's ECW, respectively on May 4, 2013. Table 2 shows Corporal Bratton's ECW discharges. Table 3 shows Officer Mann's ECW discharges.

Table 2  Corporal Bratton's ECW discharges

| Sequence # | Local Time | Duration of Discharge in Seconds |
|---|---|---|
| 217 | 05:15:04 | 2s |
| 218 | 05:15:10 | 5s |
| 219 | 05:15:18 | 5s |
| 220 | 05:15:24 | 3s |
| 221 | 05:15:25 | 2s |
| 222 | 05:15:34 | 5s |
| 223 | 05:15:53 | 5s |

| 224 | 05:16:22 | 6s |
| 225 | 05:16:28 | 5s |
| 226 | 05:16:56 | 10s |
| 227 | 05:16:59 | 3s |
| 228 | 05:25:43 | 4s |
| 229 | 05:26:24 | 5s |
| 230 | 05:26:25 | 1s |
| 231 | 05:26:37 | 5s |

Bratton, Evidence Sync Device Report, June 6, 2013, p. 5.

Table 2  Officer Mann ECW discharges

| Sequence # | Local Time | Duration of Discharge in Seconds |
|---|---|---|
| 239 | 05:33:36 | 5s |

Mann, Evidence Sync Device Report, June 6, 2013, p. 5.

Recall from Opinion#10 the TASER ECW did not have the intended effect on Mr. Lambert. Mr. Lambert actively resisted the officers after the first probe TASER deployment. After falling to the ground he attempted to again stand (Bratton, Incident # 13018177, 5-4-2013, p. 4). Mr. Lambert actively resisted officers was after the second TASER re-energizing by Corporal Bratton. Mr. Lambert refused to stop moving, and rolled around on the ground—side to side (Bratton, Incident # 13018177, 5-4-2013, p. 4).

There is high probability one TASER ECW probe came loose from Mr. Lambert or never made contact with him. Recall Dr. Jennifer Bowers, M.D. (Dr. Bowers), upon examination of Mr. Lambert's body reported 3 puncture wounds to Mr. Lambert on his "right and left flanks" (Bates Stamp, Lambert 35). Dr. Bowers' findings did not report any puncture wounds over the heart area, and the fact there were only 3 puncture wounds demonstrates only one TASER ECW had completed its electrical circuit in probe mode. If one probe does not make contact with the target in probe mode, the electrical circuit is not completed and therefore produces not neuromuscular incapacitation (NMI) on the individual.

Based upon my experience, education, and training, when an officer is involved in a dynamic situation and is holding a TASER ECW, the trigger can be depressed while pointing the ECW in the air. Also, when the ECW is used  in drive stun mode the target will often move requiring the officer to again activate the ECW while trying to maintain contact  with the target. Drive stun, or contact mode without probes, is intended to only cause compliance through localized pain, and will note produce NMI.

16.   There is no evidence the Town of South Boston and/or its Police Chief engaged in a custom, practice, or policy of condoning pervasive misconduct and abuse of authority by their police officers.

A review of documents failed to show and/or demonstrate the Town of South Boston and/or its Police Chief had engaged in a custom, practice, or policy of condoning pervasive misconduct and abuse of authority by their police officers.

**NOTE:**   The next category of opinions discuss scientific research, cause and effect research, human subject research limitations, and future research issues are in response to innuendo, claims, etc. made. I am prepared to speak about various scientific research methodologies that have been used to study the safety of the TASER ECDs. In addition to being academically trained in qualitative and quantitative research methodologies, descriptive and inferential statistics, I have experience teaching these subjects to graduate level learners, including doctoral students. Often an untrained person will inappropriately attempt to substitute (so called) common sense or correlation for cause and effect, and/or as a substitute for the scientific method. Often times, these substitutions are the bases for unfounded speculations, scientifically unsupported conclusions, generalizations, misinterpretation of data, activity, and so forth. These unscientific observations often result in the creation of simple, but erroneous allegations of "cause and effect" associations and conclusions of the TASER device being the direct cause of some seemingly unexplainable event.

17.   Temporality of TASER ECD device application to a part of the human body followed by the person's dying from heart or respiratory arrest does not scientifically establish causality.

