IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

GWENDOLYN SMALLS,    )
as Administratrix of the Estate of Linwood )
Raymond Lambert, Jr., deceased,  )
            )
    Plaintiff,     )  Case No. 4:15-cv-00017
            )
v.          )  **CORRECTED MEMORANDUM OPINION**[*]
            )
CHIEF OF POLICE JAMES W. BINNER, )  By: Hon. Jackson L. Kiser
DEPUTY CHIEF OF POLICE BRIAN K. )    Senior United States District Judge
LOVELACE, TOWN OF SOUTH  )
BOSTON, CORPORAL TIFFANY  )
BRATTON, OFFICER CLIFTON MANN, )
and OFFICER TRAVIS CLAY,   )
            )
    Defendants.   )

This matter is before the Court on the parties' competing motions for summary judgment on the issue of qualified immunity. The parties have fully briefed the motions, and I have reviewed the relevant filings and counsel's arguments. For the reasons stated herein, I will grant Defendants' motion in part and deny it in part. These rulings defeat or obviate respective facets of Plaintiff's motion, which will be denied.

## I. STATEMENT OF FACTS AND PROCEDURAL BACKGROUND[1]

Gwendolyn Smalls ("Plaintiff") is the sister of Linwood Raymond Lambert, Jr., ("Decedent") and the administratrix of his estate. Claiming relief under federal and state law, she

---

[*] The corrections are as follows: "executrix" to "administratrix" on page one; "subeject" to "subject" on page fifteen, footnote seventeen; "Officer Mann" to "Officer Clay" on page twenty-five; and "Corporal Bratton's" to "Corporal Bratton" on page twenty-six.

[1] On Defendants' motion, the facts are considered in the light most favorable to Plaintiff, <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007), except to the extent that "video ' . . . clearly contradicts the version of the story told by [Plaintiff] . . . so that no reasonable jury could believe it,'" <u>Witt v. W. Va. State Police, Troop 2</u>, 633 F.3d 272, 276 (4th Cir. 2011) (second omission in original) (quoting <u>Scott</u>, 550 U.S. at 378, 380).

has filed the present action against the Town of South Boston and several members of the South Boston Police Department ("SBPD"): Chief of Police James W. Binner, Deputy Chief of Police Brian K. Lovelace, Corporal Tiffany Bratton, Officer Clifton Mann, and Officer Travis Clay (collectively, "Defendants"). The parties have moved for summary judgment on the question whether Corporal Bratton, Officer Clay, and Officer Mann are entitled qualified immunity. The motions center on the events preceding Decedent's death, early in the morning of May 4, 2013.[2]

---

[2] Addressing these motions warrants some initial discussion of tasers and how they are used.

A taser, such as the X26 model used by Corporal Bratton, Officer Clay, and Officer Mann (see Br. in Supp. of Defs.' Mot. for Summ. J. ex. 10, at pg. 1 (hereinafter "Defs.' Supp. Br."), Dec. 16, 2015 [ECF No. 125-11]; id. ex. 11, at pg. 1 [ECF No. 125-12]; id. ex. 12, at pg. 1 [ECF No. 125-13]), may be used in either probe or stun mode.

A taser can fire probes, which are "[p]rojectiles with wires contained in [a taser] cartridge." (See Decl. of Thomas N. Sweeney ex. CC, at pg. 43, Dec. 30, 2015 [ECF No. 138-22].) A user "[p]ull[s] the trigger to release the probes from the cartridge to make contact with the subject and achieve neuromuscular incapacitation [("NMI")]," which is "[t]he effect of the [taser] on a subject when, through the application of an electrical pulse, the [taser] dominates the motor nervous system by interfering with electrical signals sent to the skeletal muscles by the central nervous system." (Id.) The "probes are expelled from the [taser] and penetrate the subject's clothing and/or skin, allowing application of the electric impulse." (Id.) However, "[i]f one probe does not make contact with the target . . . , the electrical circuit is not completed and therefore produces not [sic] [NMI] on the [subject]." (Defs.' Supp. Br. ex. 14, at pg. 11 [ECF No. 125-17] (hereinafter "Peters Report").) There could be a "partial effect," but the taser will have lost its stopping power. (See Defs.' Resp. to Pl.'s Mot. for Partial Summ. J. ex. C, at pg. 20:02–:08 (hereinafter "Defs.' Resp. Br."), Dec. 30, 2015 [ECF No. 137-5] (hereinafter "Gilliam Dep.").) One can identify a completed circuit by "a specific sound, . . . a popping. It's an arcing sound, but it's a quiet popping or arcing;" however, "[i]f one of those leads break or if one of the probes gets pulled out . . . , it immediately starts a very loud arcing, which means [that there is not] a full circuit." (Id. at pgs. 19:16–20:01.) Sparking is another indicator of an incomplete circuit. (See Defs.' Supp. Br. ex. 15, at pg. 45:04–:09 [ECF No. 125-19].)

A taser can also be used in stun, or drive stun, mode. This "requires pulling the [taser's] trigger and placing [the taser] in direct contact with the subject, causing the electric energy to enter the subject directly. Drive stun is frequently used as a non-incapacitating pain compliance technique." (See Sweeney Decl. ex. CC, at pg. 42.)

Each officer's taser had an internal computer that recorded the sequence, "frequency and duration of . . . . [the taser's] *discharges*. Discharges *do not* equate to application, because probes could have missed, came [sic] loose, or officers could have had their finger on the trigger firing the [taser] into the air." (See Peters Report at pg. 28 (emphasis added).) Five seconds is the standard runtime for a discharge. (Id. at pg. 17.)

A. Emergency Custody

In the evening of May 3, 2013, Decedent checked into the South Boston Super 8 Motel. Beginning at 2:48 a.m., the SBPD began to receive a series of phone calls from Decedent, somewhat unclearly relating a room number and a need for assistance. (See generally Decl. of Thomas N. Sweeney ex. A, at pgs. 2–6, 8–10, Dec. 30, 2015 [ECF No. 138-3]; Br. in Supp. of Defs.' Mot. for Summ. J. exs. 1 & 1A (hereinafter "Defs.' Supp. Br."), Dec. 16, 2015 [ECF Nos. 125-1, -2].) Although Decedent related the wrong room number on several attempts, Corporal Bratton, Officer Mann, and Officer Clay eventually reached his room after 4:30 a.m.[3] (See Defs.' Supp. Br. ex. 2, at pgs. 1–2, [ECF No. 125-3] (hereinafter "Clay Report"); id. ex. 3, at pg. 3 [ECF No. 125-4] (hereinafter "Bratton Report"); id. ex. 4, at pg. 1 [ECF No. 125-5] (hereinafter "Mann Report").)

Officer Clay and Officer Mann arrived first. (See Bratton Report at pg. 1.) Consistent with information received from the motel's night manager, they heard the sound of metal banging (or something breaking) coming from inside the room. (Clay Report at pg. 2; Mann Report at pg. 2.) Inside, Officer Clay and Officer Mann found Decedent out of breath and sweating profusely, with blood on his left hand and a white substance draining from his nostrils. (Clay Report at pg. 2; Mann. at pg. 2.) They also found overturned furniture, mattresses removed from bed frames, broken glass, lights torn off of the wall, broken chairs, blood drops on the bed's sheets, and various other items broken or strewn about. (Clay Report at pg. 2; Mann Report at pg. 2–3; Defs.' Supp. Br. ex. 5 [ECF No. 125-6] (photographs); see also Bratton Report at pg. 2.) Decedent was holding a piece of the bed, which he put down at Officer Mann's request. (Mann Report at pg. 2.)

---

[3] Immaterial to the matters at hand, deputies of the Halifax County Sheriff's Office were also on the scene at the hotel. (See Bratton Report at pg. 1; Clay Report at pg. 3.)

The officers asked Decedent if he required assistance, and Decedent exclaimed that "[s]omeone was after him," that the blood in the room was not his, and that "they had lights on him"—"those red lights." (Clay Report at pg. 2.) By these red lights, he meant the targeting beams of a gun. (See Bratton Report at pg 3.) Decedent claimed to have stabbed two people in the room and to have hidden their bodies in the ceiling tiles, but there were no bodies. (Id.; Mann Report at pg. 2.) Decedent seemed to be paranoid and hallucinating. (Mann Report at pg. 2.) He admitted that he had been drinking that evening (id. at pg. 3) and stated that he had consumed the entire contents of an empty bottle of vodka found in the room (Bratton Report at pg. 2). Decedent denied having any drugs, being on any medication, or having any type of medical condition. (Bratton Report at pg. 2.) When standing in the hallway, he stared at the lights and repeated "that they were after him." (Clay Report at pg. 3.) Decedent's eyes were jumping about, and when Decedent saw another motel guest walk into the hallway, Decedent stated "that he didn't like that guy and that he was after [Decedent]." (Id.) He cowered toward his room whenever someone came into the hall. (See id. at pgs. 3–4.)