*Temporality* focuses upon time and is often improperly applied in causation analysis. The fact that evidence shows that "A" preceded "B" does not mean that "A" caused "B". Cook and Campbell (1979) noted that causal inference depends upon three factors: First, "A" (cause) must precede "B" (effect); second, "A" and "B" must be related; and third, other explanations of the "A" and "B" relationship must be eliminated. Dr. Bowers, who performed the autopsy on Mr. Lambert, reported Mr. Lambert's "Cause of Death" was "Acute Cocaine Intoxication" (Bates Stamp, Lambert 35).

18.   Correlation of TASER-brand electronic control device application to a part of the human body followed by the person's dying from alleged heart or respiratory arrest does not scientifically establish causality.

Does a rooster crowing (cause) make the sun to come up (effect) in the morning? The answer is "no". While a rooster's crowing prior to a sunrise has a temporal dimension to it, the crowing does not cause the sun to rise. While this clearly demonstrates what "cause and effect" is not, it also demonstrates the concept of **correlation**.

"*Correlation* is a statistical technique that is used to measure and describe a relationship between two variables" (Gravetter & Wallnau, 1999, p. 389), and "simply describes a relationship between two variables" (p. 398). "One of the most common errors in interpreting correlations is to assume that a correlation necessarily implies a cause-and-effect relationship between the two variables" (p. 399). Miniun, King, and Bear (1993) are to the point: "correlation does not establish causation" (p. 158). Researchers and others are warned, "do not draw causal inferences from correlational data" (Graziano & Raulin, 2000, p. 171; Graziano & Raulin, 1997, p. 175).

The fact that "A" precedes "B" does not mean that "A" caused "B" (Peters, 2006). The researcher must examine causality to determine if there is any "cause and effect" that can be ruled out when comparing and interpreting the causal inference. Cook and Campbell (1979) note that causal inference depends upon three factors: First, "the cause has to precede the effect in time; second, the cause and effect have to be related; and third," (p. 18). The United Nations Inter-Agency Standing Committee (IASC) has issued *field guidelines* regarding causality and inferring cause using criteria of causation.

The IASC identifies several criteria of causation, which include:

- **Temporality**—the cause must always occur before the outcome.

- **Strength of association**—How much does the causative variable and the outcome move together?

- **Consistency**—Is the relationship between cause and outcome found over and over, among different groups or countries?

- **Specificity**—Does the cause lead to the same particular outcome over and over, or does it instead lead to different outcomes?

- **Plausibility**—Is there a reasonable explanation available as to how the variable is linked to the outcome? Is it a plausible linkage? (United Nations, n.d., p. 2)

The United Nations' criteria are supported by the research literature. Rubin (1983) defines a causal theory as "one that attempts to explain why certain propositions are true and how the variables within the propositions are interconnected. Three criteria must be met to establish a causal theory:

1. There must be a set of interdependent propositions.

2. There must be an indication of the ordering and the linkages between the variables in the separate propositions.

3. A mechanism—why something happens—must exist that explains how such linkages operate. (p. 71)

The "law" that Rubin (1983) makes reference to is scientific law. "A set of laws is a collection of propositions that seems to be true within a single policy area" (p. 70). Put another way, the law does not change, and remains constant, such as Newton's law of gravity. Supporting Rubin is Polit and Beck (2004). They define a law as "a theory that has accrued such persuasive empirical support that it is accepted as true" (p. 722).

### 19.   Association of TASER-brand electronic control device application to a part of the human body followed by the person's dying from alleged heart or respiratory arrest does not scientifically establish causality.

After a person struggles with law enforcement officers, (s)he is generally handcuffed prior to being searched (Peters, 1988). If the person died after being handcuffed, or died prior to being handcuffed for safety concerns, then the handcuffs are *associated* with the death, but, in the foregoing hypothetical event, were not the cause of the person's death. "*Association* is different than correlation, as it focuses upon how the independent variable provides information about the dependent variable" (Peters, forthcoming). In short, association does not equal causation. Hollingsworth and Lasker (2004) noted that when evidence from epidemiological studies that are highly regarded when it comes to the testing of a hypothesis about a particular substance and its effects on humans shows an association, it is well understood that association does not equal causation.

Dr. Jeffrey D. Ho and his colleagues found in a 12 month surveillance study of 162 people who died in police custody that in 22 such events, the police used no force and that the TASER device "was never associated with instantaneous death (0/50, p = 0.001) (Ho, Miner, Heegaard, & Reardon,). Admittedly there were limitations to this study, but it finds the TASER electronic control device was not associated with any person's instantaneous death. This study is an important example to keep in mind as cause-and-effect research is discussed.