Corporal Bratton determined that the officers "should take [Decedent] for a possible mental evaluation." (Bratton Report at pg. 3.) The officers handcuffed Decedent with the intent to take him, under emergency custody,[4] to the hospital, where the on-call case worker waited. (See Clay Report at pg. 4; Mann Report at pg. 3; see generally Defs.' Supp. Br. ex. 15, at pg. 13:01–:15 [ECF No. 125-19] (hereinafter "Clay Dep.").) They informed Decedent that he was

_____

[4] Under Virginia law,

> [a] law-enforcement officer who, based upon his observation or the reliable reports of others, has probable cause to believe that a person meets the criteria for emergency custody . . . may take that person into custody and transport that person to an appropriate location to assess the need for hospitalization or treatment without prior authorization.

Va. Code Ann. § 37.2-808(G). For those emergency-custody criteria, see id. § 37.2-808(A).

not under arrest and that they were finding him help. (Clay Report at pg. 3; Bratton Report at pg. 3; Mann. Report at pg. 3.) On the way to Officer Clay's police car, Decedent continued to speak about the "lights" and stopped whenever he thought that a light shone on him. (Clay Report at pg. 4.) After an unremarkable search of Decedent's person, the officers directed him into Officer Clay's car. (See Clay Report at pg. 4; Bratton Report at pg. 3.)

En route to the hospital, Decedent ducked to avoid being seen through the police car's rear window and continued to express fears about lights and the car behind him. (See generally Sweeney Decl. ex. J., at 1:35–6:00 [ECF No. 138-12] (hereinafter "Clay Rear View Dashboard Video").) Officer Clay reiterated to Decedent that the officers were taking care of him and that he would be fine. (See generally id. 0:00–6:40.) As they pulled up to park in front of the emergency room, Officer Clay related, several times, to Decedent that they had arrived. (Id. at 6:29–:37.)

B. Tasings at the Hospital Doors

After Officer Clay stated that they had arrived at the hospital, Decedent began to kick the rear right door's window. (Id. at 6:38–:40.) Over Officer Clay's multiple commands not to do so, Decedent continued kicking the window. (Id. at 6:40–:48.) Officer Clay exited the car and came to the rear left door. (Defs.' Supp. Br. ex. 8, at 7:52–:58 [ECF No. 125-9] (hereinafter "Hosp. Video").) Decedent kicked out the rear right window, its glass flying into the parking spots adjacent to that side of the car. (Clay Rear View Dashboard Video at 6:46–:48; Hosp. Video at 7:54–:57.) Officer Mann and Corporal Bratton made their way to Officer Clay's car (Hosp. Video at 7:58–8:29); meanwhile, Officer Clay, his taser drawn, opened the rear left door (see Clay Rear View Dashboard Video at 6:53–:57). He commanded Decedent to calm down as Decedent repeated, "No sir!" and asked Officer Clay to take him to the emergency room. (Clay Rear View Dashboard Video at 6:56–7:02.) Officer Clay responded, "We're at the emergency

room!" (Id. at 7:02–:04.) His speech jittery, Decedent expressed that he would calm down and added that he had provided his mother with his room number and whereabouts. (Id. at 7:04–:18.)

Decedent shuffled along the backseat before exiting the rear right door, where Corporal Bratton and Officer Mann were positioned. (Id. at 7:20–:28; Hosp. Video at 8:35–:37.) Decedent evaded Corporal Bratton and Officer Mann and headed toward the hospital's entrance. (Hosp. Video at 8:35–:39.) Corporal Bratton discharged her taser,[5] but "the cartridge was not installed so it was a dry stun with no contact with [Decedent]." (Sweeney Decl. ex. AA [ECF No. 138-20] (hereinafter "Bratton Interview"); see Hosp. Video at 8:38–:40; Clay Rear View Dashboard Video at 7:29–:31 (audio).) Decedent ran into and damaged the entrance doors,[6] which impeded him. (See Hosp. Video at 8:40–:44; Sweeney Decl. ex. I., at 7:30–:33 [ECF No. 138-12] (hereinafter "Clay Front View Dashboard Video").) Corporal Bratton, Officer Clay, and Officer Mann caught up to Decedent, and Corporal Bratton and Officer Clay fired their tasers, in probe mode, at Decedent.[7] (Hosp. Video at 8:42–:47; Clay Front View Dashboard Video at 7:33–:39.) Decedent stiffened and fell. (Clay Front View Dashboard Video at 7:33–:39.) On the way down, his head hit the hospital's outer wall or a soap dispenser on it. (See Clay Report at pg. 5; cf. Sweeney Decl. ex. Y, at pg. 2 [ECF No. 138-20].)

---

[5] Comparison of the taser logs to the video evidence approximates the relative timing of the taser discharges. Of note, the officers' taser logs do not seem to be sequenced to the same "Local Time" (compare Defs.' Supp. Br. ex. 10, with id. ex. 11, with id. ex. 12); however, one can track respective figures beginning from an officer's first tasing on video.

[6] Decedent "knocked the doors completely off of the door track" (Bratton Report at pg. 3), and the "doors no longer worked after the incident" (Defs.' Resp. Br. ex. E [ECF No. 137-7]). Officer Mann described Decedent as "huge" and "a big guy." (Defs.' Supp. Br. ex. 19, at pg. 86:25 [ECF No. 125-27].) Decedent was five feet, ten inches tall and weighed 221 pounds. (Peters Report app. A, at pg. 25.)

[7] It is difficult to confirm from the video and the taser logs, but Corporal Bratton deposed a belief that she did not complete a circuit upon her initial firing of the taser prongs. (See Defs.' Supp. Br. ex. 13, at pgs. 127:07–128:07 [ECF No. 125-14] (hereinafter "Bratton Dep.").) She also deposed a belief that, while Decedent was rolling on the ground, the loose prong "apparently pierce[d] his skin" and completed the circuit. (See id. at pg. 128:11–:17.)

Decedent remained stiff on the ground for a short while before attempting to rise while in close proximity to, and facing, Corporal Bratton. (Clay Front View Dashboard Video at 7:35–:40.) Upon this attempt, and from (roughly) Corporal Bratton's third through her fifth discharge, he screamed loudly and stiffened, again, on the ground. (See id. at 7:40–:46.) The officers commanded him to stay back, to stay down, and to stop. (Id. at 7:43–:54.) During this time, Corporal Bratton added, "You understand, every time you do that, I'm gonna' pop you." (Id. at 7:46–:49.) One of the male officers then commanded Decedent to "[r]oll back over," whereupon Corporal Bratton discharged her taser a sixth time, and Decedent screamed and stiffened his body. (Id. at 7:56–8:01.)

The officers continued commanding Decedent to roll over or lie on his belly, and Decedent, at one time, responded, "I am," and began to mutter (seemingly to himself) something sounding like, "Just roll over." (Id. at 8:10–:19.) A little while later—coinciding with Officer Clay's second taser discharge and Corporal Bratton's seventh—arcing could be heard, and sparking could be seen near Decedent's feet and in a position directly in front of Officer Clay.[8] (See id. at 8:17–:21.) Decedent's manner did not appear to change at Officer Clay's second or Corporal Bratton's seventh tasings. (See id. at 8:17–:21.) Corporal Bratton disconnected the probes from her taser (id. at 8:22–:27), and around that time, Officer Clay did so, too (see Hosp. Video at 9:30). Through this time, the officers continued to command Decedent to roll over onto his stomach, and Decedent moved about on the ground, telling the officers that he was trying to do so (or that he would) and asking that they not hurt him. (See generally Clay Front View Dashboard Video at 7:56–9:03.)

---

[8] Officer Clay deposed that the sparks seemed to "be going back to [Corporal] Bratton's taser." (Clay Dep. at pg. 274:01–:03 [ECF No. 125-23]; cf. Bratton Dep. at pgs. 127:07–:20, 128:02–:17 [ECF No. 125-14].)

Corporal Bratton reached her taser close to or against Decedent as he sat with his back somewhat leaning onto the hospital doors. (Id. at 8:41–:42.) Officer Clay and Officer Mann came closer as Corporal Bratton began to discharge, in stun mode, her taser against Decedent. (Id. at 8:42–:43.) She continued to place her taser against Decedent (id. at 8:43–:53), and for part of this time, Officer Clay leaned in and placed his taser, in stun mode, against Decedent (id. at 8:48–:49). The officers continued to order Decedent to roll over onto his stomach, and he responded, "If y'all stop, I will." (Id. at 8:49–:53.) During this interaction, Corporal Bratton discharged her taser an eighth and ninth time, and Officer Clay discharged his a third.[9]

The officers continued to command Decedent to roll over, and Officer Mann, who was holding leg restraints, grabbed and lifted Decedent's right leg. (Id. at 9:03–:12.) Officer Clay grabbed Decedent's upper body, helped Officer Clay turn Decedent over, and placed his knee on Decedent's back to pin him to the ground. (Id. at 9:08–:15.) Corporal Bratton stood over Decedent's torso, placed her taser on or near him, and commanded, "Roll around," as the other officers rolled Decedent over. (Id. at 9:11–:13.) Decedent continued to say, "No, sir!" (Id. at 9:05–:15.) Shortly after the officers had rolled him, Decedent seemed to stiffen or exert his body, while Officer Clay and Officer Mann exerted themselves, keeping Decedent pinned on the ground. (See id. at 9:13–:52.) While Decedent was pinned to the ground, Corporal Bratton stood over him with her taser and discharged it twice (her tenth and eleventh discharges) in stun mode. (See id. at 9:20–:28.) Officer Clay and Officer Mann were able to keep Decedent down on the ground until, eventually, Officer Mann shackled Decedent's legs. (Id. at 9:13–:52.)

---

[9] Unseen on video (perhaps obscured), Officer Clay deposed that, around this time, Decedent's feet kicked toward him and that one hit his face. (See Clay Dep. at pgs. 277:22–288:22 [ECF No. 125-23].) Similarly unseen, Corporal Bratton has stated that her taser made limited contact with Decedent and that Decedent grabbed and held onto her taser for some duration. (See Bratton Interview; Bratton Dep. at pgs. 134:12–136:19 [ECF No. 125-14].)

Decedent, shackled and handcuffed, rolled back over, raised his back from the ground, and stated, "I just took cocaine, man. I was just takin' cocaine." (Id. at 9:52 –10:01.) Corporal Bratton told him that he was under arrest. (Id. at 10:00–:06.) She informed dispatch that Decedent was arrested for resisting arrest and for damaging the hospital, the Super 8 Motel, and the police car. (See Defs.' Supp. Br. ex. 1A, at pg. 1.)

Officer Mann removed taser probes from Decedent (see id. at 11:00–:06, 11:22–:40; Hosp. Video 12:11–:17, 12:30–:50)—three probes were in Decedent's skin, one "was kind of stuck in [his] pants," and two lead wires were broken (Defs.' Supp. Br. ex. 19, at pgs. 64:14–:17, 65:20–66:06 [ECF No. 125-27] (hereinafter "Mann Dep.")).[10] After, the officers picked Decedent up and walked him to Officer Clay's police car. (Clay Front View Dashboard Video at 11:38–12:02; Hosp. Video at 12:55–13:20.) Upon arrival,[11] officers commanded Decedent to stand up and enter the backseat, and he eventually entered it with the officers' assistance hoisting, pushing, and pulling him in. (Clay Rear View Dashboard Video at 12:15–:24; Hosp. Video at 13:20–14:33.) Decedent lay across the backseat. (See Clay Rear View Dashboard Video at 12:24.) While Officer Clay remained at his car's driver door, Officer Mann retrieved the spent probe cartridges, Corporal Bratton checked the hospital doors, and the two surveyed the scene and spoke with hospital security. (Hosp. Video at 14:44–:45.) The officers then consulted among themselves (id. at 14:50–17:20) before Officer Mann began taking photographs of Officer Clay's broken window and of the hospital doors (id. at 17:30–18:42).

---

[10] Officer Mann could not determine which probes came from which officer's taser. (Mann Dep. at pg. 65:02–:14.)

[11] By the time Decedent reached the car, the cut on his head (from hitting the hospital wall) had clotted. (Sweeney Decl. ex. L, at pg. 3 [ECF No. 138-13].) The bleeding had not been profuse. (Id.)

C. <u>Tasings in the Police Car's Backseat</u>

While the officers were outside and Officer Clay's car doors were shut, Decedent sat up and began to swing his head about, several times hitting it against the car's interior. (Clay Rear View Dashboard Video at 16:05–:34.) At one point, an officer outside yelled, "Stop!" (<u>Id.</u> at 16:17.) Decedent continued and began to thrust his head and his torso toward the rear right door. (<u>Id.</u> at 16:15–17:36.) The command to stop followed twice more (<u>id.</u> at 17:04–:09), but Decedent continued until he slouched his position in the backseat and raised his legs (<u>id.</u> at 17:09–:28). Outside, the officers began to approach and shouted various commands including, "Don't do it!" "Stop!" "I'll light your ass up!" "Don't do it!" "Put 'em back! Put 'em back!" "Put your feet down!" "Put them down on the ground!" and "Sit up straight, act like you've got some sense!" (<u>Id.</u> at 17:30–18:00.) Decedent's legs remained raised toward the front of the car. (<u>See generally</u> <u>id.</u>)

At the car's right rear door, Corporal Bratton pointed her taser at Decedent as she continued her commands. (<u>See</u> <u>id.</u> at 17:40–18:04.[12]) With his taser in hand, Officer Mann opened the car's rear left door. (<u>Id.</u> at 17:58–18:00.) He placed his taser against Decedent's left shoulder and commanded, "Sit up. Do it now. Do it now! Do it." (<u>Id.</u> at 18:00–:09.) Corporal Bratton opened the car's rear right door (<u>id.</u> at 17:57–:58) and placed her taser against Decedent's leg (<u>id.</u> at 18:05–:10). Decedent continued to slouch, but he lowered his legs and positioned them to his right on the backseat. (<u>See</u> <u>id.</u> at 18:00–:09) Eventually, both Officer Mann and Corporal Bratton discharged their tasers in stun mode—Officer Mann's first discharge and Corporal Bratton's twelfth. (<u>See</u> <u>id.</u> at 18:07–:18.) Decedent reacted by jumping away from

---

[12] During this time, neither Corporal Bratton nor her taser can be seen on screen; however, their shadows are visible against the car's rear right seat.

Officer Mann and, then, away from Corporal Bratton. (See id.) He lay across the backseat, his head at the rear left door and his legs toward the rear right door.

Officer Mann shut the door at which he was situated, and Corporal Bratton said to Decedent, "Get yo[ur] ass up, and act like you got sense." (Id. at 18:10–:14.) Officer Mann reopened his door and commanded Decedent to sit up. (Id. at 18:14–:24.) Decedent slouched against the seat and mumbled. (Id. at 18:13–:22) Eventually, Officer Mann warned, "Sit up, or I'm going to tase you again," and placed his taser against Decedent's shoulder. (Id. at 18:30–:32.) The warnings continued as Decedent sat slumped against the back seat. (Id. at 18:35–:41.) As the warnings continued, Officer Mann stunned (his second discharge) Decedent's shoulder. (Id. at 18:39–:43.) Decedent did not seem to react. (See id.) Corporal Bratton placed her taser against Decedent's leg; shortly thereafter, Officer Mann removed his taser from Decedent's shoulder. (Id. at 18:44–:46.) Corporal Bratton's commands to "[s]it up" continued, and she discharged her taser, in rapid succession, a thirteenth and fourteenth time. (Id. at 18:52–:55.) While pulling away from Decedent, she discharged her taser (her fifteenth discharge) in stun mode near or against Decedent's leg. (See id. at 19:00–19:06.[13]) Decedent reacted, rising up and to the right. (Id. at 19:06–:11.)

After letting Decedent sit for a little while, Officer Mann stepped into the car to lift Decedent's torso so that he would be sitting in an upright position; however, his torso somewhat slouched to the right. (Id. at 19:16–:30.) At the rear right door, Officer Clay and, to some extent, Corporal Bratton helped position Decedent. (Id. at 19:22–:33; see generally Hosp. Video at 20:35–21:15.) After Officer Mann (with the others' help) fastened Decedent in a seatbelt, Decedent leaned toward Officer Clay. (See Clay Rear View Dashboard Video at 19:54–20:00.)

---

[13] For part of this time, Officer Mann touched his taser to, and removed it from, Decedent's shoulder.

Officer Clay attempted a manual pain-compliance maneuver, and Decedent tried to bite him. (Clay Report at pg. 8; see Clay Rear View Dashboard Video at 20:00–:07.)

D. Transportation, Unresponsiveness, and Death

With Decedent seated and fastened in his seatbelt, the officers congregated briefly before Officer Mann took pictures of Decedent. (See generally Clay Rear View Dashboard Video at 21:25–22:10.) Decedent sat, leaning toward the broken-out window, blood on his lips and chin and a line of blood tracing down the left side of his neck to his collarbone area, some blood smeared at the front of his shirt collar and on the left shoulder. (See Decl. of Thomas N. Sweeney ex. N, Dec. 16, 2015 [ECF No. 127-15]; Defs.' Resp. to Pl.'s Mot. for Partial Summ. J. ex. A, at pgs. 35–37, 39 (hereinafter "Defs.' Resp. Br."), Dec. 30, 2015 [ECF No. 137-1].) Perceiving potential difficulty maintaining control over Decedent (see Defs.' Supp. Br. ex. 13, at pgs. 76:24–77:12 [ECF No. 125-14] (hereinafter "Bratton Dep.")), Corporal Bratton decided that the officers would take Decedent to jail[14] rather than to the emergency room (Mann Dep. at pgs. 99:20–100:07 [ECF No. 125-30]; Sweeney Decl. ex. EE, at pg. 26:13–:21 [ECF No. 138-24]). Officer Clay and Corporal Bratton returned to their respective cars and departed for the jail. (See generally Clay Rear View Dashboard Video at 22:15–23:00.) Officer Mann exclaimed that Decedent was "bloody as a hog"[15] and "fucked up." (Sweeney Decl. ex. P, at 1:58–2:00, 2:40–:44 [ECF No. 138-15] (hereinafter "Mann Video"); see also id. at 3:28–:30 (describing Decedent as "bleeding like a hog").) Speaking with a hospital security officer before entering the hospital

---

[14] The jail had a medical nurse on staff. (See generally Defs.' Resp. Br. ex. B, at pg. 191:01–:08 [ECF No. 137-4].)

[15] Plaintiff makes much of Officer Mann's preceding exclamation that Decedent was "bloody as a hog." However dramatic Plaintiff construes this simile (cf. Gilliam Dep. at pg. 95:03–:20), it does nothing to enlarge upon the plain photographic and video evidence, which reveal relatively minor bleeding (see Sweeney Decl. ex. N [ECF No. 127-15]; Defs.' Resp. Br. ex. A, at pgs. 35–37, 39).

(see Hosp. Video at 22:30–:40), he related that they were going to take Decedent to the hospital but now he was "going to jail" (Mann Video at 2:58–3:10).

The officers did not check Decedent's vital signs or ask him about his condition. (See generally Clay Dep. at pgs. 198:12–201:04 [ECF No. 125-23]; Mann Dep. at pgs. 78:16–79:03 [ECF No. 125-27]; Bratton Dep. at pg. 161:02–:14 [ECF No. 125-14].) He was, however, known to be breathing at least as long as the car remained on hospital premises. (See Clay Dep. at pg. 48:03–:07 [ECF No. 125-19]; see also id. at pgs. 200:24–201:04 [ECF No. 125-23]; cf. Bratton Dep. at pg. 170:01–:05, :18–:23 [ECF No. 125-14].)

In the car, Decedent sat with his head resting to the right. (See Clay Rear View Dashboard Video at 21:10–:50.) He remained in the same position for the trip's duration. (Id. at 21:10–27:40.) On the way to jail, Officer Clay noticed that Decedent was quiet but "took it as he was ready to deal with what he had done." (Clay Report at pg. 8.) Once during the car ride, Officer Clay looked back to check on Decedent and perceived that Decedent had "passed out from the cocaine" or alcohol, as a drunk person might fall asleep or pass out. (See Clay Dep. at pg. 243:04–:09, :11–:24 [ECF No. 125-23].)

Upon arrival but before parking in the jail's sally port, Officer Clay told Decedent, "Wake up." (Clay Rear View Dashboard Video at 27:36–:39.) He assumed Decedent was "passed out or asleep" (Clay Dep. at pg. 250:11–:12 [ECF No. 125-23]) and went outside to deposit his service weapon in his car's trunk (see Clay Report at pgs. 8–9). Around this time, Corporal Bratton and Officer Mann walked into the port and did the same. (See Sweeney Decl. ex. L, at pg. 3 [ECF No. 138-13] (hereinafter "Clay Interview"); Mann Report at pg. 5.) Officer Mann walked toward Decedent and noticed that he was not moving. (Mann Report at pg. 5.) The officers shone a flashlight to check Decedent's eyes, shouted his name, and felt his neck for a pulse. (Clay Rear View Dashboard Video at 28:35–:02.) They found none. (Clay Report at pg. 9;

- 13 -

Mann Report at pg. 5.) The officers called for a rescue vehicle (Clay Rear View Dashboard Video at 29:00–:32) and again felt for a pulse (id. at 29:37–:48). They unbuckled Decedent (id. at 29:49–:50), opened the door to exit the port (Clay Front View Dashboard Video at 29:59–30:15),[16] and drove out (Clay Rear View Dashboard Video at 30:15–:26). Outside, they checked Decedent's eyes, called his name, and checked his pulse. (Clay Rear View Dashboard Video at 31:28–:55.) They removed him from the car. (Id. at 31:55–32:26.)

The officers performed CPR and used an autopulse machine on Decedent until an emergency vehicle arrived. (See generally Clay Front View Dashboard Video at 32:56–44:50 (audio and, eventually, video of others coming to assist and of the emergency vehicle's arrival); Clay Interview at pg. 4; see also Sweeney Decl. ex. R, at pg. 2 [ECF No. 138-15] (hereinafter "Med. Records").) At 6:06 a.m., Decedent arrived at the hospital without a pulse. (Med. Records at pg. 4.) He was declared dead at 6:23 a.m. (Id. at pg. 5). An autopsy determined the manner of death to have been "accidental" and the cause of death to have been "excited delirium due to cocaine use with subsequent physical restraint including use of [tasers]." (Defs.' Repl. to Pl.'s Resp. to Defs.' Mot. for Summ. J. at pg. 3, Jan. 6, 2016 [ECF No. 142-1] (hereinafter "Report of Autopsy").)

E. Excited Delirium

Excited delirium is a "[s]tate of extreme mental and physiological excitement, characterized by behaviors and symptoms such as extreme agitation, elevated body temperature (hyperthermia), watering eyes (epiphoria), hostility, exceptional strength, and endurance without fatigue." (See Sweeney Decl. ex. CC, at pg. 42 [ECF No. 138-22].) "It may arise in those with psychiatric illness who are also abusing cocaine or it may occur in an immensely healthy person who is abusing cocaine, a condition termed cocaine psychosis. . . . Once in progress, [an]

---

[16] There was a (roughly) twenty-second delay as jailers opened the port door. (Clay Interview at pg. 3.)

agitated delirium event may not be reversible." (Defs.' Resp. Br. ex. A, at pgs. 214:13–215:01 [ECF No. 137-1].)

"There has been no formal recognition of the phenomenon by the medical community and it is not recognized in the Diagnostic and Statistical Manual of Mental Disorders." (Sweeney Decl. ex. BB, at ¶ 93 [ECF No. 138-21] (hereinafter "Tucker Aff."); see also Defs.' Supp. Br. ex. 14, at pg. 7 [ECF No. 125-17] (hereinafter "Peters Report") (same and adding that it cannot "be found in the International Classification of Diseases").) "[It] is a recognized post-mortem diagnosis made by Medical Examiners, and can be a pre-mortem delirium subset diagnosis made by medical doctors following a differential diagnosis." (Peters Report at pg. 7.) Although "not recognize[d] . . . as a medical or psychiatric condition, both the medical and law enforcement communities agree that excited delirium is a medical emergency no matter what the cause." (Tucker Aff. ¶ 94.)

In SBPD taser training, Corporal Bratton, Officer Clay, and Officer Mann had been taught very generally about excited delirium.[17] (See Defs.' Resp. Br. ex. C, at pg. 16:03–:05 [ECF No. 137-5] (hereinafter "Gilliam Dep.").) They received no instruction on "signs that an officer should be looking at to determine if an individual is suffering from excited delirium." (See id. at pg. 16:13–:16.) At the critical moments in question, the officers had either been unfamiliar with the term "excited delirium" or unknowledgeable of its meaning. (See generally

---

[17] Taser training "[r]ecommended all [taser] users [to] conduct their own research, analysis and evaluation" and advised that it was "[i]mportant to timely review all current product materials, updates, training bulletins, and warnings from TASER." (Sweeney Decl. ex. T, at pg. 42 [ECF No. 127-18].) The training cautioned officers that excited delirium (and other conditions) may account for a person's failure to obey verbal commands (id. at pg. 32) and suggested that officers redeploy and use other force options if multiple tasings "are not making progress toward the goals of capturing, controlling, or restraining the subject," "especially . . . when dealing with persons in a health crisis such as excited delirium" (id. at pg. 35). The training presentation did not specify excited delirium's consequences or how an officer could identify the condition. (Cf. id. at pgs. 42–49.) The officers' taser manuals warned that, among others, "people suffering from excited delirium" "may be particularly susceptible to the effects of [taser] use." (See Sweeney Decl. ex. Z, at pg. 2 [ECF No. 138-20].) The manuals nowhere stated how to identify the condition.

Bratton Dep. at pgs. 54:06–:15, 128:23–:25 [ECF No. 125-14]; Clay Dep. at pgs. 70:20–:23, 72:03–:09, 150:17–:22 [ECF No. 125-19]; id. at pg. 262:14–:22 [ECF No. 125-23]; Mann Dep. at pg. 41:05–:07 [ECF No. 125-27].) SBPD officers received no "training on medical assessment of a subject following use of force." (See Defs.' Resp. Br. ex. B, at pg. 85:15–:18 [ECF No. 137-3].)

## II.   STANDARD OF REVIEW

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "[w]here the record taken as a whole could . . . lead a rational trier of fact to find for the [opposing] party." See Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). On a motion for summary judgment, the facts, insofar as they are genuinely disputed, are taken in the light most favorable to the opposing party, Scott v. Harris, 550 U.S. 372, 380 (2007); however, "when a video 'quite clearly contradicts the version of the story told by [the opposing party] . . . so that no reasonable jury could believe it, a court should not adopt that version of the facts . . . ,'" Witt v. W. Va. State Police, Troop 2, 633 F.3d 272, 276 (4th Cir. 2011) (first omission in original) (quoting Scott, 550 U.S. at 378). A genuine dispute does not exist where there is only a scintilla of evidence favoring the motion's opponent; instead, a court must look to the quantum of proof applicable to the claim. Scott, 550 U.S. at 380; Anderson, 477 U.S. at 249−50, 254. A court's task, in short, is merely to determine whether a genuine dispute exists for trial. Anderson, 477 U.S. at 249. Thus, summary judgment is appropriate "[w]here the unresolved issues are primarily legal rather than factual." See Koehn v. Indian Hills Cmty. Coll., 371 F.3d 394, 396 (8th Cir. 2004).

- 16 -

## III.  **DISCUSSION**

> Section 1983 of Title 42 creates a cause of action against any person who, acting under color of state law, abridges a right arising under the Constitution or laws of the United States. Nevertheless, a government official sued under § 1983 is entitled to invoke qualified immunity, which is more than a mere defense to liability; it is immunity from suit itself.

Cooper v. Sheehan, 735 F.3d 153, 158 (4th Cir. 2013) (citing Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)). "The doctrine of qualified immunity 'balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" Smith v. Ray, 781 F.3d 95, 100 (4th Cir. 2015) (quoting Pearson v. Callahan, 555 U.S. 223, 231 (2009)).

The "qualified immunity analysis typically involves two inquiries: (1) whether the plaintiff has established the violation of a constitutional right, and (2) whether that right was clearly established at the time of the alleged violation." Raub v. Campbell, 785 F.3d 876, 881 (4th Cir.), cert. denied, 136 S. Ct. 503 (2015). A "court 'may address these two questions in the order . . . that will best facilitate the fair and efficient disposition of each case.'" Estate of Armstrong v. Vill. of Pinehurst, 810 F.3d 892, 898 (4th Cir. 2016) (omission in original) (quoting Raub, 785 F.3d at 881). A plaintiff's claim "survives summary judgment, however, only if [the court] answer[s] both questions in the affirmative." See id.[18]

The "difficulties with which policemen are faced are not abstract. They are real." Burley v. Rada, 456 F. Supp. 1095, 1096 (E.D. Va. 1978). "[P]olice officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." Ryburn v. Huff, 132 S. Ct. 987, 992 (2012) (per curiam) (quoting Graham v. Connor, 490 U.S.

---

[18] Defendants have not argued that any rights were unclear. There is no occasion to undertake that inquiry.

386, 396–397 (1989)). Acknowledging as much, the doctrine of qualified immunity "is to be applied with due respect for the perspective of police officers on the scene and not with the greater leisure and acquired wisdom of judicial hindsight." Smith v. Ray, 855 F. Supp. 2d 569, 579 (E.D. Va. 2012), aff'd, 781 F.3d 95.[19]

A.  The officers are entitled qualified immunity on Count VIII: False Arrest.

"The right of the people to be secure in their persons . . . against unreasonable . . . seizures, shall not be violated." U.S. Const. amend. IV. "'False arrest' is shorthand for an unreasonable seizure prohibited by the Fourth Amendment." Gonzalez v. Vill. of W. Milwaukee, 671 F.3d 649, 655 (7th Cir. 2012); see also Devenpeck v. Alford, 543 U.S. 146, 152 (2004). "In a long line of cases, [the Supreme Court] ha[s] said that when an officer has probable cause to believe a person committed even a minor crime in his presence, the balancing of private and public interests is not in doubt. The arrest is constitutionally reasonable." Virginia v. Moore, 553 U.S. 164, 171 (2008).

The officers lawfully arrested Decedent. Corporal Bratton, Officer Clay, and Officer Mann were present when Decedent kicked out the rear right-door window of Officer Clay's police car and when he damaged the hospital's entrance doors. Damaging property is a crime, Va. Code Ann. § 18.2-137(A), punishable as either a misdemeanor or a felony, depending on the dollar-measure of damage, id. § 18.2-137(B). Having observed the crimes committed in their presence, the officers' arrest of Decedent was constitutional. They are entitled qualified immunity from Count VIII.

---

[19] Indeed, "[a] creative judge engaged in *post hoc* evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished." Henry v. Purnell, 652 F.3d 524, 546 (4th Cir. 2011) (en banc) (Shedd, J., dissenting) (quoting United States v. Sharpe, 470 U.S. 675, 686–87 (1985)).

B. The officers are entitled to qualified immunity, in part, on Count IV: Excessive Force.

The analysis begins under the Fourth Amendment's standard and shifts, upon Decedent's arrest, to that under the Fourteenth Amendment's Due Process Clause. The Fourth Circuit's decisions in Meyers v. Baltimore County and Orem v. Rephann are illustrative.[20]

In Meyers v. Baltimore County, Ryan Meyers' mother had called police to report a fight between Ryan[21] and his brother at her residence. 713 F.3d 723, 727 (4th Cir. 2013). Police officers were dispatched in response. Id. In the front yard, Officer Romeo, the first to arrive, found Ryan's brother and father. Id. The father (whose nose was lacerated and swollen) informed Officer Romeo that Ryan was inside and that the mother had fled, not to return until Ryan was removed from the premises. Id. Officer Romeo could see Ryan carrying a baseball bat inside. Id. The brother informed Officer Romeo that he earlier heard his mother say, "Stop, Ryan. You are hurting me," that he punched Ryan in response, and that the fistfight and police call followed. Id. The brother also informed Officer Romeo of Ryan's bipolar disorder and mental-health problems. Id. Officer Romeo called for assistance, which included Officer Mee, "who was authorized by the [police] [d]epartment to use a taser," and Officer Gaedke, who "was familiar with Ryan's mental illness, having recently arrested him . . . ." Id.

Officers Romeo and Gaedke tried "to convince [Ryan] to surrender peacefully, but he rebuffed their efforts, stating, 'No, you're going to kill me.'" Id. Officer Mee's attempt was similarly unsuccessful. Id. at 728. Ryan's brother then helped officers enter the residence. Id.

---

[20] I do not overlook the Fourth Circuit's recent decision in Estate of Armstrong, 810 F.3d 892. There, the defendants enjoyed qualified immunity because the rights they violated were not clearly established, see id. at 909, an issue Defendants do not raise here. To be clear, Estate of Armstrong provides useful discussion of rights already clearly established, and other references herein concern only this aspect—not what the opinion newly clarified.

[21] Ryan "was about six feet in height and weighed about 260 pounds." Meyers, 713 F.3d at 727. He had long struggled with mental illness and bipolar disorder. Id. Five times, his family had resorted to law enforcement to forcibly detain and transport him to a mental-health facility. Id.

Ryan was holding a baseball bat, which Officer Mee ordered him to drop. Id. When Ryan refused, Officer Mee discharged his taser in probe mode. Id.[22] The first probe discharge struck Ryan's upper body, but he neither dropped the bat nor fell. Id. He "took two more steps toward the officers." Id. On the second discharge, Ryan dropped the bat, remained standing, and advanced toward the officers. Id. The third discharge felled Ryan. Id. After Ryan fell, three officers sat on his back, while Officer Mee tased him a fourth time. Id. He switched to stun mode and stunned Ryan six times "during a period slightly exceeding one minute." Id. In the plaintiffs' best light, Ryan, while on the ground, "said nothing and was '[s]tiffening up and keeping his body rigid and keeping his hands underneath of his body'" or was "merely tr[ying] to move his legs while the officers sat on his back." See id. at 729, 733 (first alteration in original). After the tenth tasing, "the officers observed that Ryan appeared to be unconscious." Id. at 728. Responding paramedics failed to revive Ryan from his state of cardiac arrest. Id. at 729.

Considering Officer Mee's qualified immunity from the excessive-force claim, the Court addressed the first three tasings together and found them to be reasonable. See id. at 732–33. The Court observed that, during this time, "Ryan was acting erratically, was holding a baseball bat that he did not relinquish until after he received the second shock, and was advancing toward the officers until the third shock caused him to fall to the ground." Id. at 733. "Ryan posed an immediate threat to the officers' safety, and was actively resisting arrest." Id. Officer Mee was entitled qualified immunity as to these three tasings.

Next, the Court addressed Officer Mee's seven additional tasings. The justification for the first three tasings "had been eliminated after Ryan relinquished the baseball bat and fell to the

---

[22] "Ryan may have taken a step toward the officers immediately before the probe made contact with his body." Meyers, 713 F.3d at 728.

floor." Id.[23] In the plaintiffs' best light, the evidence showed that, "after Ryan fell to the floor, he no longer was actively resisting arrest, and did not pose a continuing threat to the officers' safety;" yet, Officer Mee tased Ryan until he was unconscious. Id. This sufficed to show a constitutional violation, which—as a use of "unnecessary, gratuitous, and disproportionate force to seize a secured, unarmed citizen"—was clearly established. Id. (quoting Bailey v. Kennedy, 349 F.3d 731, 744–45 (4th Cir. 2003)).[24] Officer Mee enjoyed no qualified immunity from the action on these seven tasings. Id. at 735.

In Orem v. Rephann, Sonja Orem had earlier "ransacked her husband's offices. She destroyed phones, a computer keyboard and kicked a hole in the wall. She also had assaulted her husband and thrown his clothing and belongings into their front yard." 523 F.3d 442, 444 (4th Cir. 2008) (footnote omitted), abrogated in part by Wilkins v. Gaddy, 559 U.S. 34, 37 (2010) (per curiam). After receiving a family protective order, she left the residence. Id. "Under the influence of prescription drugs, marijuana, and alcohol, Orem quickly became enraged and . . . started 'flipping out' when she discovered that she would not be allowed to see her son for six months." Id. Speeding back to the residence, she "skidded into a ditch, left her car and charged at a police officer. Three officers restrained Orem, placed her in handcuffs, a foot restraint device . . . , and put her in a police car." Id. En route to the jail in Deputy Boyles' car, "Orem yelled, cursed and banged her head against the police car window three or four times." Id. These actions were "so intense" that they caused the vehicle to rock and loosened the foot-restraint device. Id. This prompted Deputy Boyles to pull the car over. Id. Deputy Rephann and another deputy had

_____

[23] "[F]orce justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated." Meyers, 713 F.3d at 733 (quoting Waterman v. Batton, 393 F.3d 471, 481 (4th Cir. 2005)).

[24] On the question whether the violation was of clearly established law, "[t]he fact that the force . . . emanated from a taser, rather than from a more traditional device, [was] not dispositive." Meyers, 713 F.3d at 734–35.

been following, voluntarily and without Deputy Boyles' request. Id. They pulled in behind Deputy Boyles. Id.

Deputy Boyles began attempting to tighten the foot-restraint device. Id. Meanwhile, Deputy Rephann approached the car with a taser drawn. Id. Deputy Rephann spoke with Orem, who swore at him several times. Id. at 444–45. During the exchange, Deputy Rephann warned Orem to "stop it," to "[c]alm down," and to "respect" the officers, and he tased her twice in stun mode. Id. at 445.[25] He stunned her "underneath her left breast and on her left inner thigh," and "a permanent sunburn-like scar was left where the taser had been applied to her thigh." Id.

In Orem's best light, the Court found a constitutional violation. Id. at 446. Deputy Boyles was already retightening the foot-restraint device so as to calm Orem and ensure safe transport. Id. Deputy Rephann tased Orem merely because she swore at him and he wanted to command respect. Id. at 447. Noting the sensitive areas where Deputy Rephann tased her, the Court inferred that Deputy Rephann had applied the force "for the very purpose of harming and embarrassing Orem." Id. Additionally, Deputy Rephann's conduct contrasted with that of the two other deputies, neither of whom engaged Orem with a taser. See id. at 448–49. Together,[26] the facts showed, in the light most favorable to Orem, "that Deputy Rephann's use of the taser gun was wanton, sadistic, and not a good faith effort to restore discipline." Id. at 447.[27] Deputy

---

[25] "At the time of this incident, Orem was 27 years old and weighed 100 pounds. Deputy Rephann, on the other hand, weighed 280 pounds." Orem, 523 F.3d at 445.

[26] The Court also observed that, by forgoing prerequisite "open hand measures," Deputy Rephann had disobeyed his department's taser policy, Orem, 523 F.3d at 447, but it is unclear how, if at all, this observation figured into the decision, cf. infra note 28.

[27] The Court went on to address Deputy Rephann's argument that the plaintiff "only suffered de minimus injury." See Orem, 523 F.3d at 447–48. The Supreme Court has since specified to the Fourth Circuit that "[t]he 'core judicial inquiry' . . . [is] not whether a certain quantum of injury was sustained, but rather 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" See Wilkins, 559 U.S. at 37 (quoting Hudson v. McMillian, 503 U.S. 1, 7 (1992)).

Rephann's earlier "verbal attempts to secure order . . . d[id] not lessen the unreasonableness of" the tasings. Id. "[I]t was clearly established that an arrestee or pretrial detainee is protected from the use of excessive force," and Deputy Rephann enjoyed no qualified immunity. Id. at 448.

Meyers and Orem do much to frame the analysis at hand. "Of course, each case turns on its own facts and circumstances," Thomas v. Durastanti, 607 F.3d 655, 671 (10th Cir. 2010), and a court's "rather abstract pronouncements in one case may be of little assistance with the realities and particulars of another," Estate of Armstrong, 810 F.3d at 911 (Wilkinson, J., concurring in part).

1. Excessive Force Under the Fourth Amendment

"A 'claim that law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other "seizure" of [a] person' is 'properly analyzed under the Fourth Amendment's "objective reasonableness" standard.'" Estate of Armstrong, 810 F.3d at 899 (majority opinion) (alteration in original) (quoting Graham v. Connor, 490 U.S. 386, 388 (1989)). "As in other Fourth Amendment contexts . . . the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officer['s] actions are 'objectively reasonable' in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation." Turmon v. Jordan, 405 F.3d 202, 207 (4th Cir. 2005) (alterations in original) (quoting Graham, 490 U.S. at 397).[28]

---

[28] "It is . . . settled law that a violation of departmental policy does not equate with constitutional unreasonableness." Abney v. Coe, 493 F.3d 412, 419 (4th Cir. 2007); Sammons v. Barker, No. CIV.A. 2:07-0132, 2008 WL 1968843, at *13 (S.D.W. Va. May 2, 2008) (same); see also Lucas v. Shively, 31 F. Supp. 3d 800, 814 (W.D. Va. 2014), aff'd mem., 596 F. App'x 236 (4th Cir. 2015) (per curiam); Guerrero v. Deane, No. 1:09CV1313 JCC/TCB, 2012 WL 3834907, at *11 (E.D. Va. Sept. 4, 2012) ("[T]he violation of police regulations or even a state law is completely immaterial as to the question of whether a violation of the federal constitution has been established." (quoting Bruce v. City of Chicago, Case No. 09-C-4837, 2011 WL 3471074, at *1 (N.D. Ill. 2011))); cf. Moore, 553 U.S. at 172 ("We thought it obvious that the Fourth Amendment's meaning did not change with local law enforcement practices— even practices set by rule."). Constitutional reasonableness, after all, is a matter of the Constitution.

"[T]he test 'requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" Estate of Armstrong, 810 F.3d at 899 (quoting Smith, 781 F.3d at 101). There are three guiding factors:

> First, [a court] look[s] to "the severity of the crime at issue"; second, [a court] examine[s] the extent to which "the suspect poses an immediate threat to the safety of the officers or others"; and third, [a court] consider[s] "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." "To properly consider the reasonableness of the force employed [a court] must view it in full context, with an eye toward the proportionality of the force in light of all the circumstances."

Id. (penultimate alteration in original) (quoting Smith, 781 F.3d at 101). A panel majority recently observed that the Fourth Circuit's "precedent . . . makes clear that tasers are proportional force *only* when deployed in response to a situation in which a reasonable officer would perceive some immediate danger that could be mitigated by using the taser." Id. at 903.

i.  <u>Summary judgment on qualified immunity is appropriate for Corporal Bratton's first five taser discharges and for Officer Clay's first.</u>

Corporal Bratton's first taser discharge was in stun mode as she and her fellow officers pursued Decedent, who was fleeing toward the hospital shortly after damaging SBPD property—a crime—in the officers' presence. Her taser missed Decedent, and this absence of force was neither excessive nor unreasonable.[29] Corporal Bratton is entitled qualified immunity as to her failed stun attempt.

---

[29] Even if she had stunned Decedent, the use of force would have been a reasonable attempt to stop a fleeing and unpredictable person who had just committed a destructive crime in the officers' presence.

Corporal Bratton's second taser discharge[30]—this time in probe mode—was simultaneous with Officer Clay's first. They had come upon a fleeing Decedent, who had just run into (but been deterred by) the hospital doors and turned around. Although the grade of Decedent's most salient offense was not very serious, its circumstances were—handcuffed and in the presence of officers who were helping him, Decedent kicked out a police car's window. The officers could reasonably have understood him to be a threat to their safety or property and to the hospital, its personnel, or its patients and visitors. In light of their earlier observation of Decedent's mental state, his trashed motel room, and his bleeding hand, the officers could also reasonably believe that Decedent was a threat to himself. Decedent's behavior was unpredictable and reasonably suggested a continuing threat to the officers, to the public, and to Decedent. Corporal Bratton and Officer Clay acted reasonably in discharging their tasers so as to halt Decedent.[31] They enjoy qualified immunity as to these discharges.

Corporal Bratton's third, fourth, and fifth taser discharges came in rapid succession and followed Decedent's sudden attempt (a short time after his initial tasing and fall) to rise in front of and facing Corporal Bratton. Although Decedent remained handcuffed and surrounded, the situation had not settled entirely, and a reasonable officer could have interpreted Decedent's sudden attempt to rise as an attempt at flight, which, to be successful, would have likely required some physical confrontation with the officers near and surrounding him. Corporal Bratton was not required to wait and see what Decedent would do upon rising. The responsive series of

---

[30] Questions persist over the circuits' completeness at several periods. Video evidence, however, shows Plaintiff screaming and stiffening at the approximate times of Corporal Bratton's second, third-through-fifth, and sixth taser discharges. In Plaintiff's best light, each of these tasings accomplished a temporary NMI or partial effect.

[31] The simultaneity of Corporal Bratton's and of Officer Clay's discharges is of no matter here. In the split second, no reasonable officer could be expected to anticipate the other's discharge.

tasings returned Decedent to the ground and quashed any threat. This use of force was reasonable, and Corporal Bratton is entitled qualified immunity as to it.

ii.    <u>Summary judgment on qualified immunity is inappropriate as to Corporal Bratton's sixth-through-eleventh taser discharges and Officer Clay's second and third.</u>

At this time, Decedent was (somewhat) rocking back and forth on the ground and had come to lie face up; however, he did not attempt to rise again. Officers had been commanding him to stay down. During this time, Decedent remained on the ground and presented no immediate threat of violence or risk of flight. An officer ordered Decedent to roll back over; almost immediately after, Corporal Bratton discharged her taser a sixth time, again in probe mode accomplishing NMI. These relatively settled circumstances, as construed in Plaintiff's best light, did not warrant this unreasonable degree of force.

In Plaintiff's best light, Decedent started genuinely attempting to heed the officers' commands to roll over.[32] Even accepting the suggestion that neither Corporal Bratton's seventh discharge nor Officer Clay's second coincided with a completed circuit,[33] these discharges, in Plaintiff's best light, had a "partial effect"[34] (<u>see</u> Gilliam Dep. at pg. 20:02–:08) and, again, accomplished force exceeding the amount justified under the circumstances.

For Corporal Bratton's eighth and ninth taser discharges and for Officer Clay's third, they tased Decedent in stun mode.[35] By this time, the officers had narrowed Decedent's already-

---

[32] Decedent told the officers that he was attempting to comply, and his movements consisted with his expressed difficulties rolling over. At this stage, his various no-sirs and no-ma'ams must be considered as pleas that the officers not hurt him.

[33] Sparking appeared on the ground, and arcing could be heard. Decedent showed no signs of NMI and did not seem to react to any pain.

[34] A triable question of fact exists as to how much, if any, force either officer accomplished. For purposes of deciding Defendants' motion, however, the facts must be construed in Plaintiff's favor.

[35] A factual question persists, but in Plaintiff's best light, each of these stun-mode discharges accomplished force against Decedent.

limited space while Decedent continued (in Plaintiff's best light) his genuine but futile attempts to heed the officers' commands to roll over. Under the circumstances in Plaintiff's most favorable light, the force was excessive because Decedent's compromised situation posed little, if any, threat of violence or risk of flight. The force was disproportionate to the objective of moving or securing Decedent, who simply could not heed the officers' commands on his own.

Corporal Bratton's tenth and eleventh taser discharges, in stun mode, came in close succession when the officers were holding, pinning down, and moving Decedent so as to shackle his legs. She tased[36] Decedent when he rolled nearly over—seemingly on his own but with Officer Clay and Officer Mann still holding him to the ground. For that brief time, Decedent was barely capable of rolling, and he remained secured to the ground. There was no immediate threat of violence or risk of flight, and the rolling over did not warrant the force used. In Plaintiff's best light, these tasings were excessive.

2. Excessive Force Under the Fourteenth Amendment[37]

"No State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. As relevant here, "the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment." Kingsley v. Hendrickson, 135 S. Ct. 2466, 2473 (2015) (quoting Graham, 490 U.S. at 395 n.10).

"[T]o succeed on a claim of excessive force under the Due Process Clause of the Fourteenth Amendment, [a plaintiff] must show that [a] Defendant [ ] 'inflicted unnecessary and

---

[36] In Plaintiff's best light, each of these stun-mode discharges connected with Decedent.

[37] Plaintiff argues that Defendants waived qualified immunity as to the post-arrest conduct because their opening brief addressed it under the Fourth (not the Fourteenth) Amendment. Defendants' argument sufficed to raise the issue's substance, and I find no waiver. Cf. e.g., Orem, 523 F.3d at 445–46 & n.4 (treating an excessive-force claim under the Fourteenth Amendment, even though the district court addressed it under the Fourth Amendment and the litigants argued it, to both courts, under the Fourth Amendment); id. at 449 (Shedd, J., concurring) (same).

wanton pain and suffering.'" Young v. Prince George's Cnty., 355 F.3d 751, 758 (4th Cir. 2004)

(second and third alterations in original) (quoting Whitley v. Albers, 475 U.S. 312, 320 (1986)).

"In other words, [the plaintiff] must show that 'the [defendants'] actions amounted to

punishment and were not merely an incident of some other legitimate governmental purpose.'"

Wernert v. Green, 419 F. App'x 337, 340 (4th Cir. 2011) (O'Connor, J.) (quoting Robles v.

Prince George's Cnty., 302 F.3d 262, 269 (2002)).

> "In determining whether [this] constitutional line has been crossed, a court must look to such factors as the need for the application of force, the relationship between the need and the amount of force used, the extent of the injury inflicted, and whether the force was applied in a good faith effort to maintain and restore discipline or maliciously and sadistically for the very purpose of causing harm."

Orem, 523 F.3d at 446 (alteration in original) (quoting Johnson v. Glick, 481 F.2d 1028, 1033

(2d Cir. 1973)).

When the officers realized that Decedent was banging his head inside of the car and

raising his legs, they were justified in taking some action to ensure that Decedent would not

damage the car any further and that he would not injure himself. After repeated verbal

commands that he do so, Decedent (who was handcuffed and shackled) ceased raising his legs

and swinging his head. He slouched in his seat. Discipline had largely been restored, and the

threat of damage or injury had dissipated; however, Corporal Bratton and Officer Mann tased

him under these relatively settled circumstances.[38] In Plaintiff's best light, the scant justification

for force suggested malice and intent to harm or punish—not good-faith intent to restore

discipline. Neither Corporal Bratton nor Officer Mann enjoys qualified immunity as to these

tasings.

---

[38] In Plaintiff's best light, each of these stun-mode discharges connected with Decedent.

C. The officers are entitled qualified immunity on Count VII: Deprivation of Medical Care.

"[T]he Due Process Clause of the Fourteenth Amendment . . . 'mandates the provision of medical care to *detainees* who require it,'" Brown v. Harris, 240 F.3d 383, 388 (4th Cir. 2001) (quoting Hill v. Nicodemus, 979 F.2d 987, 991 (4th Cir. 1992)); however, inadequate medical treatment will not always violate the Clause, Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1307 (11th Cir. 2009). "As a general matter, '[o]nly governmental conduct that "shocks the conscience" is actionable as a violation of the Fourteenth Amendment.'" Parrish ex rel. Lee v. Cleveland, 372 F.3d 294, 302 (4th Cir. 2004) (opinion of Williams, J.) (alteration in original) (quoting Young v. City of Mount Ranier, 238 F.3d 567, 574 (4th Cir. 2001)). "In cases where the government is accused of failing to attend to a detainee's serious medical needs,[39] . . . 'conduct that amounts to "deliberate indifference" . . . is viewed as sufficiently shocking to the conscience that it can support a Fourteenth Amendment claim.'" Id. (quoting Young, 238 F.3d at 575).

"Deliberate indifference is a *very high* standard—a showing of mere negligence will not meet it." Id. at 302 (emphasis added) (quoting Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999)). Nor will the standard be met by a mere showing "that an officer's response to a perceived substantial risk was unreasonable under the circumstances." Id. at 307.

> Indeed, the Fourth Circuit has "made clear" that "the question in deliberate indifference cases is not whether the officials could have taken additional precautions—almost invariably, with the benefit of 20/20 hindsight, there are additional precautions that could have

---

[39] "[A] 'serious . . . medical need' is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008) (omission in original) (quoting Henderson v. Sheahan, 196 F.3d 839, 846 (7th Cir. 1999)). "In the alternative, a serious medical need is determined by whether a delay in treating the need worsens the condition." Mann, 588 F.3d at 1307; cf. Sharpe v. S.C. Dep't of Corr., 621 F. App'x 732, 734 (4th Cir. 2015). The common thread is "substantial risk of serious harm" if the need is "left unattended." Mann, 588 F.3d at 1307 (quoting Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003)).

Case 4:15-cv-00017-JLK-RSB   Document 171   Filed 04/01/16   Page 29 of 34   Pageid#: 3579

been taken—but whether they *disregarded* an excessive risk to . . .
[a detainee's] health or safety."

Estate of Harvey v. Roanoke City Sheriff's Office, 585 F. Supp. 2d 844, 858 (W.D. Va. 2008) (omission and alteration in original) (quoting Parrish ex rel. Lee, 372 F.3d at 309). "[O]fficials can be liable under the deliberate indifference standard only to the extent that they *actually appreciate* the risk factors in a given case, and only to the extent they *make the causal inference* that the circumstances as they perceived them created a substantial risk of serious harm." Parrish ex rel. Lee, 372 F.3d at 304 (emphases added).

Decedent's excited delirium presented "a serious medical need." See, e.g., Mann, 588 F.3d at 1307.[40] On the question whether the officers were deliberately indifferent to that need, I find good instruction from Mann v. Taser International, Inc. As relevant here, the plaintiffs in that case "assert[ed] that [sheriff's] deputies were on notice of [Melinda Fairbanks'] 'excited delirium' and [that] their failure to take her for immediate medical treatment constitute[d] deliberate indifference." See id. at 1307.

In Mann, Melinda smoked methamphetamine, became agitated and delusional, and damaged a house (mistakenly believing it to be hers) while claiming that the residents were trespassers and thieves. Id. at 1299. The sheriff's deputies responded to a call for assistance. Id. When they arrived, Melinda was wandering around and yelling "that someone had stolen her things," "[s]pecifically, . . . the demons and devils . . . had stolen her treasure." Id. She initially cooperated but became combative upon her arrest. Id. Screaming, kicking, headbutting,

---

[40] It is difficult to detect how Plaintiff marshals the facts to the elements of a claim for deprivation of medical care (cf. Second Am. Compl. ¶¶ 153–61, Nov. 18, 2015 [ECF No. 103]), but she seems to suggest serious medical needs manifested by Decedent's psychological state (i.e., excited delirium) and by his cuts and bleeding (see Pl.'s Mem. of Law in Opp'n to Defs.' Mot. for Summ. J. on the Issue of Qualified Immunity at pgs. 48, 50, Dec. 30, 2015 [ECF No. 138]). Clearly, Decedent's cuts (and consequent bleeding) did not present such a serious medical need as to support a claim for deprivation of medical care. See supra notes 11 & 15. (See also Report of Autopsy at pg. 1; cf. Bratton Dep. at pg. 158:06–:10 [ECF No. 125-14]; Clay Dep. at pgs. 67:04–:06, 122:14–123:12 [ECF No. 125-19]; Mann Dep. at pg. 75:03–:07 [ECF No. 125-27].)

handcuffing, and resisting ensued. Id. One deputy knew that Melinda was a methamphetamine user, and during the fracas, the plaintiffs told another deputy that Melinda was off her medications and needed help from a hospital rather than a trip to jail. Id. The deputies placed Melinda in a police car, where she began to reach into her pockets. Id. at 1299–1300. "This movement prompted the deputies to remove her from the patrol car in order to search for weapons or contraband." Id. at 1300. Outside of the car, Melinda accused the deputies of attempting to plant evidence on her, resisted them, and "began slamming her head against the trunk of the car and flailing her body in an attempt to hit, kick, head butt and spit on the deputies." Id. She refused to be put back into the police car, "kick[ed] uncontrollably" when inside, and "propelled herself out of the open door . . . , landing on her head and neck." Id. As a precaution, a deputy contacted emergency medical services, "stating that Melinda was acting 'crazy,' and requesting a medical consult." Id.

"Melinda continued to kick and fight with the deputies, such that they could only pin her down and wait for backup to arrive." Id. Although the deputies eventually shackled Melinda's legs and placed her back in the car, she "continued to kick uncontrollably" and kicked out one of the car's windows and bent the door's frame. Id. Ignoring the officers' instructions, she continued kicking and slamming her head. Id. After warnings went unheeded, a deputy tased Melinda three times. Id. Although the first tasing "momentarily curbed Melinda's behavior," she "continued her aggressive resistance" undeterred by the other two. Id.

When emergency personnel arrived, Melinda was too combative for them to examine her. Id. Given that "she was talking, breathing and responding," they determined that the she "was not in any immediate medical distress." Id. The deputies took Melinda, who was still combative, to jail. See id. at 1300–01. "[A]pproximately thirty seconds prior to their arrival at jail, she stopped kicking and screaming." Id. at 1301. Upon arrival and unloading, Melinda "was

- 31 -

unresponsive with labored breathing." Id. The jailers attempted to alleviate "possible heat stroke" and contacted emergency medical services. Id. They took her to an emergency room, where she suffered cardiac arrest and died. Id.

The court concluded that "the deputies were not deliberately indifferent to Melinda's serious medical condition when they opted to take her to jail instead of to the hospital." Id. at 1308. Of the officers who "had knowledge of Melinda's disconnect from reality," none "kn[ew] of the medical condition called 'excited delirium' or its accompanying risk of death." Id. at 1307. Melinda's "physical resistance and verbal communication suggested to the deputies that although agitated, [she] was not in immediate medical danger."[41] Id. at 1308. "There [was] no evidence that indicate[d] Melinda's behavior evidenced a serious disease rather than a temporary reaction to the known use of methamphetamine. Most importantly, nothing in the record suggest[ed] that the deputies were aware Melinda's condition could lead to death if not promptly treated." Id. Further, the deputies' "precautionary measure of calling [emergency medical services[42]] after Melinda had fallen out of the patrol car" revealed a state of mind "[f]ar from" deliberate indifference. See id. Whatever "error in judgment" the deputies might have made, "mere negligence or a mistake in judgment does not rise to the level of deliberate indifference." Id.

Even in Plaintiff's best light, the Record does not reveal the officers' causal inference that Decedent's circumstances substantially risked excited delirium or consequent sudden death. In training, the officers heard some passing mention of excited delirium, but whatever vague

---

[41] "The Constitution does not require an arresting police officer . . . to seek medical attention for every arrestee or inmate who appears to be affected by drugs or alcohol." Mann, 588 F.3d at 1308 (quoting Burnette v. Taylor, 533 F.3d 1325, 1331 (11th Cir. 2009)); accord Woodward v. City of Gallatin, No. 3:10-1060, 2013 WL 6092224, at *8 (M.D. Tenn. Nov. 19, 2013); Bradway v. Town of Southampton, 826 F. Supp. 2d 458, 471 (E.D.N.Y. 2011); Estate of Crouch v. Madison Cnty., 682 F. Supp. 2d 862, 872 (S.D. Ind. 2010); Estate of Lawson ex rel. Fink v. City of Hamilton, No. C-1-07-927, 2009 WL 1444556, at *16 (S.D. Ohio May 21, 2009).

[42] The court repeated that emergency personnel concluded that "Melinda did not appear in any immediate medical distress because she was verbally responsive and breathing normally." Mann, 588 F.3d at 1308.

remembrance they had, it did not form an appreciation of the risk of sudden death or of the telltales that differentiate a person suffering (or on the verge of) excited delirium from an intoxicated or psychotic person not so affected. Because the officers lacked both the abstract and the concrete knowledge of Decedent's condition, they cannot be found to have been deliberately indifferent.[43] The officers are entitled to qualified immunity on this claim.

## IV. CONCLUSION

Defendants' motion succeeds against Count VII: Deprivation of Medical Care and Count VIII: False Arrest.[44] Given these dispositions, the officers are also entitled to summary judgment against Plaintiff's state-law claims to the extent that they are premised on the officers' reasonable conduct, as found herein. See, e.g., Waller v. City of Danville, 212 F. App'x 162, 174 (4th Cir. 2006). Defendants' motion fails on the remaining claims, most notably, Count IV: Excessive Force.[45] These rulings either confirm or (effectively) deny qualified immunity and, in turn, defeat or obviate the respective bases for Plaintiff's motion, which will be denied.

The remaining claims are set for trial.

---

[43] It is no crucial distinction that the deputies in Mann contacted emergency medical services as a precaution. Their doing so evinced no greater perception of a substantial risk of serious harm. Nor does the outcome here change in consideration of Officer Mann's laughter while relating that his fellow officers were taking Decedent to jail instead of the hospital; even taken in Plaintiff's best light, his chuckling does not prove the officers' awareness of substantial medical risks to Decedent. Nor do Decedent's eventual calm in the police car's backseat or his quiet during the drive to the jail go so far as to evince a subjective appreciation of serious medical risk or danger.

[44] To be sure, these rulings do not occasion summary judgment on Count VI: Unconstitutional/Inadequate Policies, Training, and Procedures or on other Defendants' vicarious liability for other remaining claims.

[45] Not to be overlooked, Defendants' overarching cause-of-death argument fails. The cause-of-death question is of central relevance to the wrongful-death count and is not ripe for decision. (See Order pg. 3, Aug. 6, 2015 [ECF No. 42] (staying discovery "relating to the claims against the Town of South Boston and the claims against the chief and deputy chief of police, as well as the state law claims against all defendants").) Insofar as Defendants' argument relates to the federal claims considered herein, Plaintiff's ultimate success requires no specific cause of death and, more fundamentally, no death at all.

The clerk is directed to forward a copy of this Memorandum Opinion to all counsel of record.

Entered this 1st day of April, 2016.

s/Jackson L. Kiser
SENIOR UNITED STATES DISTRICT JUDGE